**IN THE UNITED STATES COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| **JESSICA FULLER, individually and on behalf of all similarly situated persons,** | Civil Action No.: |
| Plaintiffs, | |
| vs. | |
| **HYDE SCHOOL; LAURA GAULD; MALCOLM GAULD; GEORGIA GAULD MACMILLAN; MALCOLM MACMILLAN; LAURIE GAULD HURD** | **CLASS ACTION COMPLAINT** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff Jessica Fuller, individually and on behalf of all others similarly situated, by and through her attorneys, Island Justice Law and Justice Law Collaborative, LLC and hereby file this Individual and Class action complaint against Defendants Hyde School ("Hyde"); Laura Gauld; Malcolm Gauld; Georgia Gauld MacMillan; Malcolm MacMillan; and Laurie Gauld Hurd (hereinafter collectively "Defendants"; individually named defendants, collectively "Gauld Defendants"). Plaintiff alleges as follows:

## I.    <u>INTRODUCTION</u>

This action exposes a systematic child exploitation scheme operating under the guise of "character development" for troubled teenagers. For nearly sixty years, the Gauld family has operated Hyde School in Bath, Maine as a profitable family enterprise designed to extract maximum tuition revenue from vulnerable teenagers while subjecting them to forced labor, abuse, and exploitation.

1

The defendants in this action are all participants in what has been collectively termed the Troubled Teen Industry ("TTI"), a multi-billion-dollar network of for-profit residential facilities that prey on parents' desperation to help their struggling children. Hyde marketed itself as providing a unique and innovative character-building education while systematically concealing and manipulating the abuse and forced labor that all students were required to endure.

The Gauld family founded, owned, and has operated Hyde School for over five decades. Multiple family members have held key executive positions at the facility. Joseph Gauld is the patron saint of Hyde serving as founder and inspirational leader until he was forced to resign after making shameful and misogynistic comments about a 13-year-old student's sexual abuse. Malcolm Gauld currently serves as Executive Director, while his wife Laura Gauld serves as President and Head of School. Other family members have served in various leadership roles throughout Hyde's operation.

For decades, defendants marketed Hyde as a safe, cutting-edge educational facility with "expert staff" promising to foster student self-confidence. Hyde's founding principle is that every student has a unique potential that defines their destiny.  They promised families that their children would receive  a life-changing education, unconditional acceptance of meeting students where they were, and all in a safe environment focused on building character rather than breaking students down.

None of this was true. Hyde operated as an authoritarian system subjecting every student to identical abuse, forced labor, and exploitation. There was no individualized education or character development. There was only systematic manipulation and coercion designed to extract free labor while maximizing family tuition payments.

Defendants maintained complete control over residents through a punitive disciplinary system called "Brother's Keeper" that required students to surveil and report on each other. Violations—real or given up in response to abusive interrogation—resulted in placement on "2-4," Hyde's forced labor punishment system where students were isolated from classes, on food restriction (referred to as "lost food privileges"), and compelled to perform manual labor in Maine's winter conditions for weeks at a time.

Students were forced to work without pay. They landscaped the campus in extreme weather without protective gear, cleaned the entire facility including staff bathrooms, built structures and walls, and even performed landscaping at staff members' personal homes. They were told this forced labor was "therapeutic" and required for them to develop character and advance at Hyde.

The abuse was systematic and severe. Staff routinely called students derogatory names, blamed them for past trauma including sexual abuse, and used physical restraints that left students injured. Students were denied basic necessities, forced to wear soiled clothing, and punished for requesting medical care or clean clothes. Education was minimal and led by unqualified staff with little to no tenure, with some students spending more time in forced labor than in classrooms.

This lawsuit seeks justice for the hundreds of students who were trafficked, abused, and exploited by the Gauld family's systematic child labor scheme operating under the false promise of character development and innovative education.

## II.    PARTIES

1.    Defendant Hyde School is a 501(c)(3) organization that was chartered in the State of Maine in 1966. Hyde's principal address is 616 High Street, Bath, ME 04530. Defendant Laura Gauld is the President and Principal Officer of Hyde.

2.      Defendant Laura Gauld is the President, Head of School, and Principal Officer of Hyde. Laura Gauld is a resident of Sagadahoc County in the State of Maine. Laura Gauld is married to Defendant Malcolm Gauld.

3.      Defendant Malcolm Gauld is the son of the late Joseph Gauld, the founder of Hyde. Malcolm Gauld was the President of Hyde from 1998 to 2018. He was the headmaster of Hyde from 1987-1998. He is the current Executive Director of Hyde. Malcolm Gauld is a resident of Sagadahoc County in the State of Maine.

4.      Defendant Georgia "Gigi" Gauld MacMillan is a daughter of Hyde founder Joseph Gauld. Georgia Macmillan was the prior head of campus for Hyde's locations in both Maine and Connecticut. Gigi MacMillan was and/or is still the Executive Director of Family Education at Hyde. Georgia Macmillan is a resident of Sagadahoc County in the State of Maine. Georgia MacMillan is married to Defendant Donald MacMillan.

5.      Defendant Malcolm MacMillan is married to Defendant Georgia "Gigi" Gauld MacMillan. Malcolm MacMillan is the former Head of School at Hyde and is a current staff teacher at Hyde. Malcolm MacMillan is a resident of Sagadahoc County in the State of Maine.

6.      Defendant Laurie Gauld Hurd is a daughter of Hyde founder Joseph Gauld. Laurie Hurd is the current Director of Community Engagement at Hyde. Laurie Hurd is a resident of Sagadahoc County in the State of Maine.

7.      Plaintiff Jessica Fuller is an individual residing in Palm Beach County, Florida.

### III.      <u>JURISDICTION AND VENUE</u>

8.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because claims asserted in the Complaint arise under the Trafficking and Victims Protection Reauthorization Act (18 U.S.C. §§ 1589 *et seq*).

9.     This Court has original subject matter jurisdiction over this Class Action pursuant to 28 U.S.C. § 1332(d) because of the following:

    a.   The named Plaintiff and Defendants are citizens of different states pursuant to 28 U.S.C. § 1332(d)(2)(A).

    b.   Pursuant to 28 U.S.C. § 1332(d)(2), the aggregate amount of the Class Members' claims substantially exceeds $5,000,000.00.

    c.   Upon information and belief, the Proposed Class substantially exceeds 100 persons.

10.     This Court has general jurisdiction over Hyde because it is a Maine entity with its principle place of business located in Maine.

11.     This Court has general jurisdiction over all Gauld Defendants because they are all residents of Maine.

12.     This Court has specific jurisdiction over all Gauld Defendants because they all committed torts and conduct in violation of both state and federal trafficking laws from within Maine, and their violative conduct from within Maine is the basis for the claims of Plaintiff and the Class Members.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the acts giving rise to the violations alleged herein occurred in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.  Summary of Class Allegations

#### 1.  Hyde Has Always Been a Profitable Gauld Family Enterprise

14.     Joseph Gauld founded Hyde in 1966. He developed Hyde's curriculum, which the school still uses today.

15.     Joseph Gauld was intricately involved with Hyde up until his death in 2023.  He was Hyde's president, a teacher, an executive, and a benefactor to the school.

