## IN THE UNITED STATES COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| JESSICA FULLER, individually and on behalf of all similarly situated persons, | Civil Action No.: 2:25-cv-00354 |
| Plaintiffs, | |
| vs. | |
| HYDE SCHOOL; LAURA GAULD; MALCOLM GAULD; GEORGIA GAULD MACMILLAN; DONALD MACMILLAN; LAURIE GAULD HURD | **FIRST AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff Jessica Fuller, individually and on behalf of all others similarly situated, by and through her attorneys, Island Justice Law and Justice Law Collaborative, LLC and hereby file this First Amended Individual and Class Action Complaint against Defendants Hyde School ("Hyde"); Laura Gauld; Malcolm Gauld; Georgia Gauld MacMillan; Donald MacMillan; and Laurie Gauld Hurd (hereinafter collectively "Defendants"; individually named defendants, collectively "Gauld Defendants"). Plaintiff alleges as follows:

## I.       INTRODUCTION

This action arises from what Plaintiff and Class Members allege to be a longstanding pattern of forced labor, coercive disciplinary practices, and emotional abuse at Hyde School, a residential educational program located in Bath, Maine. For nearly six decades, Hyde School has operated under the leadership and direction of members of the Gauld family, who are alleged to have maintained significant control over its operations and financial decision-making.

1

At all relevant times, Hyde has marketed itself as a character development school for adolescents in need of structure and support. It promised a safe and nurturing environment, emphasizing personal growth, integrity, and leadership. However, Plaintiff and Class Members allege that these representations concealed coercive disciplinary methods, non-therapeutic forced labor, and emotional mistreatment.

Since the inception of the school, multiple members of the Gauld family have held executive positions at Hyde and have shaped its disciplinary practices and institutional philosophy. Plaintiff and Class Members allege that Hyde's leadership structure functioned as a closely coordinated enterprise, where family members shared both decision-making authority and financial benefits.

Plaintiff and Class Members allege that the school imposed a rigid disciplinary system, including a practice referred to as "Brother's Keeper," which encouraged peer surveillance and reporting. Students accused of infractions were subject to a system called "2-4," during which they were oftentimes removed from classes, placed under food restrictions, and required to perform extensive manual labor, often outdoors and in extreme weather conditions.

Plaintiff and Class Members report that students were expected to perform unpaid labor, including campus maintenance, cleaning tasks, and landscaping. On some occasions, Plaintiff and Class Members allege that this work extended to staff members' residences or off-site properties. Plaintiff and Class Members further allege that this labor was presented to students and families as a core part of Hyde's therapeutic model, despite its lack of educational or psychological basis.

Plaintiff and Class Members report being subjected to verbal degradation, public humiliation, and excessive physical control measures at Hyde. Plaintiff and Class Members report that students were often discouraged or punished for requesting basic necessities, including clean

clothing and medical care. Plaintiff and Class Members also report that educational instruction was inconsistent and often secondary to labor-related assignments or punitive tasks.

This action seeks legal accountability and appropriate relief for Plaintiff and Class Members who allege that they were subjected to abuse, coercion, and forced labor at Hyde School under conditions that Plaintiff and Class Members contend were materially misrepresented to families and inconsistent with accepted educational and therapeutic standards.

## II.    **PARTIES**

1.    Upon information and belief, Defendant Hyde School is a 501(c)(3) organization that was chartered in the State of Maine in 1966. Hyde's principal address is 616 High Street, Bath, ME 04530. Defendant Laura Gauld is the President and Principal Officer of Hyde.

2.    Upon information and belief, Defendant Laura Gauld is the President, Head of School, and Principal Officer of Hyde. Laura Gauld is a resident of Sagadahoc County in the State of Maine. Laura Gauld is married to Defendant Malcolm Gauld.

3.    Upon information and belief, Defendant Malcolm Gauld is the son of the late Joseph Gauld, the founder of Hyde. Malcolm Gauld was the President of Hyde from 1998 to 2018. He was the headmaster of Hyde from 1987-1998. He is the current Executive Director of Hyde. Malcolm Gauld is a resident of Sagadahoc County in the State of Maine.

4.    Upon information and belief, Defendant Georgia "Gigi" Gauld MacMillan is a daughter of Hyde founder Joseph Gauld. Georgia MacMillan was the prior head of campus for Hyde's locations in both Maine and Connecticut. Gigi MacMillan was and/or is still the Executive Director of Family Education at Hyde. Georgia MacMillan is a resident of Sagadahoc County in the State of Maine. Georgia MacMillan is married to Defendant Donald MacMillan.

5.      Upon information and belief, Defendant Donald MacMillan is married to Defendant Georgia "Gigi" Gauld MacMillan. Donald MacMillan is the former Head of School at Hyde and is a current staff teacher at Hyde. Donald MacMillan is a resident of Sagadahoc County in the State of Maine.

6.      Upon information and belief, Defendant Laurie Gauld Hurd is a daughter of Hyde founder Joseph Gauld. Laurie Hurd is the current Director of Community Engagement at Hyde. Laurie Hurd is a resident of Sagadahoc County in the State of Maine.

7.      Plaintiff Jessica Fuller is an individual residing in Palm Beach County, Florida.

## III.    JURISDICTION AND VENUE

8.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because claims asserted in the Complaint arise under the Trafficking and Victims Protection Reauthorization Act (18 U.S.C. §§ 1589 *et seq*) and civil remedies provision of 18 U.S.C. § 2255.

9.      This Court has original subject matter jurisdiction over this Class Action pursuant to 28 U.S.C. § 1332(d) because of the following:

a.   The named Plaintiff and Defendants are citizens of different states pursuant to 28 U.S.C. § 1332(d)(2)(A).

b.   Pursuant to 28 U.S.C. § 1332(d)(2), the aggregate amount of the Class Members' claims substantially exceeds $5,000,000.00.

c.   Upon information and belief, the Proposed Class substantially exceeds 100 persons.

10.     This Court has personal jurisdiction over all Defendants based on Federal Rule of Civil Procedure 4(k)(1)(C) and the nationwide service of process provision of 18 U.S.C. § 2255. Plaintiff was a minor at the time of trafficking and asserts claims under 18 U.S.C. §§ 1589, 1590 and 2255. 18 U.S.C. § 2255 provides for nationwide service of process for such claims.

11.     This Court has general jurisdiction over Hyde because it is a Maine entity with its principal place of business located in Maine.

12.     This Court has general jurisdiction over all Gauld Defendants because they are all residents of Maine.

13.     This Court has specific jurisdiction over all Gauld Defendants because they are alleged to have committed torts and conduct in violation of both state and federal trafficking laws from within Maine, and their violative conduct from within Maine is the basis for the claims of Plaintiff and the Class Members.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b)(2) because a substantial part of the acts giving rise to the violations alleged herein occurred in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.  Summary of Class Allegations

#### 1.    Hyde Has Always Been a Profitable Gauld Family Enterprise

15.     Joseph Gauld founded Hyde in 1966. Upon information and belief, he developed Hyde's curriculum, which the school still uses today.

16.     Upon information and belief, Joseph Gauld was intricately involved with Hyde up until his death in 2023.  He was Hyde's president, a teacher, an executive, and a benefactor to the school.

17.     Joseph Gauld founded Hyde as a "character development" school. He went on to write several books on the topic and was a frequent national lecturer. Upon information and belief, Joseph Gauld was a supporter of Hyde up until his death.

18.    Hyde promotes Joseph Gauld as its founder, but more than that, as its continuing source of traditions, vision, and inspiration. Hyde sent this message to its community of students and alumni following Joseph Gauld's death in 2023:



19.    Joseph Gauld had a decades-long pattern of making troubling statements that reflected Hyde's culture of student abuse and exploitation. His published writings and public statements demonstrate the racist, misogynistic, and abusive philosophy that became and remain foundational to Hyde's operations.

20.    In 1973, Joseph Gauld published *A Courage to Grow*, a collection of weekly columns promoting his character development model. In one chapter titled *Slap May Be Just What Child Needs*, Gauld bragged about calling a 16-year-old prospective student a "brat," slapping her three times for "screaming at me," then threatening to throw her in a pond if she didn't apologize. In another column titled *Learning By Digging a Pit*, he previewed Hyde's forced labor practices,

describing a punishment where he made a student "dig a very deep pit to figuratively bury your old image" and "work on the grounds and live by yourself until you are proven ready to join the Hyde community again."

21.     In a column titled *The Black "I-Q"* Joseph Gauld posited with "confidence in what I have found: whites [are] more developed in some intellectual areas, particularly academics" and that we should all "consider the domination of the black in fields of expression like music and sports." After all, "why would the black man have the same 'I.Q.' as a white?"

22.     Multiple Class Members describe Joseph Gauld as having been viewed internally as the enduring figurehead of Hyde. Multiple Class Members report physical mistreatment, including being slammed into walls or grabbed at Hyde. Multiple Female Class Members report being called derogatory terms, including "sluts", by Mr. Gauld or in his presence.