16.     Joseph Gauld founded Hyde as a "character development" school. He went on to write several books on the topic, always pointing back to Hyde as meritorious evidence of his "character development" theory. Joseph Gauld was a frequent national lecturer and significant booster of Hyde up until his death.

17.     Hyde promotes Joseph Gauld as its founder, but more than that, as its continuing source of traditions, vision, and inspiration. Hyde sent this message to its community of students and alumni following Joseph Gauld's death in 2023:



Today, Hyde carries on with the core traditions of the founder's vision.  The school's mission is to **Develop Character to Discover Unique Potential**.  There is no more important work than to make a difference in the lives of so many students and families. We will continue to be inspired by the Founder who started it all with the statement, *"Every individual is gifted with a unique potential that defines a destiny."*

18.     Joseph Gauld had a decades-long pattern of making troubling statements that reflected Hyde's culture of student abuse and exploitation. His published writings and public

statements demonstrate the racist, misogynistic, and abusive philosophy that became and remain foundational to Hyde's operations.

19.    In 1973, Joseph Gauld published *A Courage to Grow*, a collection of weekly columns promoting his character development model. In one chapter titled *Slap May Be Just What Child Needs*, Gauld bragged about calling a 16-year-old prospective student a "brat," slapping her three times for "screaming at me," then threatening to throw her in a pond if she didn't apologize. In another column titled *Learning By Digging a Pit*, he previewed Hyde's forced labor practices, describing a punishment where he made a student "dig a very deep pit to figuratively bury your old image" and "work on the grounds and live by yourself until you are proven ready to join the Hyde community again."

20.    In a column titled *The Black "I-Q"* Joseph Gauld posited with "confidence in what I have found: whites [are] more developed in some intellectual areas, particularly academics" and that we should all "consider the domination of the black in fields of expression like music and sports." After all, "why would the black man have the same 'I.Q.' as a white?"

21.    Joseph Gauld consistently implemented these abusive themes at Hyde. Several Class Members report that Gauld preferred students call him "God" and that he was physically abusive, slamming students into walls, grabbing them by the neck, and poking his finger into students' sternums so hard it would bruise, a practice known as the "Joey finger." Female students consistently report being called "sluts" by Joseph Gauld and other staff, while Asian and African American students report being called racial slurs with staff refusing to intervene.

22.    On information and belief, and according to Doug Gauld, Joseph Gauld's nephew, the Hyde Board of Directors forced Joseph Gauld out in the late 1970s due to his extreme teaching

methods and physical abuse, only allowing his return after he raised significant funds for the struggling school.

23.    Joseph Gauld's tenure at Hyde finally ended in 2021 after his disturbing Facebook comments about a 13-year-old female student who was allegedly blackmailed into sending nude photos. Joseph Gauld stated the child should "never have allowed herself to be raped by blackmail" and that "the only legitimate rape is to get physically overpowered."



24.     Following this incident, Hyde characterized Joseph's comments as "hurtful, puzzling, and inappropriate" while maintaining they would "forever be indebted to him for his vision and courage," demonstrating the school's continued reverence for his abusive philosophy even after his departure.

25.     For nearly sixty years, the Gauld family has operated Hyde as a coordinated enterprise, with each defendant playing a role in the systematic recruitment, manipulation, and exploitation of students while sharing in the financial benefits generated by Hyde's operations.



26.     Since 2004, Malcolm Gauld has held multiple executive positions at Hyde, averaging over $250,000 annually. In 2020 alone, Hyde paid Malcolm Gauld $1,509,153 as Executive Director.

27.     Laura Gauld has held executive positions at Hyde since 2004, progressing from Executive Director to Family Education Director to Headmaster to her current role as President. In 2021, Hyde paid her over $310,000.

28.     Throughout this period, Hyde has maintained substantial financial resources. The school generated $13.3 million in revenue and held $23.1 million in assets in 2005, growing to over $43 million in assets by 2020 despite revenue fluctuations.

29.     Hyde's annual tuition is currently $68,300. The tuition has been above $50,000 for years.

### 2.    Hyde's Deceptive Marketing and Recruitment Scheme

30.     For decades, Defendants engaged in a recruitment scheme designed to entice parents of struggling tens to pay tens of thousands of dollars in annual tuition under false promises of specialized and innovative education.

31.     Defendants market Hyde as a place where students' strengths are built upon, not broken down, claiming the school is "established on the belief that every individual is gifted with a unique potential that defines a destiny" and committed to "character development, open and effective communication, and personal integrity."

32.     Hyde promises to instill in graduates its five core values: courage, integrity, leadership, curiosity and concern, marketing itself as fundamentally different from other boarding schools and therapeutic programs.

> **Q. How does Hyde differ from a therapeutic school?**
>
> A: Therapeutic schools seek to remedy a particular unresolved matter, typically a psychological or cognitive diagnosis, with the belief that once the problem is remedied, the individual will then be prepared to resume life in the mainstream.
>
> Hyde seeks to build upon a student's strengths with the belief that a holistic way-of-life can help students manage or resolve life's current and future problems as a residual benefit of pursuing a new path.

33.     Hyde utilizes a surveillance system called "Brother's/Sister's Keeper," through which students are required to report infractions to the administration. Hyde markets the Keeper system as promoting "meaningful relationships and accountability," but it actually creates an environment of constant fear and mutual surveillance

34.     Malcolm Gauld described Brother's Keeper as requiring students to report infractions, warning that if they failed to do so, they would "find themselves in the same disciplinary boat" as the student committing the infraction. Students who failed to report infractions, and students who were reported on, under Brother's Keeper were all put on "Work Crew."

35.     Work Crew is Hyde's forced labor punishment system in which Hyde students are isolated and forced into grueling labor for no pay in extreme weather conditions.

### THE ALTERNATIVE TO EXPULSION

So… If a school doesn't rely on expulsion, how can it appropriately penalize transgressions?  At Hyde, should you find yourself on the receiving end of BK, you will likely be "campused" and/or spend some time on what we call Work Crew. This may find you cleaning windows, picking up litter, or raking leaves during times when your peers might be kicking back and enjoying themselves.

36.    Malcolm Gauld, as was consistent with all Hyde marketing over the years, previewed but manipulated and downplayed the punitive forced labor scheme at Hyde.

37.    Malcolm Gauld described Hyde as "such a forgiving place" but noted that "it may not feel like it when you're out shoveling walkways in February after a Maine snowstorm."

38.    Malcolm Gauld dismissed concerns about punishing teenagers with forced labor, stating: "While physical labor has a bad rap these days, we've come to value its therapeutic, restorative effect" and warning that "At Hyde we may not expel you, but we may make you wish we did." He manipulated parents and students by claiming this surveillance system actually maintained safety, asserting that "a strong BK culture makes it very difficult for egregious, harmful, abusive behavior to continue."