23.     Upon information and belief, Joseph Gauld's tenure at Hyde ended in 2021 after Facebook comments about a 13-year-old female student who was allegedly blackmailed into sending nude photos. Joseph Gauld stated the child should "never have allowed herself to be raped by blackmail" and that "the only legitimate rape is to get physically overpowered."



24.    Following this incident, Hyde characterized Joseph's comments as "hurtful, puzzling, and inappropriate" while maintaining they would "forever be indebted to him for his vision and courage," demonstrating the school's continued reverence for his abusive philosophy even after his departure.

25.    Upon information and belief, for nearly sixty years, the Gauld family has operated Hyde as a coordinated enterprise, with each Defendant playing a role in the systematic recruitment,

8

manipulation, and exploitation of students while sharing in the financial benefits generated by Hyde's operations.



26.    Upon information and belief, since approximately 2004, Malcolm Gauld has held multiple executive positions at Hyde, averaging over $250,000 annually. In 2020 alone, Hyde paid Malcolm Gauld $1,509,153 as Executive Director.

27.    Upon information and belief, Laura Gauld has held executive positions at Hyde since 2004, progressing from Executive Director to Family Education Director to Headmaster to her current role as President. In 2021, Hyde paid her over $310,000.

28.    Upon information and belief, Hyde generated $13.3 million in revenue and held $23.1 million in assets in 2005, growing to over $43 million in assets by 2020 despite revenue fluctuations.

29.    Hyde's annual tuition is currently approximately $68,300. The tuition has been above $50,000 for years.

### 2.    Hyde's Deceptive Marketing and Recruitment Scheme

30.    For decades, Defendants engaged in a recruitment scheme designed to entice parents of struggling tens to pay tens of thousands of dollars in annual tuition under false promises of specialized and innovative education.

31.    At all relevant times, Defendants marketed Hyde as a place where students' strengths are built upon, not broken down, claiming the school is "established on the belief that every individual is gifted with a unique potential that defines a destiny" and committed to "character development, open and effective communication, and personal integrity."

32.    At all relevant times, Hyde promised to instill in graduates its five core values: courage, integrity, leadership, curiosity and concern, marketing itself as fundamentally different from other boarding schools and therapeutic programs.



Q. How does Hyde differ from a therapeutic school?

A: Therapeutic schools seek to remedy a particular unresolved matter, typically a psychological or cognitive diagnosis, with the belief that once the problem is remedied, the individual will then be prepared to resume life in the mainstream.

Hyde seeks to build upon a student's strengths with the belief that a holistic way-of-life can help students manage or resolve life's current and future problems as a residual benefit of pursuing a new path.

33.    At all relevant times, Hyde utilized a surveillance system called "Brother's/Sister's Keeper," through which students were required to report infractions to the administration. Hyde markets the Keeper system as promoting "meaningful relationships and accountability," but it actually creates an environment of constant fear and mutual surveillance

34.     Malcolm Gauld described Brother's Keeper as requiring students to report infractions, warning that if they failed to do so, they would "find themselves in the same disciplinary boat" as the student committing the infraction. Plaintiff and Class Members report that students who failed to report infractions, and students who were reported on, under Brother's Keeper were put on "Work Crew."

35.     At all relevant times, "Work Crew" was Hyde's forced labor punishment system in which Hyde students would perform labor for no pay, sometimes in extreme weather conditions.

## THE ALTERNATIVE TO EXPULSION

So... If a school doesn't rely on expulsion, how can it appropriately penalize transgressions? At Hyde, should you find yourself on the receiving end of BK, you will likely be "campused" and/or spend some time on what we call Work Crew. This may find you cleaning windows, picking up litter, or raking leaves during times when your peers might be kicking back and enjoying themselves.

36.     Plaintiff and Class Members report that Malcolm Gauld downplayed the punitive forced labor scheme at Hyde.

37.     Malcolm Gauld described Hyde as "such a forgiving place" but noted that "it may not feel like it when you're out shoveling walkways in February after a Maine snowstorm."

38.     Malcolm Gauld dismissed concerns about punishing teenagers with forced labor, stating: "While physical labor has a bad rap these days, we've come to value its therapeutic, restorative effect" and warning that "At Hyde we may not expel you, but we may make you wish we did." Malcolm Gauld claimed that this surveillance system actually maintained safety, asserting that "a strong BK culture makes it very difficult for egregious, harmful, abusive behavior to continue."

39.    Upon information and belief, the Gauld Defendants all went to Hyde, and they claim everyone else should as well. This distinction is used in marketing to sell Hyde as distinguishable from "therapeutic schools."

> A past chair of Hyde's governing board once said, "The world would be a better place if everyone spent some time at Hyde School." This, he said, is why he chose to give his time to ensuring its future. I agree, and it is why I sent my daughters to Hyde and why nearly all of Hyde's senior administrators send their teenaged children to our schools. I suspect that this would not be true of the therapeutic schools.
> - Malcolm Gauld
> Hyde Schools President

40.    Defendants consistently marketed Hyde as the only legitimate model for troubled teens, distinguishing themselves from therapeutic schools and claiming their character development approach is superior to traditional therapy or education.

### 3.    Plaintiff and Class Members Report that Hyde Abused and Labor Trafficked Students for Decades

41.    At all relevant times, Hyde promoted its punitive disciplinary model as essential for student growth and development.

42.    Plaintiff and Multiple Class Members report that Hyde emotionally, physically, and psychologically abused students to break down their sense of self and ensure compliance.

43.    Plaintiff and Multiple Class Members report that Hyde students were subjected to regular surveillance, fear of public humiliation, forced self-disclosure, emotional manipulation, threats of punishment, and isolation.

44.     Plaintiff and Multiple Class Members report that attack therapy was a central component to Hyde's curriculum. In it, students often sat in a circle while staff and peers screamed verbal attacks at them.

45.     Plaintiff and Multiple Class Members report that Hyde students were forced to admit traumatizing and embarrassing facts to their peers, often from a stage to a large group.

46.     Plaintiff and Multiple Class Members report that the Defendants often punished students who refused compliance, with punishment including excessive exercise and forced labor.

47.     Plaintiff and Multiple Class Members report that they experienced a culture of sexism and racism at Hyde. Multiple Class Members report that staff called female students 'sluts,' gay students 'faggots,' and Asian students 'chinks.'

48.     Plaintiff and Multiple Class Members report that the Defendants blamed students for their negative experiences, often telling them they choose to have mental illness and were responsible for their own trauma.

49.     Plaintiff and Multiple Class Members report that the Defendant(s) physically abused students. Multiple Class Members describe being slammed into walls by Hyde staff, choked, grabbed, and pushed to the ground.

50.     Hyde's disciplinary system centered on punishment, with Brother's Keeper serving as the primary mechanism for surveillance of students.

51.     Class Members were required to report other students' infractions to the administration. Plaintiff and Multiple Class Members report that Defendants would engage in abusive measures to extract confessions when none were forthcoming.

52.     Multiple Class Members report being taken to a basement and forced to hold a "lightbulb" pose, which meant they had to stand on one leg with their hands facing out, facing the

ceiling with their eyes open, and not blink. Multiple Class Members report that Hyde staff would crank the heat in the room, and no one could rest until a confession was made.

53.    Plaintiff and Multiple Class Members report how exercise was generally the first line of punishment at Hyde. Students were placed on "5:30." Plaintiff and Multiple Class Members report how during 5:30, students were subjected to forced exercise.

**5:30**  The basic form of student accountability for ethical infractions and poor attitudes.  Requires students to rise at 5:30 AM and perform basic chores around campus prior to breakfast.

54.    Plaintiff and Multiple Class Members report that 5:30 exercises often resulted in students passing out, vomiting, and/or injuring themselves. Students were forced to run on broken toes, with shin splints, in freezing conditions, and even with untreated asthma attacks.

55.    Multiple Class Members report that students were forced to exercise in sync in the middle of the night, in the snow, without gloves or coats. They further report that those who fell out of sync were often punished, and the group could not stop until exercise was completed in sync for a set period of time. They report how students were often freezing, at risk of frostbite, and vomiting.

56.    Class Members report how a student was forced to run after injuring her hip in a car accident. According to reports, staff called this student "fat" when she refused to comply.

57.    Class Members report how a student was forced to make another student do sit-ups in dog feces without being allowed to clean herself afterward.

58.    The next step in the punishment cycle was called "2-4" for when "5:30 will not suffice."

**Two-Four, 2-4**   When 5:30 will not suffice.  A stricter form of discipline which suspends the student from the regular curricular program and requires him/her to perform work duties around campus during school hours with breaks during meal hours.  The student is expected to earn his/her way back into the regular program

59.    Plaintiff and Multiple Class Members report that students spent significant amounts of time on 2-4, often for weeks at a time. During this time, they attended little to no classes and did little to no schoolwork.

60.    Plaintiff and Multiple Class Members recall how, while on 2-4, students were often forced into isolation, forbidden from speaking to other students or attending classes, and put under severe food restrictions, such as being limited to just peanut butter and jelly sandwiches.

61.    Multiple Class Members report being forced to "earn his/her way back into the regular program" from 2-4 by performing forced labor for Defendants in all weather conditions.