39.    Defendants marketed their cult-like atmosphere as a benefit. The Gauld Defendants all went to Hyde, so they claim everyone else should as well. This distinction is used in marketing to sell Hyde as distinguishable from "therapeutic schools."

*A past chair of Hyde's governing board once said, "The world would be a better place if everyone spent some time at Hyde School." This, he said, is why he chose to give his time to ensuring its future. I agree, and it is why I sent my daughters to Hyde and why nearly all of Hyde's senior administrators send their teenaged children to our schools. I suspect that this would not be true of the therapeutic schools.*

*- Malcolm Gauld*
*Hyde Schools President*

40.    Defendants consistently market Hyde as the only legitimate model for troubled teens, distinguishing themselves from 'therapeutic schools' and claiming their 'character development' approach is superior to traditional therapy or education. This marketing creates a false sense of exclusivity and urgency, making desperate parents believe Hyde offers their only hope for helping their struggling children.

### 3.    Hyde Abused and Labor Trafficked Students for Decades

41.    Student abuse at Hyde is a foundational principle for the school.

42.    Hyde touts its punitive disciplinary model as essential for student growth and development.

43.    Hyde's student abuse comes in many forms. Hyde emotionally, physically, and psychologically abuses students to break down their sense of self and ensure compliance.

44.    Hyde students are subjected to constant surveillance, fear of public humiliation, forced self-disclosure, emotional manipulation, threats of punishment, and isolation.

45.    Attack therapy is a central component to Hyde's curriculum. In it, students sit in a circle while staff and peers scream verbal attacks at them.

13

46.    Hyde students are forced to admit traumatizing and embarrassing facts to their peers, often from a stage to a large group.

47.    Defendants punish any student who refused compliance. Punishment includes excessive exercise and forced labor.

48.    Hyde maintains a rampant culture of sexism and racism. Staff routinely call female students 'sluts,' gay students 'faggots,' and Asian students 'chinks.'

49.    Defendants blame students for all negative experiences, telling them they choose to have mental illness and are responsible for their own trauma.

50.    Defendants physically abused students. Class Members have been slammed into walls by Hyde staff, choked, grabbed, and pushed to the ground.

51.    Hyde's disciplinary system centers on punishment, with Brother's Keeper serving as the primary mechanism for surveillance of students.

52.    Class Members were required to report other students' infractions to the administration. Defendants would engage in abusive measures to extract confessions when none were forthcoming.

53.    Class Members recall being taken to the "dungeon" basement and forced to hold a "light-bulb" pose, which meant they had to stand on one leg with their hands facing out, facing the ceiling with their eyes open, and not blink. Hyde staff would crank the heat in the room. No one could rest until a confession was made. Defendants punished whoever confessed, even it was clearly just an attempt to stop the abuse. Defendants further punished whoever had failed to confess.

54.    Exercise was the first line of punishment. Students were placed on "5:30." Hyde marketed 5:30 as basic chores around campus. This was false. During 5:30, Class Members and Plaintiff were subjected to excessive and dangerous forced exercise.

**5:30**    The basic form of student accountability for ethical infractions and poor attitudes. Requires students to rise at 5:30 AM and perform basic chores around campus prior to breakfast.

55.    5:30 exercise regularly resulted in Class Members passing out, vomiting, or injuring themselves. Students were forced to run on broken toes, with shin splints, in freezing conditions, and even with untreated asthma attacks.

56.    As an example, Defendants required Class Members to exercise in sync in the middle of the night, in the snow, without gloves or coats. Those who fell out of sync were punished, and the group could not stop until exercise was completed in sync for a set period of time. Students were freezing, at risk of frostbite, and vomiting.

57.    Other notable examples of abuse include forcing a student to run after breaking her hip in a car accident (staff called her "fat" when she refused) and making another student do sit-ups in dog feces without allowing her to clean herself afterward.

58.    The next step in the punishment cycle was called "2-4" for when "5:30 will not suffice."

**Two-Four, 2-4**    When 5:30 will not suffice. A stricter form of discipline which suspends the student from the regular curricular program and requires him/her to perform work duties around campus during school hours with breaks during meal hours. The student is expected to earn his/her way back into the regular program

59.    Students spent significant amounts of time on 2-4, often for weeks at a time. During this time, they attended no classes and did no schoolwork.

60.    While on 2-4, students were in prison-like conditions. Students were forced into isolation, forbidden from speaking to other students or attending classes, and under severe food restrictions, such as being limited to just three peanut butter and jelly sandwiches per day.

61.    Class Members were forced to "earn his/her way back into the regular program" from 2-4 by performing forced labor for Defendants in all weather conditions.

62.    The following is a list of some of the forced labor 2-4 students were forced to do, often for weeks at a time, including in Maine winter conditions:

    a.  shovel snow from all walkways and common areas on Hyde's campus;

    b.  dig holes;

    c.  landscape Hyde's campus by moving rocks around campus;

    d.  build walls and other structures on Hyde's campus to be used by other students and staff;

    e.  landscape staff members' homes, including, on information and belief, Gauld family members' homes;

    f.  landscape the Hyde campus by gardening, clearing pathways, and cutting grass;

    g.  pick up dead birds and animals around campus;

    h.  clean the entire Hyde campus, including bathrooms, without protective gear;

    i.  work at local farms;

    j.  clean lint off theater seats until the lint ball reached an acceptable size;

63.    Hyde and Defendant Malcolm Gauld are proud of this abuse.



64.    Students who refused or were physically unable to work as required were punished with additional forced labor or exercise.

65.    Defendants threatened Class Members with 2-4 for reporting medical conditions, asking for psychological help, running away, threatening to run away, asking for medicine, or refusing medicine.

66.    Class Members recall being told they had "lost food privileges" when they refused to work. This meant they were under total food restriction.

67.    Class Members who were allowed to eat were commonly made to eat in a glass room in front of other students or to eat their food off the ground like a dog while on 2-4.

68.    2-4 was not the final stop for abusive forced labor. Defendants forced Class Members and other students to improve and maintain wilderness properties that Hyde owned and marketed to prospective students.

**Tude Trip**  A wilderness camp/work project of 4 to 7 days duration.  A group of 10 to 12 students develop teamwork under the supervision of a faculty member.  Usually a disciplinary measure for students who exhibit unacceptable attitudes on 2-4 but is sometimes utilized for other students whom the faculty believe could benefit from such a challenge.

69.    Hyde owns a wilderness property in Eustis, Maine that it currently calls the Lennox Outdoor Leadership Center. Hyde markets the Eustis property as part of its summer leadership program, for which it charges a separate tuition fee. Hyde also markets the Eustis property to prospective students, stating all students "travel to the Lennox Outdoor Leadership Center for a three-day outdoor adventure orientation…" where they get to "know each other through hiking, canoeing, and other team building activities."

70.    Defendants have consistently marketed the Eustis property as a benefit to summer and regular student to increase revenue.

71.    Defendants have consistently charged summer students extra tuition fees to access the Eustis property and Defendants have used the property to increase enrollment.