62.    Multiple Class Members report the following examples of labor 2-4 students were forced to do, often for weeks at a time, including in Maine winter conditions:

   a.   shovel snow from all walkways and common areas on Hyde's campus;

   b.   dig holes;

   c.   landscape Hyde's campus by moving rocks around campus;

   d.   clear out the Hyde school basement that had visible signs stating asbestos was present;

   e.   build walls and other structures on Hyde's campus to be used by other students and staff;

   f.   landscape staff members' homes, including, on information and belief, Gauld family members' homes;

   g.   landscape the Hyde campus by gardening, clearing pathways, and cutting grass;

h.  pick up dead birds and animals around campus;

i.  clean the entire Hyde campus, including bathrooms, without protective gear;

j.  work at local farms;

k.  clear brush and cut trees down on the acreage surrounding campus;

l.  clean lint off theater seats until the lint ball reached an acceptable size;

63.    Hyde and Defendant Malcolm Gauld boasted about said forced labor:



64.    Plaintiff and Multiple Class Members report how students who refused or were physically unable to work as required were punished with additional forced labor or exercise.

65.    Multiple Class Members report how the Defendants would threaten them with 2-4 for reporting medical conditions, asking for psychological help, running away, threatening to run away, asking for medicine, or refusing medicine.

66.    Multiple Class Members recall being told they had "lost food privileges" when they refused to work.

67.    Multiple Class Members report how Defendants forced students to improve and maintain wilderness properties that Hyde owned and marketed to prospective students.

**Tude Trip**  A wilderness camp/work project of 4 to 7 days duration.  A group of 10 to 12 students develop teamwork under the supervision of a faculty member.  Usually a disciplinary measure for students who exhibit unacceptable attitudes on 2-4 but is sometimes utilized for other students whom the faculty believe could benefit from such a challenge.

68.    At all relevant times, Hyde has owned a wilderness property in Eustis, Maine that is currently called the Lennox Outdoor Leadership Center.

69.    At all relevant times, Hyde has marketed the Eustis property as part of its summer leadership program, for which it charges a separate tuition fee.

70.    At all relevant times, Hyde has marketed the Eustis property to prospective students, stating students "travel to the Lennox Outdoor Leadership Center for a three-day outdoor adventure orientation…" where they get to "know each other through hiking, canoeing, and other team building activities."

71.    Upon information and belief, Defendants have marketed the Eustis property as a benefit to increase revenue.

72.    Upon information and belief, Defendants have charged summer students extra tuition fees to access the Eustis property and Defendants have used the property to increase enrollment.

73.    Upon information and belief, Hyde used Tude Trip, and similar wilderness forced labor punishments, to gain free labor to maintain and improve attractions that Hyde used to generate revenue.

74.    Multiple Class Members recall how the Defendants would force them to camp at Eustis property for days on end without adequate clothes or food. Multiple Class Members recall being limited to just a few handfuls of trail mix per day, which Defendants called "gorp," while camping and working at the Eustis property.

75.    Multiple Class Members recall being forced to create their own shelters at the Eustis property. Multiple Class Members report being forced to sleep in the snow for days.

76.    Multiple Class Members recall being forced to build structures on the Eustis property. Multiple Class Members report that Defendants forced students to pull logs and manually assemble structures. Upon information and belief, Defendants have used these structures to provide services to other students during the summer programs and orientation.

77.    Multiple Class Members recall being forced to clear trails and brush from the Eustis property in the late winter to prepare it for spring and summer.

78.    Multiple Class Members recall being forced to maintain Seguin Island as punishment.

79.     Seguin Island is a small island off the coast of Maine. Upon information and belief, Defendants had a contract with the owners of the island under which Defendants had access to it to provide services to students and provided free student labor in exchange.

80.     For decades, Hyde students were forced to clear brush, move boulders, and other hard labor on Sequin Island.



81.     Defendants forced Hyde students to build a stone walkway from the beach.



82.     As they continue to do with the Eustis property, Defendants profited from their association with Seguin Island by being able to offer it as a campground and summer activity to prospective students. Upon information and belief, this increased revenue at Hyde.

83.     Upon information and belief, Defendants profited from the forced labor of students.

84.     Upon information and belief, Defendants utilized forced labor to maintain the Eustis property by forcing students to live in extreme and dangerous conditions on meager rations while clearing brush, building structures, and cleaning paths.

85.     Multiple Class Members report that the Defendants transported students to private properties off campus where students were forced to clean and landscape.

86.     Upon information and belief, the Defendants benefited from this free forced labor by not having to pay normal wages to laborers.

87.     Upon information and belief, the Defendants manipulated students and families into thinking this forced labor was "character development" and that it was teaching them morality, responsibility, and giving them an appreciation and respect for community and hard work.

88.     Upon information and belief, the Defendants manipulated students and families into believing this forced labor was required for them to develop and grow.

89.     Defendants continue to mischaracterize and deny the abuse that the Plaintiff and Class Members endured at Hyde.

90.     Upon information and belief, the Defendants have never admitted or acknowledged the abuse and trafficking that the Plaintiff and Class Members endured at Hyde.

91.     Upon information and belief, the Defendants have maintained that the abuse and trafficking were "character development" and that the Plaintiff and Class Members' depictions of

their abuse "does not reflect the school, the philosophy, or the people we have experienced as alumni, as parents, and as current and former faculty and staff."

92.    Multiple Class Members report that this consistent denial by Hyde has prevented many students from accurately understanding that their own experiences at Hyde as abuse.

93.    Members of Hyde's Board of Governors have made public statements in recent weeks alleging that the law firm(s) representing the Plaintiff and Class Members are "angling for a big payday".

94.    Member(s) of Hyde's Board of Governors have made public statements in recent weeks alleging that the law firm(s) representing the Plaintiff and Class Members are "bullies":



It seems the reporting about Hyde followed a ready-fire-aim process. We think the school and our Maine community demand a thoughtful follow-up. This is a law firm angling for a big payday. We hope Hyde stands up to these bullies and that that's the angle for the next story.

**Tom and Mary Moore**
*Harpswell*

*Editor's note: Tom Moore is a member of the Hyde School* board of governors. *Mary Moore, a former teacher at Hyde, served as the school's director of family education.*



Comments are not available on this story. Read More about

95.     Upon information and belief, a practicing attorney and member of the Hyde Board of Governors, made similar public statements which characterized Plaintiff and Class Members' allegations of abuse as "reasonable punishment" and further characterized the instant action something that "makes me laugh" because the Class Members would receive about "1-100" dollars.



**B. Hyde's Conspiracy to Exploit Students**

96.    Upon information and belief, from its founding, the Gauld family has operated Hyde as a coordinated enterprise described to maximize profits through the exploitation of vulnerable minors placed in their care.

97.    Upon information and belief, the conspiracy involves multiple family members who have held executive positions, made key policy decisions, shared financial benefits, and actively participated in concealing the nature of Hyde's operations from families and regulators.

98.    Evidence of this conspiracy includes:

    a.   Multi-generational family control of most, if not all, key positions at the school;

    b.   Shared financial benefits

    c.   Coordinated marketing that concealed abusive practices;

    d.   Joint decision-making on disciplinary policies that facilitated forced labor;

    e.   Collective efforts to silence victims and prevent reporting.

### C.  Hyde's Abuse and Coercion of Ms. Fuller

99.    Ms. Fuller was 16-17 years old when she attended Hyde from approximately July 2014 through February 2015.

100.    Ms. Fuller reports that the Defendants abused and neglected her while she was at Hyde.

101.    Ms. Fuller reports that she was physically restrained with excessive force and without justification at Hyde. Fuller reports that each restraint was traumatizing and physically harmful.

102.    Ms. Fuller reports that the Defendants forced her to exercise excessively.

103.    Ms. Fuller reports that the Defendants forced her to exercise when she was sick and injured to the point of further injury, collapse, and vomiting.

104.    Ms. Fuller experienced a mental health crisis while at Hyde which she attributes to the Defendants' abuse and neglect.

105.    Ms. Fuller reports that she was refused prescribed psychiatric medication during said mental health crisis, then was left alone for long periods of time.

106.    Ms. Fuller reports that the Defendants emotionally abused her at Hyde.

107.    Ms. Fuller reports that the Defendants regularly surveilled her, or forced other students to surveil her, including during private moments such as using the bathroom or showering.

108.    Ms. Fuller reports that the Defendants restricted and monitored her contact with family.

109.    Ms. Fuller reports that the Defendants restricted her ability to report abuse.

110.    Ms. Fuller reports that the Defendants punished students who questioned their tactics or behavior with 2-4 forced labor.

111.    Ms. Fuller reports that the Defendants blamed her for her own struggles, telling her that her trauma, mental illness, and mistreatment were her fault.

112.    Ms. Fuller reports that the Defendants encouraged peer criticism, which subjected her to a constant barrage of peer and staff criticism.

113.    Ms. Fuller reports that the Defendants required her to participate in attack therapy where she was subjected to verbal abuse, forced disclosures of past trauma, and humiliation in group settings.

114.    Ms. Fuller reports that the Defendants threatened her with exercise and 2-4 forced labor if she did not participate in attack therapy.