72.    Hyde used Tude Trip, and similar wilderness forced labor punishments, to gain free labor to maintain and improve attractions that Hyde used to generate revenue.

73.     Defendants forced Class Members to camp at Eustis property for days on end without adequate clothes or food. Several Class Members recall being limited to just a few handfuls of trail mix per day, which Defendants called "gorp," while camping and worked at the Eustis property.

74.     Class Members were forced to create their own shelters at the Eustis property. Other Class Members were made to sleep in the snow, for days, while being forced to work on the property.

75.     Class Members were forced to build structures on the Eustis property. Defendants forced them to pull logs and to manually assemble the structures. On information and belief, Defendants have used these structures to provide services to other students during the summer programs and orientation.

76.     Class Members were forced to clear trails and brush from the Eustis property in the late winter to prepare it for spring and summer.

77.     Defendants forced students to maintain Seguin Island as punishment.

78.     Seguin Island is a small island off the coast of Maine. On information and belief, Defendants had a contract with the owners of the island under which Defendants had access to it to provide services to students and provided free student labor in exchange.

79.     For decades, Hyde students were forced to clear brush, move boulders, and other hard labor on Sequin Island.



**SEGUIN ISLAND**
Need an attitude check...up?

Sometimes you just have to remove yourself from the everyday humdrum activities to get inspired about making a deep change in your character. Hyde's wilderness program takes you to Maine's rocky coast to explore the beautiful landscape, marine wildlife, and, of course, yourself.

80.    Defendants forced Hyde students to build a stone walkway from the beach.



81.    As they continue to do with the Eustis property, Defendants profited from their association with Seguin Island by being able to offer it as a campground and summer activity to prospective students. This increased revenue by making Hyde appear to be a relatively more attractive program.

82.    Defendants profited from the forced labor of Plaintiff and Class Members.

83.    Defendants utilized forced labor to maintain the Eustis property by forcing students to live for weeks at a time in extreme and dangerous conditions on meager rations while clearing brush, building structures, and cleaning paths. The students did all of this instead of going to school.

84.    Defendants utilized Plaintiff and Class Members' forced labor to maintain Hyde's campus through forcing them to clean, landscape, and build structures.

85.    Defendants transported Class Members to their own homes and other staff homes and forced Class Members to clean and landscape.

86.    Defendants benefited from this free forced labor by not having to pay normal wages to laborers.

87.    Defendants manipulated Plaintiff and Class Members into thinking this forced labor was "character development" and that it was teaching them morality, responsibility, and giving them an appreciation and respect for community and hard work. Defendants manipulated residents into believing this forced labor was required for them to develop and grow.

**B.    Hyde's Abuse and Coercion of Ms. Fuller**

88.    Ms. Fuller was 16-17 years old when she attended Hyde from approximately July 2014 through February 2015.

89.    Defendants abused and neglected Ms. Fuller the entire time she was at Hyde.

90.    Defendants physically abused Ms. Fuller by physically restraining her with excessive force and without justification. Each restraint was traumatizing and physically harmful.

91.    Defendants forced Ms. Fuller to exercise excessively. Defendants forced her to exercise when she was sick and injured to the point of further injury, collapse, and vomiting.

92.    Ms. Fuller experienced a mental health crisis while at Hyde in response to Defendants' abuse and neglect. Defendants refused to give her prescribed psychiatric medication during the crisis, then left her alone for long periods of time.

93.    Defendants emotionally abused Ms. Fuller the entire time she was at Hyde.

94.    Defendants constantly surveilled Ms. Fuller, or forced other students to surveil her, including during private moments such as using the bathroom or showering.

95.    Defendants restricted and monitored Ms. Fuller's contact with family.

21

96.     Defendants restricted Ms. Fuller's ability to report abuse. Defendants punished students who questioned their tactics or behavior with 2-4 forced labor.

97.     Defendants blamed Ms. Fuller for her struggles, telling her that her trauma, mental illness, and mistreatment was her fault.

98.     Defendants encouraged peer criticism. This subjected Ms. Fuller to a constant barrage of peer and staff criticism.

99.     Defendants required Ms. Fuller to participate in attack therapy where she was subjected to verbal abuse, forced disclosures of past trauma, and humiliation in group settings.

100.     Defendants threatened Ms. Fuller with exercise and 2-4 forced labor if she did not subject herself to the attack therapy abuse on a regular basis. Ms. Fuller was forced to subject herself to shame, ridicule, and humiliation because of Defendants constant threats of forced labor.

101.     Defendants coercive and abusive tactics caused Ms. Fuller to internalize guilt and shame, which has led to serious and long-lasting psychological pain and suffering.

102.     Rather than address and care for her depression and trauma, Defendants subjected Ms. Fuller to the "2-4" disciplinary forced labor system described herein.

103.     Ms. Fuller spent an excessive amount of time relegated to 2-4. While on 2-4, Defendants isolated Ms. Fuller from other students, forbade her from speaking, restricted her access to food and water, and publicly shamed and humiliated her in front of other students.

104.     Defendants required Ms. Fuller to work under threat of physical and emotional harm, deprivation of food and housing, and further forced labor without pay.

105.     Under threat of physical and emotional harm, deprivation of food and housing, and further punishment, Defendants forced Ms. Fuller to perform a variety of unpaid labor without pay that benefited Defendants, including but not limited to:

    **a.**  Pulling weeds on the Hyde campus;

    **b.**  Gardening the Hyde campus;

    **c.**  Cutting the grass on the Hyde campus;

    **d.**  Cleaning the entire campus and all facilities and buildings;

    **e.**  Cleaning toilets while a rag and bleach while sick;

    **f.**  Pushing and pulling heavy wheel barrels for long periods of time.

106.    Ms. Fuller has suffered significant physical and emotional injuries because of Defendants' abuse and neglect, including but not limited to depression, anxiety, hypervigilance, difficulty trusting others, difficulty forming and maintaining relationships, sleep disturbances, gastrointestinal issues, back pain, substance abuse challenges, interruption and delay of education, loss of earning capacity, among other harms.

107.    Defendants operated, and still operate, a coercive and manipulative culture at Hyde in which all students and parents are told not to question the merit of "character building."

108.    Defendants sell character building to the world as innovative and as the only legitimate structure for child education.

109.    Character building is a coercive system Defendants use to break students down into compliance, loss of self, and eventually behavioral and psychological modification. This process is traumatizing, damaging, and without merit.

110.    Defendants isolate students from the outer world, and then from each other through punishment.

111.    Defendants then flood students with constant fear, public humiliation, shame, threats, manipulation, and control to force students to accept "the Hyde way" and buy in to Defendants narrative. This limits students' ability to process their surroundings, forcing them to

accept the reality of Hyde as legitimate. If they resist, Defendants force students into compliance with excessive labor, exercise, food and water restrictions, and other abuses and punishments.

112.    Defendants maintain exclusive control over all students' thoughts and emotions. Defendants make students feel flawed or inadequate if they do not comply with Hyde's mantra of "character over achievement." Students are forced to question their own memories and perceptions, and then to ultimately replace those with Hyde's interpretation through alternating cycles of shame, praise, and punishment.