115.    Ms. Fuller reports that she was subjected to shame, ridicule, and humiliation because of Defendants' constant threats of forced labor.

116.    Ms. Fuller reports that the Defendants' coercive and abusive tactics caused her to internalize guilt and shame, which has led to serious and long-lasting psychological pain and suffering.

117.    Ms. Fuller reports that the rather than address and care for her depression and trauma, the Defendants subjected Ms. Fuller to the "2-4" disciplinary forced labor system described herein.

118.    Ms. Fuller reports that she spent an excessive amount of time relegated to 2-4. Ms. Fuller reports that while on 2-4, Defendants isolated her from other students, forbade her from speaking, restricted her access to food and water, and publicly shamed and humiliated her in front of other students.

119.    Ms. Fuller reports that the Defendants required her to work under threat of physical and emotional harm, deprivation of food and housing, and further forced labor without pay.

120.    Ms. Fuller reports that the under threat of physical and emotional harm, deprivation of food and housing, and further punishment, Defendants forced her to perform a variety of unpaid labor that benefited Defendants, including but not limited to:

    a.   Pulling weeds on the Hyde campus;

    b.   Gardening the Hyde campus;

    c.   Cutting the grass on the Hyde campus;

    d.   Cleaning campus facilities and buildings;

    e.   Cleaning toilets while a rag and bleach while sick;

    f.   Pushing and pulling heavy wheel barrels for long periods of time.

121.    Ms. Fuller has suffered significant physical and emotional injuries because of Defendants' abuse and neglect, including but not limited to depression, anxiety, hypervigilance, difficulty trusting others, difficulty forming and maintaining relationships, sleep disturbances, gastrointestinal issues, back pain, substance abuse challenges, interruption and delay of education, loss of earning capacity, among other harms.

122.    At all relevant times, the Defendants knew or should have known that vulnerable teenage students struggling with mental health issues, such as Ms. Fuller, are particularly vulnerable and open to impression.

123.    Upon information and belief, the Defendants manipulated that vulnerability to achieve and demand compliance and surrender.

124.    Ms. Fuller reports that she was subjected to coercion and manipulation as described above while at Hyde.

125.    Ms. Fuller reports that the Defendants broke her down until she complied and accepted the Hyde way as reality.

126.    Ms. Fuller reports that the Defendants coerced her into believing that the abuse and neglect she suffered at Hyde was a legitimate and innovative form of behavioral modification and education.

127.    Ms. Fuller reports that she was coerced into believing that Defendants were trying to help her.

## V.    CLASS ALLEGATIONS

128.    Plaintiffs bring this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

**Primary Class Defined As:**

All persons who were students at Hyde School and subjected to forced labor by Defendants while at Hyde and either (1) such forced labor occurred on or after July 12, 2015, or (2) were minors when subjected to such forced labor and have not reached the age of 28 as of July 11, 2025.

**Subclass Defined As**:

All other persons who were students at Hyde School and subjected to forced labor by Defendants while at Hyde but are not included in the Primary Class.

129.    Excluded from the Classes are Defendants, their affiliates, employees, officers, and directors, and the Judge(s) assigned to this case.

130.    Plaintiffs reserve the right to modify, change, or amend the Class definitions set forth above based on discovery and further investigation.

131.    **Numerosity**. The requirements of Rule 23(a)(1) are satisfied because there are too many Class Members for joinder of all of them to be practicable. Upon information and belief, the total number of Class Members far exceeds 100 in number.

132.    **Commonality.** The claims of the Class Members raise numerous common issues of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2). These common legal and factual questions may be resolved without the necessity of resolving individualized factual disputes concerning individual Class Members.

133.    Common **Questions Predominate.** This action involves common questions of law and fact to the class, including:

> i.    Whether Defendants' conduct violated the forced labor and trafficking provisions of the TVPRA (18 U.S.C. §§ 1584, 1589, 1590)
>
> ii.    Whether Defendants' violations of Maine law caused harm to the Class Members;
>
> iii.    Whether Defendants conduct violated the forced labor and trafficking provision of 5 M.R.S. § 4701;
>
> iv.    The nature of damages available to Plaintiffs and members of the putative class, including the applicability of compensatory and/or punitive damages.

134.    Common **Questions Predominate.** This action involves common questions of law and fact to the class, including:

> i.    Whether Defendants used and/or threatened Plaintiff and other Class Members with physical restraint, serious harm, coercion, and/or abuse of the legal process in order to obtain Plaintiffs' and other putative class members' labor or services;
>
> ii.    Whether Defendants recruited, harbored, transported, and/or obtained Plaintiff and Class Members in order to subject them to forced labor and/or involuntary servitude;

      iii.    Whether Defendants knowingly benefited from participating in a venture that Defendants knew or should have known was engaged in providing and/or obtaining Plaintiff and Class Members' labor or services through threats, physical restraint, serious harm, and/or coercion.

      iv.    Whether Defendants knowingly benefited from participating in a venture that Defendants knew or should have known was engaged in the recruitment, harboring, transporting, obtaining and/or providing Plaintiff and Class Members for the purpose of subjecting them to forced labor and/or involuntary servitude;

      v.    Whether Defendants used standardized recruitment, record-keeping, and policies and practices for Plaintiff and Class Members;

      vi.    The source and amount of Plaintiff and Class Members' damages.

135.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. Additionally, Class treatment of common issues under the Federal Rule of Civil Procedure 23(c)(4) will materially advance the litigation.

136.    **Typicality**. The claims of the named Plaintiff are typical of the claims of the unnamed Class Members she represents because, among other things, all such claims arise out of the same misconduct by Defendants as alleged herein. Plaintiff's claims are typical off the claims of the Class because Plaintiff and all Class Members were injured or damaged by the same wrongful practices in which the Defendants engaged.

137.    **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of all Class Members because it is in her best interest to prosecute the claims alleged herein to obtain full compensation due to them for the misconduct of which they complain. Plaintiff has no interests that are in conflict with, or antagonistic to, the interests of Class Members. Plaintiff has retained highly competent and experienced Class action attorneys to represent her interests and those of the Class Members. By prevailing on her own claims, Plaintiff will establish Defendants' liability to all Class Members. Plaintiff and her counsel have the necessary financial resources to

adequately and vigorously litigate this Class action and Plaintiff and her undersigned counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class Members.

138.   **Superiority**. There is no plain, speedy, or adequate remedy other than by maintenance of this Class action. The prosecution of individual remedies by Class members will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, an important public interest will be served by addressing the matter as a Class action.

139.   Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a Class action.

## COUNT ONE
**(Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1584)**
**(On Behalf of Plaintiff and Both Classes)**
**(Against all Defendants)**

140.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

141.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

142.    Plaintiff and Class Members were all victims of forced labor trafficking in violation of 18 U.S.C. § 1584.

143.    Under 18 U.S.C. § 1584, it is unlawful to knowingly and willfully hold another person to involuntary servitude or to sell any person into any condition of involuntary servitude.

144.    Upon information and belief, the Defendants knowingly held Plaintiff and the Class Members to involuntary servitude through the following acts:

a.    Defendants knowingly held Plaintiff and the Class Members to involuntary servitude and forced labor through a coordinated system of control, coercion, and concealment. This system extended beyond isolated acts and abuse and constituted an institutional structure deliberately designed to extract unpaid labor and suppress dissent.

b.    Defendants exercised total control over students' daily lives, including when and where they ate, slept, worked, communicated with family, and received medical or psychological care. This level of control eliminated any meaningful autonomy, creating a captive labor force under the guise of "character education".

c.    Defendants implemented and enforced internal policies that eliminated meaningful educational oversight. While Hyde marketed itself as an academic institution, its curriculum was secondary to its labor and disciplinary systems. Many students, including Plaintiff, spent more time in punishment and forced labor than in class.

d.    Defendants deliberately misrepresented Hyde's practices to families, regulators, and the public, branding their coercive methods as therapeutic and character-building. Internally, they enforced rigid surveillance systems such as "Brother's Keeper," not only to monitor student behavior, but to prevent exposure of Hyde's

true practices. Staff and students were conditioned to remain silent, and complaints were met with punishment rather than investigation.

e.  To ensure ongoing control and suppress dissent, Defendants relied on isolation, deprivation, and psychological coercion. Students who questioned authority, reported abuse, or resisted labor were punished with food and sleep restrictions, isolated from their peers, public shaming, and intensified physical exertion. These mechanisms were not incidental – they were institutional procedures integral to Hyde's model.

f.  Defendants' structure functioned to maintain institutional silence, preventing students and families from recognizing, reporting, or challenging the abuse. Students like Ms. Fuller were not simply working under duress – they were indoctrinated to believe that their abuse was necessary for growth, and that resistance signaled personal failure.

g.  Through this coercive system, Defendants maintained a profitable enterprise that used children for unpaid labor under total institutional control. Each Defendant had knowledge of and actively participated in this structure and thus knowingly benefitted from the forced labor scheme in violation of the Trafficking Victims Protection Reauthorization Act.

h.  Creating and maintaining a program wherein Plaintiff and the Class Members were forced to work against their will both on and off Hyde's property;

i.  Requiring Plaintiff and the Class Members to work in extreme weather conditions, using industrial chemicals and tools, and without protective gear, precautions, or supervision;

j.  Requiring Plaintiff and Class Members to work against their will in order to advance grade levels or graduate;

k.  Maintaining complete control over Plaintiff and the Class Members throughout the forced labor period, dictating when, where, and for how long they would work, and under what conditions;

l.  Restricting and controlling Plaintiff and the Class Members' communications with people outside of Hyde, including family and loved ones, and thereby preventing Plaintiff and Class Members from reporting the forced labor as it was happening;

145.  Upon information and belief, the Defendants operated with one common and shared financial interest, which was to share the profits from Hyde.