113.    With Hyde's complete deference and admiration of Joseph Gauld and his Hyde philosophy, Hyde operates much like a cult where control is maintained through complete and systemic domination of thought, emotion, and perception.

114.    Hyde understands that teenage students struggling with mental health issues, like Ms. Fuller, are particularly vulnerable and open to impression.  Defendants manipulate that vulnerability to achieve and demand complete compliance and surrender.

115.    Defendants further break down students through induced exhaustion with excessive exercise and forced labor.

116.    Students are left exhausted and under constant emotional strain and attack. Combined with their age and mental health struggles, students are left with no ability to critically think or maintain their sense of self. The result is a heightened dependence on Defendant's authority and values.

117.    Ms. Fuller was subjected to all of the coercion and manipulation described herein while at Hyde. Defendants broke her down until she complied and accepted the Hyde way as reality. Through so doing, Ms. Fuller was left incapable of realizing that Defendants were abusing and neglecting her.

118.    Defendants coerced Ms. Fuller into whole-heartedly believing that the abuse and neglect she suffered at Hyde was a legitimate and innovative form of behavioral modification and education. Ms. Fuller was coerced into believing that Defendants were trying to help her.

119.    Defendants have never admitted or acknowledged their abuse of any students. Defendants have always maintained that their tactics and behavior are not abuse or neglect – they maintain that appearance to this day.

> Over the last few years, Hyde School, one of the most respected boarding schools in Maine and nationally recognized for its character education approach, has been the target of a social media defamatory effort to malign the school's good name.
>
> Hyde has been and remains a transformative school that has helped countless students realize success, academically and personally.
>
> Every ten years since the school's founding, Hyde has been accredited by the New England Association of Schools and Colleges (NEASC). Additionally, we are also proud members in good standing of The National Association of Independent Schools (NAIS), the Association of Boarding Schools (TABS), and the Small Boarding Schools Association (SBSA). Hyde is also an approved Maine school for the receipt of public tuition funds, which requires an annual review and approval from the Maine Department of Education.

120.    Because of Defendants systemic and intense coercion, Ms. Fuller was prevented from discovering the true nature of her experience at Hyde until recently.

121.    Ms. Fuller only recently discovered media coverage of the Troubled Teen Industry, and institutions like Hyde. The media coverage has brought to light the reality of abuse and neglect at institutions like Hyde.

## V.    CLASS ALLEGATIONS

122.    Plaintiffs bring this action as a class action pursuant to Rule 23(b)(3) the Federal Rules of Civil Procedure.

**Primary Class Defined As:**

All persons who were students at Hyde School and subjected to forced labor by Defendants while at Hyde and either (1) such forced labor occurred on or after July 12, 2015, or (2) were minors when subjected to such forced labor and have not reached the age of 28 as of July 11, 2025.

**Subclass Defined As**:

All other persons who were students at Hyde School and subjected to forced labor by Defendants while at Hyde but are not included in the Class

123.    Excluded from the Classes are Defendants, their affiliates, employees, officers, and directors, and the Judge(s) assigned to this case.

124.    Plaintiffs reserve the right to modify, change, or amend the Class definitions set forth above based on discovery and further investigation.

125.    **Numerosity**. The requirements of Rule 23(a)(1) are satisfied because there are too many Class Members for joinder of all of them to be practicable. Upon information and belief, the total number of Class Members far exceeds 100 in number.

126.    **Commonality.** The claims of the Class Members raise numerous common issues of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2). These common legal and factual questions may be resolved without the necessity of resolving individualized factual disputes concerning individual Class Members.

127.    Common **Questions Predominate.** This action involves common questions of law and fact to the class, including:

      i.    Whether Defendants' conduct violated the forced labor and trafficking provisions of the TVPRA (18 U.S.C. §§ 1584, 1589, 1590)

      ii.    Whether Defendants' violations of Maine law caused harm to the Class Members;

iii.    Whether Defendants conduct violated the forced labor and trafficking provision of 5 M.R.S. § 4701;

iv.    The nature of damages available to Plaintiffs and members of the putative class, including the applicability of compensatory and/or punitive damages.

128.    Common **Questions Predominate.** This action involves common questions of law and fact to the class, including:

i.    Whether Defendants used and/or threatened Plaintiff and other Class Members with physical restraint, serious harm, coercion, and/or abuse of the legal process in order to obtain Plaintiffs' and other putative class members' labor or services;

ii.    Whether Defendants recruited, harbored, transported, and/or obtained Plaintiff and Class Members in order to subject them to forced labor and/or involuntary servitude;

iii.    Whether Defendants knowingly benefited from participating in a venture that Defendants knew or should have known was engaged in providing and/or obtaining Plaintiff and Class Members' labor or services through threats, physical restraint, serious harm, and/or coercion;

iv.    Whether Defendants knowingly benefited from participating in a venture that Defendants knew or should have known was engaged in the recruitment, harboring, transporting, obtaining and/or providing Plaintiff and Class Members for the purpose of subjecting them to forced labor and/or involuntary servitude;

v.    Whether Defendants used standardized recruitment, record-keeping, and policies and practices for Plaintiff and Class Members;

vi.    The source and amount of Plaintiff and Class Members' damages.

129.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. Additionally, Class treatment of common issues under the Federal Rule of Civil Procedure 23(c)(4) will materially advance the litigation.

130.    **Typicality**. The claims of the named Plaintiff are typical of the claims of the unnamed Class Members she represents because, among other things, all such claims arise out of the same misconduct by Defendants as alleged herein. Plaintiff's claims are typical off the claims

of the Class because Plaintiff and all Class Members were injured or damaged by the same wrongful practices in which the Defendants engaged.

131.    **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of all Class Members because it is in her best interest to prosecute the claims alleged herein to obtain full compensation due to them for the misconduct of which they complain. Plaintiff has no interests that are in conflict with, or antagonistic to, the interests of Class Members. Plaintiff as retained highly competent and experienced Class action attorneys to represent her interests and those of the Class Members. By prevailing on her own claims, Plaintiff will establish Defendants' liability to all Class Members. Plaintiff and her counsel have the necessary financial resources to adequately and vigorously litigate this Class action and Plaintiff and her undersigned counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class Members.

132.    **Superiority**. There is no plain, speedy, or adequate remedy other than by maintenance of this Class action. The prosecution of individual remedies by Class members will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, an important public interest will be served by addressing the matter as a Class action.

133.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a Class action.

## COUNT ONE

**Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1584**

**(On Behalf of Plaintiff and Both Classes)**

**(Against all Defendants)**

134.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

135.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

136.    Plaintiff and Class Members were all victims of forced labor trafficking in violation of 18 U.S.C. § 1584

137.    Under 18 U.S.C. § 1584, it is unlawful to knowingly and willfully hold another person to involuntary servitude or to sell any person into any condition of involuntary servitude.