146.  Upon information and belief, the Defendants increased profits by keeping Plaintiff and Class Members enrolled at Hyde for as long as possible.

147.  Upon information and belief, the Defendants were engaged in an enterprise because they were all collectively motivated with increasing and maintaining enrollment, such that they all shared in the risk of their abuse of Plaintiff and Class Members being reported as such and negatively affecting enrollment, and thus profit.

148.  Upon information and belief, the Defendants increased profits by minimizing expenses at Hyde by utilizing the forced labor of Plaintiff and the Class Members

149.  Upon information and belief, the forced labor of Plaintiff and the Class Members generated financial benefit for all Defendants.

150.  Upon information and belief, all Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant

knowingly benefitted by receiving revenue and other benefits from participation in the continuing business venture of Hyde.

151.    Upon information and belief, all Defendants personally witnessed and enforced the forced labor scheme at Hyde against Plaintiff and the Class Members.

152.    Each Defendant is jointly and severally liable to Plaintiff and the Class Members because, upon information and belief, they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and Class Members were trafficked, harbored, and sold in violation of U.S.C. § 1584.

153.    Upon information and belief, each Defendant received, and continues to receive, a financial benefit from participating in the operations of Hyde, through which the Defendants recruited, exploited, and manipulated vulnerable kids from desperate families around the country, including Plaintiff and the Class Members.

154.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered economic damages for which they should be compensated.

155.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT TWO
**(Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1589)**
**(On Behalf of Plaintiff and Both Classes)**
**(Against all Defendants)**

156.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

157.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff and Class Members against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving

anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

158.    Plaintiff and Class Members were all victims of forced labor trafficking in violation of 18 U.S.C. § 1589.

159.    Under 18 U.S.C. § 1589(a), it is unlawful to knowingly provide or obtain labor or services by means of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause a person to believe that they would suffer serious harm or physical restraint if they did not perform such labor or services.

160.    Under 18 U.S.C. § 1589(b), it is also unlawful to "knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" by the means described in subsection (a).

161.    Under 18 U.S.C. § 1589(c)(2) the term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, reputational harm…"

162.    Defendants violated 18 U.S.C. § 1589 through obtaining the Plaintiff and Class Members' forced and involuntary labor through extreme emotional abuse and serious harm.

163.    Upon information and belief, the Defendants operated Hyde as a tightly controlled environment designed to eliminate student autonomy and foster submission. They instituted a complex system of discipline and coercion that left little avenue for dissent. Staff enforced labor through cycles of punishment, psychological manipulation, and deprivation. The absence of educational focus or external accountability created an environment where forced labor was the norm, not the exception.

164.    Upon information and belief, the Defendants' internal disciplinary structures, such as "2-4" and "Work Crew," functioned as punitive tools to compel compliance and labor under the constant threat of punishment. Defendants obscured these practices under a deceptive narrative of personal development and therapeutic intervention, thereby concealing the true nature of their conduct from students and parents.

165.    Upon information and belief, the use of institutional isolation, routine verbal degradation, and collective punishment reinforced psychological dependency and fear. Students were cut off from meaningful contact with outsiders, told that their suffering was their own fault, and led to belief that forced labor was essential for redemption or progress.

166.    Upon information and belief, the Defendants obtained the forced labor of Plaintiff and Class Members in the following ways:

a. Creating and enforcing a system wherein Plaintiff and Class Members were punished with forced labor;

b. Creating and enforcing a system wherein Plaintiff and Class Members had food and water withheld as punishment and for not complying with the forced labor requirements;

c. Creating and enforcing a system wherein Plaintiff and Class Members were threated and forced to engage in strenuous exercise to point of collapse as punishment and for not complying with forced labor requirements;

d. Emotionally abusing and threating Plaintiff and Class Members into believing they had to comply with the punitive forced labor requirements in order to succeed at Hyde and to adopt the "Hyde way";

e.  Emotionally abusing and humiliating Plaintiff and Class Members to break them down into a state of full compliance;

f.  Punishing Plaintiff and Class Members with threats of violence, isolation, restraint, and loss of privileges and status if they did not comply with the forced labor requirements;

g.  Ignoring the complaints of injury, exhaustion, or exposure to extreme weather from Plaintiff and Class Members to continue forcing them to work;

h.  Controlling Plaintiff and Class Members' access to housing, food, and water, and through that control implementing a punishment system of withholding or restricting all said items to force Plaintiff and Class Members into compliance and forced labor;

i.  Systematically undermining Plaintiff and Class Members' sense of autonomy through psychological manipulation;

j.  Using the structure and status of a reputable boarding school with an innovative educational philosophy to shield forced labor practices from scrutiny and to manipulate families and Plaintiff and Class Members into believing the forced labor was for their benefit.

167.  Upon information and belief, the Defendants operated with one common and shared financial interest, which was to share the profits from Hyde.

168.  Upon information and belief, the Defendants increased profits by keeping Plaintiff and Class Members enrolled at Hyde for as long as possible.

169.  Upon information and belief, the Defendants were engaged in an enterprise because they were all collectively motivated with increasing and maintaining enrollment, such that they all

shared in the risk of their abuse of Plaintiff and Class Members being reported as such and negatively affecting enrollment, and thus profit.

170.    Upon information and belief, the Defendants increased profits by minimizing expenses at Hyde through utilizing the forced labor of Plaintiff and the Class Members.

171.    Upon information and belief, the forced labor of Plaintiff and the Class Members generated financial benefit for all Defendants.

172.    Upon information and belief, the Defendants operated as a coordinated family enterprise with shared financial interests in maximizing profits through forced labor. Evidence includes:

a. Malcolm Gauld's compensation exceeding $1.5 million in 2020 alone.

b. Laura Gauld's compensation exceeding $310,000 in 2021.

c. Multiple family members in executive positions.

d. Shared decision-making on policies facilitating forced labor.

e. Coordinated marketing that concealed abusive practices.

173.    All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, upon information and belief, each Defendant knowingly benefitted by receiving revenue and other benefits from participation in the continuing business venture of Hyde.

174.    Upon information and belief, all Defendants personally witnessed and enforced the forced labor scheme at Hyde against Plaintiff and the Class Members.

175.    Each Defendant is jointly and severally liable to Plaintiff and the Class Members because, upon information and belief, they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and Class Members were trafficked, harbored, and sold in violation of U.S.C. § 1589.

176.    Upon information and belief, each Defendant received, and continues to receive, a financial benefit from participating in the operations of Hyde, through which the Defendants recruited, exploited, and manipulated vulnerable kids from desperate families around the country, including Plaintiff and the Class Members.

177.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered economic damages for which they should be compensated.

178.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered emotional and physical pain and suffering for which they should be compensated.

### COUNT THREE
**(Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1590)**
**(On Behalf of Plaintiff and Both Classes)**
**(Against all Defendants)**

179.    Plaintiff incorporates by reference all preceding allegations.

180.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff and Class Members against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

181.    Upon information and belief, the Defendants all benefited from a venture in which Plaintiff and Class Members were recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

182.    Upon information and belief, the Defendants operated a closed and self-reinforcing environment where external oversight was minimized, and internal control was maximized. Through deceptive marketing and false assurances to families, Defendants lured vulnerable minors to Hyde under false pretenses. Once enrolled, students were quickly subjected to institutional

control mechanisms that restricted communication, movement, autonomy, and access to basic rights.

183.    Upon information and belief, recruitment into Hyde was based, at least in part, on emotional appeals to families in crisis, offering a solution that emphasized "character development" while hiding the labor conditions to which students would be subjected. Once under Defendants' control, students were required to work long hours without pay, under conditions that directly benefited Defendants financially.

184.    Upon information and belief, through this system, Defendants obtained labor by means of deception, coercion, and psychological control. Defendants did not merely tolerate the abuses occurring under their watch - they orchestrated them and profited from them.

185.    Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of this chapter."

186.    Upon information and belief, the Defendants violated 18 U.S.C. § 1590 in several ways, including but not limited to the following:

    a.  Creating and disseminating misleading marketing materials to Plaintiff, Class Members, and their families that described Defendants' services and programs as a legitimate educational program with leading and innovative expertise educating teenagers;

    b.  Specifically targeting, through marketing and messaging, vulnerable and struggling teens and their desperate families;

    c.  Transporting students to forced labor job sites;

    d.   Maintaining exclusive control over Plaintiff and Class Members' housing, transportation, food, and water while Defendants were benefiting from the forced labor of the named Plaintiffs and putative class members

    e.   Harboring Plaintiff and Class Members the entire time that Defendants were benefitting from Plaintiff and Class Members' forced labor.