138.    Defendants knowingly held Plaintiff and the Class Members to involuntary servitude through the following acts:

    a.    Defendants knowingly held Plaintiff and the Class Members to involuntary servitude and forced labor through a coordinated system of control, coercion, and concealment. This system extended beyond isolated acts and abuse and constituted an institutional structure deliberately designed to extract unpaid labor and suppress dissent.

    b.    Defendants exercised total control over students' daily lives, including when and where they ate, slept, worked, communicated with family, and received medical or

psychological care. This level of control eliminated any meaningful autonomy, creating a captive labor force under the guise of "character education".

c. Defendants implemented and enforced internal policies that eliminated meaningful educational oversight. While Hyde marketed itself as an academic institution, its curriculum was secondary to its labor and disciplinary systems. Many students, including Plaintiff, spent more time in punishment and forced labor than in class.

d. Defendants engaged in a systemic pattern of concealment. They deliberately misrepresented Hyde's practices to families, regulators, and the public, branding their coercive methods as therapeutic and character-building. Internally, they enforced rigid surveillance systems such as "Brother's Keeper," not only to monitor student behavior, but to prevent exposure of Hyde's true practices. Staff and students were conditioned to remain silent, and complaints were met with punishment rather than investigation.

e. To ensure ongoing control and suppress dissent, Defendants relied on isolation, deprivation, and psychological coercion. Students who questioned authority, reported abuse, or resisted labor were punished with food and sleep restrictions, isolated from their peers, public shaming, and intensified physical exertion. These mechanisms were not incidental – they were institutional procedures integral to Hyde's model.

f. Defendants' structure functioned to maintain institutional silence, preventing students and families from recognizing, reporting, or challenging the abuse. Students like Ms. Fuller were not simply working under duress – they were

indoctrinated to believe that their abuse was necessary for growth, and that resistance signaled personal failure.

g.  Through this coercive system, Defendants maintained a profitable enterprise that used children for unpaid labor under total institutional control. Each Defendant had knowledge of and actively participated in this structure and thus knowingly benefitted from the forced labor scheme in violation of the Trafficking Victims Protection Reauthorization Act.

h.  Creating and maintaining a program wherein Plaintiff and the Class Members were forced to work against their will both on and off Hyde's property;

i.  Requiring Plaintiff and the Class Members to work in extreme weather conditions, using industrial chemicals and tools, and without protective gear, precautions, or supervision;

j.  Requiring Plaintiff and Class Members to work against their will in order to advance grade levels or graduate;

k.  Maintaining complete control over Plaintiff and the Class Members throughout the forced labor period, dictating when, where, and for how long they would work, and under what conditions;

l.  Restricting and controlling Plaintiff and the Class Members' communications with people outside of Hyde, including family and loved ones, and thereby preventing Plaintiff and Class Members from reporting the forced labor as it was happening;

139.    Defendants operated with one common and shared financial interest, which was to share the profits from Hyde.

140.    Defendants increased profits by keeping Plaintiff and Class Members enrolled at Hyde for as long as possible.

141.    Defendants were engaged in an enterprise because they were all collectively motivated with increasing and maintaining enrollment, such that they all shared in the risk of their abuse of Plaintiff and Class Members being reported as such and negatively affecting enrollment, and thus profit.

142.    Defendants increased profits by minimizing expenses at Hyde by utilizing the forced labor of Plaintiff and the Class Members

143.    The forced labor of Plaintiff and the Class Members generated financial benefit for all Defendants.

144.    All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant knowingly benefitted by receiving revenue and other benefits from participation in the continuing business venture of Hyde.

145.    All Defendants personally witnessed and enforced the forced labor scheme at Hyde against Plaintiff and the Class Members.

146.    Each Defendant is jointly and severally liable to Plaintiff and the Class Members because they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and Class Members were trafficked, harbored, and sold in violation of U.S.C. § 1584.

147.    Each Defendant received, and continues to receive, a financial benefit from participating in the operations of Hyde, through which the Defendants recruited, exploited, and manipulated vulnerable kids from desperate families around the country, including Plaintiff and the Class Members.

148.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered economic damages for which they should be compensated.

149.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT TWO

**Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1589**
**(On Behalf of Plaintiff and Both Classes)**
**(Against all Defendants)**

150.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

151.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff and Class Members against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

152.    Plaintiff and Class Members were all victims of forced labor trafficking in violation of 18 U.S.C. § 1589.

153.    Under 18 U.S.C. § 1589(a), it is unlawful to knowingly provide or obtain labor or services by means of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause a person to believe that they would suffer serious harm or physical restraint if they did not perform such labor or services.

154.    Under 18 U.S.C. § 1589(b), it is also unlawful to "knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" by the means described in subsection (a).

155.    Under 18 U.S.C. § 1589(c)(2) the term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, reputational harm…"

156.    Defendants violated 18 U.S.C. § 1589 through obtaining the Plaintiff and Class Members' forced and involuntary labor through extreme emotional abuse and serious harm.

157.    Defendants operated Hyde as a tightly controlled environment designed to eliminate student autonomy and foster submission. They instituted a complex system of discipline and coercion that left little avenue for dissent. Staff enforced labor through cycles of punishment, psychological manipulation, and deprivation. The absence of educational focus or external accountability created an environment where forced labor was the norm, not the exception.

158.    Further, Defendants' internal disciplinary structures, such as "2-4" and "Work Crew," functioned as punitive tools to compel compliance and labor under the constant threat of punishment. Defendants obscured these practices under a deceptive narrative of personal development and therapeutic intervention, thereby concealing the true nature of their conduct from students and parents.

159.    The use of institutional isolation, routine verbal degradation, and collective punishment reinforced psychological dependency and fear. Students were cut off from meaningful contact with outsiders, told that their suffering was their own fault, and led to belief that forced labor was essential for redemption or progress.

160.    Defendants obtained the forced labor of Plaintiff and Class Members in the following ways:

a.  Creating and enforcing a system wherein Plaintiff and Class Members were punished with forced labor;

b.  Creating and enforcing a system wherein Plaintiff and Class Members had food and water withheld as punishment and for not complying with the forced labor requirements;

c.  Creating and enforcing a system wherein Plaintiff and Class Members were threated and forced to engage in strenuous exercise to point of collapse as punishment and for not complying with forced labor requirements;

d.  Emotionally abusing and threating Plaintiff and Class Members into believing they had to comply with the punitive forced labor requirements in order to succeed at Hyde and to adopt the "Hyde way";

e.  Emotionally abusing and humiliating Plaintiff and Class Members to break them down into a state of full compliance;

f.  Punishing Plaintiff and Class Members with threats of violence, isolation, restraint, and loss of privileges and status if they did not comply with the forced labor requirements;

g.  Ignoring the complaints of injury, exhaustion, or exposure to extreme weather from Plaintiff and Class Members to continue forcing them to work;

h.  Controlling Plaintiff and Class Members' access to housing, food, and water, and through that control implementing a punishment system of withholding or restricting all said items to force Plaintiff and Class Members into compliance and forced labor;

i. Systematically undermining Plaintiff and Class Members' sense of autonomy through psychological manipulation;

j. Using the structure and status of a reputable boarding school with an innovative educational philosophy to shield forced labor practices from scrutiny and to manipulate families and Plaintiff and Class Members into believing the forced labor was for their benefit.