187.   Upon information and belief, the Defendants operated with one common and shared financial interest, which was to share the profits from Hyde.

188.   Upon information and belief, the Defendants increased profits by keeping Plaintiff and Class Members enrolled at Hyde for as long as possible.

189.   Upon information and belief, the Defendants were engaged in an enterprise because they were all collectively motivated with increasing and maintaining enrollment, such that they all shared in the risk of their abuse of Plaintiff and Class Members being reported as such and negatively affecting enrollment, and thus profit.

190.   Upon information and belief, the Defendants increased profits by minimizing expenses at Hyde through utilizing the forced labor of Plaintiff and the Class Members.

191.   Upon information and belief, the forced labor of Plaintiff and the Class Members generated financial benefit for all Defendants.

192.   All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, upon information and belief, each Defendant knowingly benefitted by receiving revenue and other benefits from participation in the continuing business venture of Hyde.

193.   Upon information and belief, all Defendants personally witnessed and enforced the forced labor scheme at Hyde against Plaintiff and the Class Members.

194.    Each Defendant is jointly and severally liable to Plaintiff and the Class Members because, upon information and belief, they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and Class Members were trafficked, harbored, and sold in violation of U.S.C. § 1590.

195.    Upon information and belief, each Defendant received, and continues to receive, a financial benefit from participating in the operations of Hyde, through which the Defendants recruited, exploited, and manipulated vulnerable kids from desperate families around the country, including Plaintiff and the Class Members.

196.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered economic damages for which they should be compensated.

197.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT FOUR
### (Forced Labor Violations of 5 M.R.S. § 4701)
### (On Behalf of Plaintiff and Both Classes)
### (Against all Defendants)

198.    Plaintiff incorporates by reference all preceding allegations.

199.    Defendants operated Hyde in violation of Maine's human trafficking statute, 5 M.R.S. § 4701, by subjecting Plaintiff and Class Members to forced labor through coercion, threats, and deprivation as defined under 17-A M.R.S. §§ 304 and 305.

200.    Upon information and belief, the Defendants created and maintained a systematic forced labor program that subjected students to physical labor in extreme weather conditions, including shoveling snow, hauling wood, clearing school grounds, and performing maintenance work on school facilities and remote locations.

201.    Upon information and belief, this labor was imposed as punishment, control, and a means of breaking down student resistance. Students were told they had to "earn their way out" through compliance with work requirements.

202.    Upon information and belief, students who resisted, complained, or failed to meet work expectations were subjected to escalating punishments including physical abuse, isolation, food deprivation, sleep deprivation, and being forced to sleep outdoors.

203.    Upon information and belief, medical care was routinely withheld from students who were visibly ill or injured, including during and after forced labor assignments.

204.    Upon information and belief, the Defendants coerced labor through direct and implied threats of physical injury. Students were threatened with physical punishment if they refused to work or failed to complete assigned tasks.

205.    Upon information and belief, students were forced to work in dangerous conditions without adequate protective gear, knowing that refusal would result in physical punishment or more dangerous work assignments.

206.    Upon information and belief, student proctors often threatened physical violence against students who failed to comply with work requirements.

207.    Upon information and belief, student proctors leveraged their authority to coerce peers into inappropriate sexual contact under the threat of additional punishment or labor.

208.    Upon information and belief, the Defendants systematically used deprivation of basic necessities to coerce labor, including:

 a.    Withholding food from students who refused to work or failed to meet work quotas;

 b.    Forcing students to sleep on snow or outdoors as punishment for work-related defiance;

43

c.   Denying access to adequate clothing and protective gear during outdoor labor;

d.   Isolating students from peers and family contact until work requirements were met;

209.    Upon information and belief, the Defendants threatened students' health and safety by punishing entire groups when individual students refused to work, creating peer pressure to comply with forced labor demands.

210.    Upon information and belief, students who attempted to help sick or injured peers during work assignments were punished, creating a system where no or inadequate assistance was provided to those suffering during forced labor.

211.    Upon information and belief, the Defendants threatened to expose students' personal information, struggles, or perceived failures to peers and family members if they refused to comply with work requirements.

212.    Upon information and belief, students were threatened with public humiliation, loss of status within the school hierarchy, and isolation from the school community for work-related non-compliance.

213.    Upon information and belief, the Defendants implemented a hierarchical point system that extorted students into working by conditioning access to basic necessities and privileges on work compliance, including:

a.   Access to hygiene facilities and personal care items;

b.   Family contact and communication privileges;

c.   Adequate food and nutrition;

d.   The ability to advance through the program and ultimately leave the school;

214.    This system created a framework where students believed they had no choice but to comply with forced labor requirements to avoid losing academic credits, privileges, family contact, and their opportunity to leave Hyde.

215.    Upon information and belief, the Defendants required students to work in extreme weather conditions with inadequate clothing, protective gear, or supervision while using industrial chemicals and dangerous tools.

216.    Upon information and belief, students were forced to work at remote locations including Eustis and Sequin Island, where they were completely isolated from family, peers, and potential oversight or intervention.

217.    Upon information and belief, the Defendants maintained complete control over all aspects of the forced labor, dictating when, where, how long, and under what conditions students would work.

218.    Upon information and belief, the Defendants concealed these forced labor practices from families and regulatory authorities by staging visits, censoring communications, monitoring phone calls, and forbidding students from speaking negatively about Hyde.

219.    Upon information and belief, Hyde marketed its program as "transformative" and therapeutic while omitting any mention of the forced labor practices that were central to its operations.

220.    Parents paid tuition believing their children were receiving legitimate educational and therapeutic services rather than being subjected to illegal forced labor.

221.    The forced labor violations are aggravated under 17-A M.R.S. § 305(1) because victims were minors under the age of 18.

222.    The systematic nature of the forced labor program, its integration into the school's operations, and the deliberate concealment of these practices from families and authorities demonstrate the calculated and intentional nature of Defendants' violation.

223.    As a direct and proximate result of Defendants' forced labor violations, Plaintiff and Class Members suffered severe emotional trauma, physical injuries, educational deprivation, and other significant harms.

224.    Plaintiff and Class Members seek all relief permitted under 5 M.R.S. § 4701(2), including actual damages, punitive damages, attorney's fees, costs, and appropriate equitable remedies.

225.    As a result of Defendants' conduct, Plaintiff and the Class Members suffered emotional and physical pain and suffering for which they should be compensated.

## COUNT FIVE
### (Civil Action Under 18. U.S.C. § 2255
### (On Behalf of Plaintiff and Both Classes)
### (Against all Defendants)

226.    Plaintiff incorporates by reference all preceding allegations.

227.    Plaintiff and members of the Forced Labor Subclasses were minors in the custody, care and control of Defendants at Hyde School.

228.    Upon information and belief, while in the Defendants' custody, Plaintiff and members of the Forced Labor Classes were subjected to forced labor by the Defendants and their agents by:

    a.    Creating and disseminating misleading marketing materials to Plaintiff, Class Members, and their families that described Defendants' services and programs as a

legitimate educational program with leading and innovative expertise educating teenagers;

b.  Specifically targeting, through marketing and messaging, vulnerable and struggling teens and their families;

c.  Transporting Plaintiff and Class Members to forced labor job sites;

d.  Maintaining exclusive control over Plaintiff and Class Members' housing, transportation, food, and water while Defendants were benefiting from the forced labor of the named Plaintiffs and putative class members

e.  Harboring Plaintiff and Class Members the entire time that Defendants were benefitting from Plaintiff and Class Members' forced labor.

f.  Creating and enforcing a system wherein Plaintiff and Class Members were punished with forced labor;

g.  Creating and enforcing a system wherein Plaintiff and Class Members had food and water withheld as punishment and for not complying with the forced labor requirements;

h.  Creating and enforcing a system wherein Plaintiff and Class Members were threated and forced to engage in strenuous exercise to point of collapse as punishment and for not complying with forced labor requirements;

i.  Emotionally abusing and threating Plaintiff and Class Members into believing they had to comply with the punitive forced labor requirements in order to succeed at Hyde and to adopt the "Hyde way";

j.  Emotionally abusing and humiliating Plaintiff and Class Members to break them down into a state of full compliance;

k.  Punishing Plaintiff and Class Members with threats of violence, isolation, restraint, and loss of privileges and status if they did not comply with the forced labor requirements;

l.  Ignoring the complaints of injury, exhaustion, or exposure to extreme weather from Plaintiff and Class Members to continue forcing them to work;

m.  Controlling Plaintiff and Class Members' access to housing, food, and water, and through that control implementing a punishment system of withholding or restricting all said items to force Plaintiff and Class Members into compliance and forced labor;

n.  Systematically undermining Plaintiff and Class Members' sense of autonomy through psychological manipulation;

o.  Using the structure and status of a reputable boarding school with an innovative educational philosophy to shield forced labor practices from scrutiny and to manipulate families and Plaintiff and Class Members into believing the forced labor was for their benefit;

p.  Forcing Plaintiff and the Class Members to landscape the Hyde campus; maintain off-site properties from which Hyde profited; clear brush and cut down trees from the Hyde campus; clean the entire Hyde campus with industrial cleaners and no protective equipment; and perform maintenance, landscaping, and cleaning at the Individual Defendants off-campus homes.