161. Defendants operated with one common and shared financial interest, which was to share the profits from Hyde.

162. Defendants increased profits by keeping Plaintiff and Class Members enrolled at Hyde for as long as possible.

163. Defendants were engaged in an enterprise because they were all collectively motivated with increasing and maintaining enrollment, such that they all shared in the risk of their abuse of Plaintiff and Class Members being reported as such and negatively affecting enrollment, and thus profit.

164. Defendants increased profits by minimizing expenses at Hyde through utilizing the forced labor of Plaintiff and the Class Members

165. The forced labor of Plaintiff and the Class Members generated financial benefit for all Defendants.

166. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant knowingly benefitted by receiving revenue and other benefits from participation in the continuing business venture of Hyde.

167. All Defendants personally witnessed and enforced the forced labor scheme at Hyde against Plaintiff and the Class Members.

36

168.     Each Defendant is jointly and severally liable to Plaintiff and the Class Members because they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and Class Members were trafficked, harbored, and sold in violation of U.S.C. § 1589.

169.     Each Defendant received, and continues to receive, a financial benefit from participating in the operations of Hyde, through which the Defendants recruited, exploited, and manipulated vulnerable kids from desperate families around the country, including Plaintiff and the Class Members.

170.     As a result of Defendants' conduct, Plaintiff and the Class Members suffered economic damages for which they should be compensated.

171.     As a result of Defendants' conduct, Plaintiff and the Class Members suffered emotional and physical pain and suffering for which they should be compensated.

## <u>COUNT THREE</u>

**(Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1590)**

**(On Behalf of Plaintiff and Both Classes)**

**(Against all Defendants)**

172.     Plaintiff incorporates by reference all preceding allegations.

173.     The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff and Class Members against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

174.     Defendants all benefited from a venture in which Plaintiff and Class Members were recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

175.    Defendants operated a closed and self-reinforcing environment where external oversight was minimized, and internal control was maximized. Through deceptive marketing and false assurances to families, Defendants lured vulnerable minors to Hyde under false pretenses. Once enrolled, students were quickly subjected to institutional control mechanisms that restricted communication, movement, autonomy, and access to basic rights.

176.    Recruitment into Hyde was based on emotional appeals to families in crisis, offering a solution that emphasized "character development" while hiding the labor conditions to which students would be subjected. Once under Defendants' control, students were required to work long hours without pay, under conditions that directly benefited Defendants financially.

177.    Through this system, Defendants obtained labor by means of deception, coercion, and psychological control. Defendants did not merely tolerate the abuses occurring under their watch - they orchestrated them and profited from them.

178.    Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of this chapter."

179.    Defendants violated 18 U.S.C. § 1590 in several ways, including but not limited to the following:

a.    Creating and disseminating misleading marketing materials to Plaintiff, Class Members, and their families that described Defendants' services and programs as a legitimate educational program with leading and innovative expertise educating teenagers;

b.    Specifically targeting, through marketing and messaging, vulnerable and struggling teens and their desperate families;

c.    Transporting Plaintiff and Class Members to forced labor job sites;

d. Maintaining exclusive control over Plaintiff and Class Members' housing, transportation, food, and water while Defendants were benefiting from the forced labor of the named Plaintiffs and putative class members

e. Harboring Plaintiff and Class Members the entire time that Defendants were benefitting from Plaintiff and Class Members' forced labor.

180. Defendants operated with one common and shared financial interest, which was to share the profits from Hyde.

181. Defendants increased profits by keeping Plaintiff and Class Members enrolled at Hyde for as long as possible.

182. Defendants were engaged in an enterprise because they were all collectively motivated with increasing and maintaining enrollment, such that they all shared in the risk of their abuse of Plaintiff and Class Members being reported as such and negatively affecting enrollment, and thus profit.

183. Defendants increased profits by minimizing expenses at Hyde through utilizing the forced labor of Plaintiff and the Class Members

184. The forced labor of Plaintiff and the Class Members generated financial benefit for all Defendants.

185. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant knowingly benefitted by receiving revenue and other benefits from participation in the continuing business venture of Hyde.

186. All Defendants personally witnessed and enforced the forced labor scheme at Hyde against Plaintiff and the Class Members.

187.    Each Defendant is jointly and severally liable to Plaintiff and the Class Members because they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and Class Members were trafficked, harbored, and sold in violation of U.S.C. § 1590.

188.    Each Defendant received, and continues to receive, a financial benefit from participating in the operations of Hyde, through which the Defendants recruited, exploited, and manipulated vulnerable kids from desperate families around the country, including Plaintiff and the Class Members.

189.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered economic damages for which they should be compensated.

190.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT FOUR

**(Forced Labor Violations of 5 M.R.S. § 4701)**

**(On Behalf of Plaintiff and Both Classes)**

**(Against all Defendants)**

191.    Plaintiff incorporates by reference all preceding allegations.

192.    Defendants operated Hyde in violation of Maine's human trafficking statute, 5 M.R.S. § 4701, by subjecting Plaintiff and Class Members to forced labor through coercion, threats, and deprivation as defined under 17-A M.R.S. §§ 304 and 305.

193.    Defendants created and maintained a systematic forced labor program that subjected students to grueling physical labor in extreme weather conditions, including shoveling snow, hauling wood, clearing school grounds, and performing maintenance work on school facilities and remote locations.

194.    This labor was imposed as punishment, control, and a means of breaking down student resistance. Students were told they had to "earn their way out" through compliance with work requirements.

195.    Students who resisted, complained, or failed to meet work expectations were subjected to escalating punishments including physical abuse, isolation, food deprivation, sleep deprivation, and being forced to sleep outdoors.

196.    Medical care was routinely withheld from students who were visibly ill or injured, including during and after forced labor assignments.

197.    Defendants coerced labor through direct and implied threats of physical injury. Students were threatened with physical punishment if they refused to work or failed to complete assigned tasks.

198.    Students were forced to work in dangerous conditions without adequate protective gear, knowing that refusal would result in physical punishment or more dangerous work assignments.

199.    Student proctors, acting under Defendants' authority and direction, threatened physical violence against students who failed to comply with work requirements.

200.    In multiple instances, student proctors coerced Class Members into performing sexual acts by threatening continued forced labor and physical harm if they refused.

201.    Defendants systematically used deprivation of basic necessities to coerce labor, including:

    a.    Withholding food from students who refused to work or failed to meet work quotas;

    b.    Forcing students to sleep on snow or outdoors as punishment for work-related defiance;

    c.   Denying access to adequate clothing and protective gear during outdoor labor;

    d.   Isolating students from peers and family contact until work requirements were met;

202.    Defendants threatened students' health and safety by punishing entire groups when individual students refused to work, creating peer pressure to comply with forced labor demands.