229.  Defendants knew or should have known of the propensity of their staff to engage in this misconduct but failed to take reasonable steps to prevent such abuse.

230.    As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Forced Labor Classes suffered severe physical and emotional harm.

231.    Under 18. U.S.C. § 2255, Plaintiff and members of the Forced Labor Classes are entitled to:

      a.    Actual damages or liquidated damages of $150,000, whichever is greater;

      b.    Punitive damages;

      c.    Attorney's fees and costs;

      d.    Such other relief as the Court deems just.

<u>**COUNT SIX**</u>
<u>**(Civil Action Under 18 U.S.C. § 1595(a) for Attempted Forced Labor Violations of 18 U.S.C. § 1594(a)**</u>
<u>**(On Behalf of Plaintiff and Both Classes)**</u>
<u>**(Against All Defendants)**</u>

232.    Plaintiff incorporates by reference all preceding allegations.

233.    Upon information and belief, the Defendants intended to violate 18 U.S.C. §§ 1584, 1589, and 1590 by establishing a system designed to extract forced labor from students.

234.    Upon information and belief, the Defendants took substantial steps towards these violations by:

      a. Creating disciplinary systems specifically designed to coerce labor;

      b. Deliberately understaffing Hyde to necessitate student labor;

      c. Establishing punishment protocols that forced compliance;

      d. Marketing Hyde to attract vulnerable students for exploitation.

## COUNT SEVEN
### (Civil Action Under 18. U.S.C. § 1595(a) for Conspiracy to Commit Forced Labor Violations of 18 U.S.C. § 1594(b)
### (On Behalf of Plaintiff and Both Classes)
### (Against All Defendants)

235.    Plaintiff incorporates by reference all preceding allegations.

236.    Upon information and belief, the Defendants conspired to violate 18 U.S.C. § 1584, 1589, and 1590 through their coordinated family enterprise.

237.    Evidence of conspiracy includes:

a. Agreement among family members to operate Hyde for maximum profit;

b. Shared financial benefits from forced labor scheme;

c. Coordinated policies designed to extract student labor;

d. Joint efforts to conceal abusive practices from authorities;

e. Multi-generational participation in the scheme.


## COUNT EIGHT
### (Civil Action Under 18 U.S.C. § 1595(a) for Individual Liability for Forced Labor Violations)
### (On Behalf of Plaintiff and Both Classes)
### (Against Individual Defendants Laura Gauld, Malcolm Gauld, Georgia Gauld MacMillan, Donald MacMillan, and Laurie Gauld Hurd)

238.    Plaintiff incorporates by reference all preceding allegations.

239.    Upon information and belief, tach individual Defendant personally participated in, directed and benefitted from the forced labor scheme at Hyde School.

240.    Upon information and belief, the Defendant Laura Gauld's Individual Liability includes as follows:

a. As President and Head of School, personally implemented and enforced policies requiring student forced labor;

b. Directly supervised staff who carried out forced labor assignments;

c. Received over $310,000 in 2021 from Hyde's operations funded by forced labor;

d. Personally observed and approved the "2-4" forced labor system;

e. Made executive decisions to understaff Hyde to necessitate student labor.

241.    Upon information and belief, the Defendant Malcolm Gauld's Individual Liability includes as follows:

a. As Executive Director and former President, designed and implemented forced labor policies;

b. Publicly promoted the forced labor system as "therapeutic";

c. Received over $1.5 million in 2020 from Hyde's forced labor operations;

d. Personally directed students to perform unpaid labor;

e. Created the "Brother's Keeper" surveillance system to facilitate forced labor.

242.    Upon information and belief, the Defendant Georgia Gauld MacMillan's Individual Liability includes as follows:

a. As former Head of Campus and Executive Director of Family Education, implemented forced labor policies;

b. Personally supervised forced labor at both Maine and Connecticut locations;

c. Received financial compensation from Hyde's forced labor operations;

d. Directly participated in disciplinary decisions that resulted in forced labor;

e. Concealed forced labor practices from families during education sessions.

243.    Upon information and belief, the Defendant Donald MacMillan's Individual Liability includes as follows:

a. As former Head of School and current teacher, personally directed student forced labor;

b. Implemented classroom policies that supported the forced labor system;

c. Received compensation from Hyde's forced labor operations;

d. Directly supervised students performing unpaid labor;

e. Failed to report forced labor violations despite mandatory reporting obligations.

244. Upon information and belief, the Defendant Laurie Gauld Hurd's Individual Liability includes as follows:

a. As Director of Community Engagement, marketed Hyde while concealing forced labor practices;

b. Received financial benefit from Hyde's forced labor operations;

c. Personally participated in recruitment that brought students to forced labor conditions;

d. Created marketing materials that misrepresented the true nature of student "work";

e. Actively concealed forced labor practices from the community and prospective families.

245. Upon information and belief, each individual Defendant acted with actual knowledge of the forced labor violations and personally benefited from the scheme.

246. Each individual Defendant's actions were in violation of 18 U.S.C. §§ 1584, 1589, and 1590 as alleged herein.

247. Each individual Defendant is personally liable under 18 U.S.C. § 1595(a) for their direct participation in trafficking violations.

**COUNT NINE**
**(Civil Action Under 18 U.S.C. § 2255 for Individual Liability for Forced Labor Violations)**
**(On Behalf of Plaintiff and Both Classes)**
**(Against Individual Defendants Laura Gauld, Malcolm Gauld, Georgia Gauld MacMillan,**
**Donald MacMillan, and Laurie Gauld Hurd)**

248.    Plaintiff incorporates by reference all preceding allegations.

249.    Upon information and belief, each individual Defendant personally participated in, enabled, or failed to prevent the forced labor of students at Hyde School.

250.    Upon information and belief, the Defendant Laura Gauld's Individual Liability includes as follows:

a. As President and Head of School, had actual knowledge of students being subjected to forced labor by staff;

b. Failed to take corrective action when forced labor was reported;

c. Personally implemented policies that isolated students and prevented reporting;

d. Created an environment that facilitated forced labor.

251.    Upon information and belief, the Defendant Malcolm Gauld's Individual Liability includes as follows:

a. As Executive Director, had ultimate authority over student safety policies;

b. Personally knew of a culture of forced labor at Hyde but failed to address it;

c. Created isolation and punishment systems that facilitated forced labor;

d. Failed to implement adequate safeguards to protected students from being subjected to forced labor by staff;

e. Personally witnessed students being subjected to forced labor but failed to intervene.

252.    Upon information and belief, the Defendant Georgia Gauld MacMillan's Individual Liability includes as follows:

a. As Executive Director of Family Education, failed to protect students from forced labor;

b. Had direct contact with students and personally observed forced labor.

253.    Upon information and belief, the Defendant Donald MacMillan's Individual Liability includes as follows:

a. As teacher and former Head of School, had direct regular contact with students;

b. Personally witnessed students being subjected to forced labor but failed to intervene;

c. Created classroom environments that normalized forced labor.

254.    Upon information and belief, the Defendant Laurie Gauld Hurd's Individual Liability includes as follows:

a. Had knowledge of students being subjected to forced labor but continued to market Hyde as safe;

b. Personally interacted with families while concealing forced labor;

c. Created marketing materials that misrepresented student safety.

255.    Upon information and belief, each individual Defendant's conduct constituted deliberate indifference to the substantial risk of forced labor.

256.    Each individual Defendant is personally liable under 18 U.S.C. § 2255 for enabling and failing to prevent forced labor of minors in their custody.

**COUNT TEN**
**(Individual Liability for Conspiracy Under 18 U.S.C. § 1594(b)**
**(On Behalf of Plaintiff and Both Classes)**
**(Against Individual Defendants Laura Gauld, Malcolm Gauld, Georgia Gauld MacMillan,**
**Donald MacMillan, and Laurie Gauld Hurd)**

257. Plaintiff incorporates by reference all preceding allegations.

258. Upon information and belief, each individual Defendant knowingly entered into and participated in a conspiracy to commit forced labor and trafficking violations.

259. Upon information and belief, evidence of Individual Conspiracy Participation includes:

   a. Shared financial benefits creating common interest in the scheme;

   b. Joint decision-making on disciplinary policies that facilitated forced labor;

   c. Collective efforts to conceal violations from families.

260. Upon information and belief, Overt Acts in Furtherance of Conspiracy include as follows:

   a. Each Defendant implemented policies designed to extract forced labor;

   b. Each Defendant helped conceal violations from parents and authorities;

   c. Each Defendant shared in financial benefits of the forced labor scheme;

   d. Each Defendant participating in marketing that concealed the true nature of Hyde;

   e. Each Defendant took steps to silence victims and prevent reporting.