203.    Students who attempted to help sick or injured peers during work assignments were punished, creating a system where no assistance was provided to those suffering during forced labor.

204.    Defendants threatened to expose students' personal information, struggles, or perceived failures to peers and family members if they refused to comply with work requirements.

205.    Students were threatened with public humiliation, loss of status within the school hierarchy, and isolation from the school community for work-related non-compliance.

206.    Defendants implemented a hierarchical point system that extorted students into working by conditioning access to basic necessities and privileges on work compliance, including:

    a.   Access to hygiene facilities and personal care items;

    b.   Family contact and communication privileges;

    c.   Adequate food and nutrition;

    d.   The ability to advance through the program and ultimately leave the school;

207.    This system created a framework where students believed they had no choice but to comply with forced labor requirements to avoid losing academic credits, privileges, family contact, and their opportunity to leave Hyde.

208.    Defendants required students to work in extreme weather conditions with inadequate clothing, protective gear, or supervision while using industrial chemicals and dangerous tools.

209.    Students were forced to work at remote locations including Eustis and Sequin Island, where they were completely isolated from family, peers, and potential oversight or intervention.

210.    Defendants maintained complete control over all aspects of the forced labor, dictating when, where, how long, and under what conditions students would work.

211.    Defendants concealed these forced labor practices from families and regulatory authorities by staging visits, censoring communications, monitoring phone calls, and forbidding students from speaking negatively about Hyde.

212.    Hyde marketed its program as "transformative" and therapeutic while omitting any mention of the forced labor practices that were central to its operations.

213.    Parents paid tuition under false pretenses, believing their children were receiving legitimate educational and therapeutic services rather than being subjected to illegal forced labor.

214.    The forced labor violations are aggravated under 17-A M.R.S. § 305(1) because victims were minors under the age of 18.

215.    The systematic nature of the forced labor program, its integration into the school's operations, and the deliberate concealment of these practices from families and authorities demonstrate the calculated and intentional nature of Defendants' violation.

216.    As a direct and proximate result of Defendants' forced labor violations, Plaintiff and Class Members suffered severe emotional trauma, physical injuries, educational deprivation, and other significant harms.

217.    Plaintiff and Class Members seek all relief permitted under 5 M.R.S. § 4701(2), including actual damages, punitive damages, attorney's fees, costs, and appropriate equitable remedies.

218.     As a result of Defendants' conduct, Plaintiff and the Class Members suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT FIVE

**(Negligence, Negligence Per Se, and Negligent Infliction of Emotional Distress)**

**(On Behalf of Plaintiff)**

**(Against all Defendants)**

219.     Plaintiff incorporates by reference all preceding allegations.

220.     Defendants owed a duty of care to Plaintiff, a minor entrusted to their custody and control.

221.     Defendants breached that duty through the abuse, neglect, and systemic misconduct described herein, including violations of statutory obligations enacted to protect children from harm.

222.     Specifically, 22 M.R.S. § 4011-A required Defendants to report known or suspected child abuse and neglect to the State of Maine. Plaintiff was a member of the class of persons this statute was designed to protect.

223.     Defendants failed to make any such reports, despite knowing or recklessly disregarding that Plaintiff was being subjected to abuse.

224.     As a direct and proximate result of Defendants' breaches, Plaintiff suffered physical injuries, emotional trauma, and serious psychological distress – distress so severe that it exceeds what a reasonable person should be expected to endure.

225.     It was reasonably foreseeable that a child of normal sensitivities would suffer significant harm under these conditions.

226.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered emotional and physical pain and suffering and financial loss.

## COUNT SIX

**(Injunctive Relief and Asset Preservation)**

**(Against all Defendants)**

227.     Plaintiff incorporates by reference all preceding allegations.

228.     Plaintiff seeks a temporary restraining order, preliminary injunction, permanent injunction, and asset preservation relief pursuant to Federal Rule of Civil Procedure 64 and applicable Maine attachment statutes.

229.     Plaintiff has shown a substantial likelihood of success on the merits of her trafficking, forced labor, and negligence claims, which detail systematic abuse of vulnerable minors over a period of more than seventeen years – abuse that yielded significant financial gain for Defendants.

230.     Without immediate injunctive relief, Plaintiff and the Class Members face irreparable harm. Defendants have operated Hyde and its related entities as a family-controlled enterprise and have demonstrated a history of secrecy and concealment. There is a serious risk that Defendants will dissipate, conceal, or transfer assets to avoid judgment enforcement.

231.     The public interest strongly supports the protection of children and the preservation of assets to ensure compensation for trafficking and abuse survivors.

232.     Accordingly, Plaintiff respectfully requests that this Court:

a.     **Asset Preservation**: Enter an order pursuant to Federal Rule of Civil Procedure 64 attaching and restraining all Defendants' assets, including real estate, financial accounts, business interests, and any other property that may be used to satisfy judgment;

b. **Operational Restraints**: Enjoin Defendants from requiring or permitting any student at Hyde to engage in forced labor or labor performed under threat or coercion;

c. **Document Preservation**: Enjoin Defendants from destroying, concealing, altering, or transferring any documents or data relating to Hyde's finances, assets, or operational history;

d. **Financial Disclosure**: Order Defendants to provide a full and sworn accounting of all assets, liabilities, and financial interests; and

e. **Further Relief**: Grant such other and further equitable relief as the Court deems just and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands a jury trial and prays for the following:

a. Determine that Defendants are liable for the violations set forth above;

b. Award Plaintiff and the Class all compensatory, statutory, restitution, and punitive damages as provided by law;

c. Certify the Class as defined herein, designating Plaintiff as Class representative, and appointing the undersigned counsel as Class Counsel;

d. Declare that Defendants are financially responsible for notifying the Class members of the pendency of this action;

e. Schedule a trial by jury in this action on all claims so triable;

f. Award Plaintiff's reasonable attorneys' fees, costs, and expenses, as provided by law;

g.  Award Plaintiff and Class members trebled, statutory, and/or punitive damages as
    authorized by law;

h.  Award pre-judgment and post-judgment interest on any amounts awarded, as
    provided by law; and

i.  Grant such further relief that the Court deems appropriate.

Dated: July 12, 2025

                                            **RESPECTFULLY SUBMITTED,**
                                            **PLAINTIFF,**

                                            **By Their Attorneys,**

                                            /s/ *John Steed, Esq.*
                                            John Steed, Esq. (ME Bar #5399)
                                            ISLAND JUSTICE
                                            PO Box 771
                                            Stonington, ME 04681
                                            Phone: 207-200-7077
                                            john@islandjusticelaw.com


                                            /s/ *Kelly Guagenty*
                                            Kelly A. Guagenty, Esq.
                                            *(pending pro hac vice admission)*
                                            Kimberly Dougherty, Esq.
                                            *(pending pro hac vice admission)*
                                            JUSTICE LAW COLLABORATIVE
                                            210 Washington St.
                                            North Easton, MA 02356
                                            (508) 230-2700
                                            kelly@justiclc.com
                                            kim@justiclc.com