261. Upon information and belief, each individual Defendant had knowledge of the essential elements of the conspiracy and voluntarily participated with intent to further its goals.

262. Each individual Defendant is personally liable under 18 U.S.C. § 1594(b) for conspiracy to commit trafficking violations.

55

## **COUNT ELEVEN**
### **(Negligence and Negligent Infliction of Emotional Distress)**
### **(On Behalf of Plaintiff)**
### **(Against Hyde School)**

263.    Plaintiff incorporates by reference all preceding allegations.

264.    Defendant owed a duty of care to Plaintiff, a minor entrusted to its custody and control.

265.    Defendant breached that duty through the abuse, neglect, and systemic misconduct described herein, including violations of statutory obligations enacted to protect children from harm.

266.    Specifically, 22 M.R.S. § 4011-A required Defendant to report known or suspected child abuse and neglect to the State of Maine. Plaintiff was a member of the class of persons this statute was designed to protect.

267.    Upon information and belief, Defendant failed to make any such reports, despite knowing or recklessly disregarding that Plaintiff was being subjected to abuse.

268.    As a direct and proximate result of Defendant's breaches, Plaintiff suffered physical injuries, emotional trauma, and serious psychological distress – distress so severe that it exceeds what a reasonable person should be expected to endure.

269.    It was reasonably foreseeable that a child of normal sensitivities would suffer significant harm under these conditions.

270.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered emotional and physical pain and suffering and financial loss.

**COUNT TWELVE**
**(Individual Liability for Negligence and Negligent Infliction of Emotional Distress)**
**(On Behalf of Plaintiff)**
**(Against Individual Defendants Laura Gauld, Malcolm Gauld, Georgia Gauld MacMillan, Donald MacMillan, and Laurie Gauld Hurd)**

271.    Plaintiff incorporates by reference all preceding allegations.

272.    Each individual Defendant owed Plaintiff a personal duty of care as a minor entrusted to their custody or control.

273.    Upon information and belief, these Individual Duties and Breaches included:

a. Laura Gauld: As President, had ultimate responsibility for student welfare and breached this duty through deliberate indifference.

b. Malcolm Gauld: As Executive Director, had operations control and breached duty through implementation of abusive policies;

c. Georgia MacMillan: As family educator, had duty to protect students and breached it through concealment and enabling abuse;

d. Donald MacMillan: As teacher, had direct duty to students and breached it through personal participation in abuse;

e. Laurie Gauld Hurd: As community liaison, had duty to accurately represent Hyde and breached it through deceptive practices.

274.    Each breach was the proximate cause of Plaintiff's injuries, and each individual's conduct was sufficiently outrageous to constitute negligent infliction of emotional distress.

**COUNT THIRTEEN**
**(Individual Liability for Intentional Infliction of Emotional Distress)**
**(On Behalf of Plaintiff)**
**(Against Individual Defendants Laura Gauld, Malcolm Gauld, Georgia Gauld MacMillan, Donald MacMillan, and Laurie Gauld Hurd)**

275.    Plaintiff incorporates by reference all preceding allegations.

276.    Upon information and belief, each individual Defendant engaged in extreme and outrageous conduct that intentionally or recklessly caused severe emotional distress to Plaintiff.

277.    Upon information and belief, said Individual Extreme and Outrageous Conduct included:

a. Laura Gauld: Deliberately implemented policies designed to break down students psychologically;

b. Malcolm Gauld: Created and promoted abusive systems while knowing they caused severe psychological harm;

c. Georgia MacMillan: Deceived families while knowing students were being psychologically harmed;

d. Donald MacMillan: Personally participated in psychological abuse of students in classroom settings;

e. Laurie Gauld Hurd: Marketed psychological abuse s beneficial character development.

278.    The conduct of each individual Defendant exceeded all bounds of decency and it utterly intolerable in a civilized society.

279.    Each individual Defendant's conduct directly caused Plaintiff to suffer severe emotional distress.

**COUNT FOURTEEN**
**(Negligent Hiring, Retention, and Supervision)**
**(On Behalf of Plaintiff)**
**(Against All Defendants)**

280.    Plaintiff incorporates by reference all preceding allegations.

281.    Defendants had a duty to exercise reasonable care in hiring, retaining, and supervising staff who would have contact with vulnerable minors.

58

282.    Upon information and belief, the Defendants breached this duty by:

a. Failing to conduct adequate background checks;

b. Hiring individuals with known propensities for abuse;

c. Retaining staff after receiving abuse complaints;

d. Failing to adequately supervise staff interactions with students;

e. Creating policies that facilitated abuse.

283.    As a direct result of these breaches, Plaintiff suffered physical, emotional, and psychological harm.

## COUNT FIFTEEN
### (Premises Liability)
### (On Behalf of Plaintiff)
### (Against All Defendants)

284.    Plaintiff incorporates by reference all preceding allegations.

285.    Defendants owed a duty to maintain Hyde's premises in a reasonably safe condition for students.

286.    Defendants knew that students would be particularly vulnerable due to their separation from families and the residential nature of the program.

287.    Defendants breached their duty by:

a. Creating an unsafe environment that facilitated abuse;

b. Failing to implement adequate safety protocols;

c. Designing systems that isolated students from help;

d. Failing to warn of known dangers.

288.    As a direct result of these breaches, Plaintiff suffered physical, emotional, and psychological harm.

289.    Defendants breached their duty by:

a. Creating an unsafe environment that facilitated abuse;

b. Failing to implement adequate safety protocols;

c. Designing systems that isolated students from help;

d. Failing to warn of known dangers.

## COUNT SIXTEEN
### (Injunctive Relief and Asset Preservation)
### (Against all Defendants)

290.    Plaintiff and Class Members incorporate by reference all preceding allegations.

291.    Plaintiff and Class Members seek a temporary restraining order, preliminary injunction, permanent injunction, and asset preservation relief pursuant to Federal Rule of Civil Procedure 64 and applicable Maine attachment statutes.

292.    Plaintiff and Class Members have shown a substantial likelihood of success on the merits of their trafficking, forced labor, and negligence claims, which detail systematic abuse of vulnerable minors over a period of more than seventeen years – abuse that yielded significant financial gain for Defendants.

293.    Without immediate injunctive relief, Plaintiff and Class Members face irreparable harm. Defendants have operated Hyde and its related entities as a family-controlled enterprise and have demonstrated a history of secrecy and concealment. There is a serious risk that Defendants will dissipate, conceal, or transfer assets to avoid judgment enforcement.

294.    The public interest strongly supports the protection of children and the preservation of assets to ensure compensation for trafficking and abuse survivors.

295.    Accordingly, Plaintiff and Class Members respectfully requests that this Court:

a.    **Asset Preservation**: Enter an order pursuant to Federal Rule of Civil Procedure 64 attaching and restraining all Defendants' assets, including real estate, financial

accounts, business interests, and any other property that may be used to satisfy judgment;

b. **Operational Restraints**: Enjoin Defendants from requiring or permitting any student at Hyde to engage in forced labor or labor performed under threat or coercion;

c. **Document Preservation**: Enjoin Defendants from destroying, concealing, altering, or transferring any documents or data relating to Hyde's finances, assets, or operational history;

d. **Financial Disclosure**: Order Defendants to provide a full and sworn accounting of all assets, liabilities, and financial interests; and

e. **Further Relief**: Grant such other and further equitable relief as the Court deems just and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and Class Members respectfully demands a jury trial and pray for the following:

a. Determine that Defendants are liable for the violations set forth above;

b. Award Plaintiff and the Classes all compensatory, statutory, restitution, and punitive damages as provided by law;

c. Award Plaintiff and the Classes liquidated damages of $150,000 per violation or actual damages, whichever is greater, under 18 U.S.C. § 2255;

d. Award compensation at prevailing wage rates for all unpaid labor, including overtime;

e.   Certify the Class as defined herein, designating Plaintiff as Class representative, and appointing the undersigned counsel as Class Counsel;

f.   Declare that Defendants are financially responsible for notifying the Class Members of the pendency of this action;

g.   Schedule a trial by jury in this action on all claims so triable;

h.   Award Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses, as provided by law;

i.   Award Plaintiff and Class Members trebled, statutory, and/or punitive damages as authorized by law;

j.   Award pre-judgment and post-judgment interest on any amounts awarded, as provided by law; and

k.   Grant such further relief that the Court deems appropriate.


Dated:  July 31, 2025                          Respectfully Submitted
                                               Plaintiff,

                                               By their attorneys,

                                               */s/  Kelly A. Guagenty*
                                               Kelly A. Guagenty, Esq. (BBO #658872)
                                               *(Admitted pro hac vice)*
                                               Kimberly Dougherty, Esq.
                                               *(pending pro hac vice admission)*
                                               JUSTICE LAW COLLABORATIVE
                                               210 Washington St.
                                               North Easton, MA 02356
                                               (508) 230-2700
                                               kelly@justicelc.com
                                               kim@justicelc.com

                                               and,

                                               John Steed, Esq. (ME Bar #5399)
                                               ISLAND JUSTICE

PO Box 771
Stonington, ME 04681
Phone: 207-200-7077
john@islandjusticelaw.com