# INDEX OF EXHIBITS TO PLAINTIFF'S NOTICE OF ERRATA

| EXHIBIT | DESCRIPTION |
|---|---|
| A | *Doe v. Howard*, Civil Action No. 1:11-cv-1105 (E.D. Va. Sept. 4, 2012) |
| B | *Doe v. Moravian College*, Civil No. 5:20-cv-00377-JMG, 2023 U.S. Dist. Lexis 4027 (E.D. Pa. Jan. 10, 2023) |
| C | *Bates v. Sequel Youth & Family Servs., LLC,* No. 2:23-CV-01063-RDP, 2024 U.S. Dist. LEXIS 118421 (N.D. Ala. July 5, 2024) |
| D | *Bates v. Sequel Youth & Family Servs., LLC*, No. 2:23-CV-01063-RDP, 2025 U.S. Dist. LEXIS 202430 (N.D. Ala. Oct. 14, 2025) |

# Exhibit A

FILED
SEP - 4 2012
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:11-cv-1105 |
| | ) | |
| LINDA HOWARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

The Court adopted the Report and Recommendation of the Magistrate Judge (Dkt. No. 106), entering default against Defendants Linda and Russell Howard and in favor of Plaintiff Jane Doe. As a result, the Defendants are liable for the counts alleged in Plaintiff's Amended Complaint (Dkt. No. 18). On August 8, 2012, the Court held a trial on the discrete issue of damages. Defendants failed to appear at the trial. The Opinion herein details the Court's findings related to damages, and finds that Plaintiff is entitled to a total damages award in the amount of $3,306,468.

### I. Background

1. Under Count 1, both Defendants were found liable for holding Plaintiff in involuntary servitude in violation of 18 U.S.C. §1584. Mrs. Doe was raped, sexually abused, and forced to work 80 hours or more per week. At trial, Plaintiff testified that Russell Howard raped her at least four times, that he forced her to perform oral sex approximately ten times, and that he repeatedly sexually assaulted her. Plaintiff testified that Linda Howard was complicit in her husband's sexual abuse, telling Plaintiff that she should gratify Russell Howard and make Russell happy. Mrs. Howard also refused Mrs. Doe's request

to relocate away from Mr. Howard, to a different room within the U.S. Embassy compound. In addition, the Howards used nonphysical force, such as isolation and threats of deportation, to coerce Mrs. Doe into servitude.

2. Under Count 2, both Defendants were found liable for holding Plaintiff in forced labor in violation of 18 U.S.C. § 1589. The Howards entered into a scheme to induce Mrs. Doe to travel from Yemen to Japan for the purpose of forcing her to perform involuntary labor and sexual services. Russell Howard used physical force to restrain Mrs. Doe. The Howards psychologically manipulated Mrs. Doe to compel her labor and services. The Howards limited Doe's contact with the outside world, and verbally, physically, and mentally abused her.

3. Under Count 3, both Defendants were found liable for trafficking with respect to forced labor or involuntary servitude in violation of the Trafficking Victims Protection Act of 2000 ("TVPA"), 18 U.S.C. §§ 1584, 1589, and 1590. The Defendants recruited Mrs. Doe to move from her previous employment with them in Yemen, to a foreign country, thousands of miles away, where they held her in involuntary servitude and forced labor. Defendants induced Mrs. Doe to move with them by creating false trust, and by promising her that she would have benefits that would make her trip worth her while. For example, the Howards told Mrs. Doe that she would have a day off each week, health insurance, and a safe place to live and work.

4. Under Count 4, both Defendants were found liable for conspiracy in violation of 18 U.S.C. § 1594 and civil conspiracy in violation of the common law.

5. Under Count 5, Defendant Russell Howard was found liable for obstructing enforcement in violation of 18 U.S.C. § 1590(b). Howard flew to Ethiopia in June 2011 and contacted

Mrs. Doe's husband, with the purpose of obstructing the investigation of the underlying crimes. Russell was fully aware that his and his wife's conduct was under federal investigation. Mrs. Doe testified at the damages trial that upon learning about Russell's trip, she told her family to move and became fearful that Mr. Howard was searching for her with the intent of harming her.

6. Under Count 6, Defendants were found liable for unjust enrichment. Mrs. Doe received an average wage of approximately $0.88 per hour. Her employment contract's salary provision is unenforceable, and the Howards acted inequitably by failing to pay Mrs. Doe in accordance with the prevailing market rate.

## II. Damages

Mrs. Doe is entitled to both compensatory and punitive damages under the TVPA. *See* 18 U.S.C. § 1595(a); *Ditullio v. Boehm*, 662 F.3d 1091, 1100 (9th Cir. 2011) ("Section 1595 creates a civil cause of action that permits victims of trafficking to recover compensatory and punitive damages from individuals who violate the TVPA."). Given the novelty of the damages issue in the context of the TVPA, the Court will look to other awards in similar cases to ensure that the award is within a reasonable range. *See Shukla v. Sharma*, No. 07–CV–2972, 2012 WL 481796, *14 (E.D.N.Y. Feb. 14, 2012); *see also Sloane v. Equifax Information Services, LLC*, 510 F.3d 495, 504-05 (4th Cir. 2007) (looking to other cases awarding "compensatory damages in factually similar circumstances" to determine appropriate damages in the developing FCRA context).

### a. Compensatory Emotional Distress Damages

Emotional distress damages are a form of compensatory damages and are recoverable in a private cause of action under the TVPA. *Gurung v. Malhotra*, 2012 U.S. Dist. LEXIS 40970,

*23-25 (S.D.N.Y. Feb. 21, 2012); *Mazengo v. Mzengi*, 2007 U.S. Dist. LEXIS 99377, *23-24 (D.D.C. Dec. 20, 2007). A plaintiff may recover multiple emotional distress awards for different violations of the TVPA. *See Shukla*, 2012 U.S. Dist. LEXIS 18392, at *36 (noting that the "jury could have rationally split the harms for forced labor and trafficking into those flowing from the services obtained through defendants' compulsion and those flowing from the conditions of harboring to which plaintiff was subjected"). Here, Mrs. Doe is entitled to two discrete emotional distress awards: one for distress suffered due to her forced sexual servitude to Mr. Howard, and the other due to her forced labor as a domestic worker for the Howards. "In determining the measure of recovery for non-pecuniary harms, the court should examine the duration and intensity of the emotional distress, which in turn requires that the court consider 'all relevant circumstances . . . , including sex, age, condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm.'"*Mazengo*, 2007 U.S. Dist. LEXIS 99377, at *23 (quoting Restatement (Second) of Torts § 905 (1979)).

**i. Forced Sexual Servitude**

The Howards forcibly subjected Mrs. Doe to sexual servitude. Russell Howard verbally tormented Mrs. Doe, and early after the move to Japan, he demanded that Mrs. Doe engage in sexual relations with him. He mentioned that the Howards had had several previous domestic workers from whom he demanded sex, including threesome sexual contact with both of the Howards. He told Mrs. Doe that prior workers who refused to comply with his requests had been fired. He kept Mrs. Doe from practicing her religion, the one exercise in which she found solace in the midst of her unfortunate surroundings. Eventually, Russell Howard raped Mrs. Doe four times, forced her to perform oral sex on him approximately ten times, and sexually assaulted her. Linda Howard was complicit in her husband's sexual abuse, and refused Mrs. Doe's request to

relocate to a different room within the U.S. Embassy compound. She told Mrs. Doe that Mrs. Doe should try to make Russell Howard happy and fulfill his needs.

At trial, Mrs. Doe testified that as a result of the Howards' actions related to the sexual assaults, she suffered from anxiety attacks, depression, insomnia, an inability to concentrate or complete tasks, and traumatic distress following her escape from the Howards' home in Tokyo. She continues to suffer severe emotional trauma. The experience has also damaged her current marriage and sexual relationship with her husband. Mrs. Doe testified that she has no self-confidence and that she lives in fear and believes it will be nearly impossible to trust anyone again. The damages expert confirmed these symptoms as typical for someone subjected to the type of abuse to which Mrs. Doe had been a victim.

Damages in other cases involving sexual assaults vary greatly. In *Buhalo v. City of Philadelphia*, the district court affirmed a judgment of $1,315,000 in compensatory damages against two police officers whom plaintiff alleged had raped her. No. 03-4727 (E.D. Pa. Nov. 9, 2006). Plaintiff claimed that two police officer defendants approached her outside of a convenience store and asked her to get into their patrol car. Once inside the car, the officers drove her to a vacant parking lot and took turns raping her.

In *James v. Wellham*, a defendant police officer stopped the plaintiff's car on the ostensible suspicion of driving while intoxicated. 104 F.3d 620 (4th Cir. 1997). Instead of driving the plaintiff home as promised, the police officer took plaintiff to a parking lot and forcibly raped her. The jury awarded compensatory damages in the amount of $650,000. In *Meyer v. Nava*, plaintiff was awarded $750,589 in compensatory damages. No. 04-CV-4099, 2007 U.S. Dist. LEXIS 77556 (D. Kan. Oct. 17, 2007). In *Meyer*, the plaintiff was initially arrested for driving under the influence and taken to a county jail, where the acting shift

supervisor took the intoxicated plaintiff to a room and raped, sodomized, and sexually battered her.

Like the plaintiff in these cases, Mrs. Doe trusted Mrs. Howard, a U.S. government official, and her husband. And, in Mrs. Doe's case, the incidents of rape were numerous and repeated. In addition, Mrs. Doe had a prior relationship with the Defendants, establishing a deeper relationship of trust, before the incidents of rape occurred.

Based on these comparisons, the Court finds that an award for compensatory emotional distress damages relating to the forced sexual servitude in the amount of $1,250,000 is appropriate.

**ii. Forced Labor as a Domestic Worker**

In recent cases, Courts have ordered or affirmed emotional distress damages relating to forced domestic labor of trafficking victims ranging from $415 to $800 for each day of forced labor. For example, in *Shukla*, the plaintiff was approached in India about working in an ashram in the United States. 2012 WL 481796, at *8-9. Although certain promises were made regarding plaintiff's salary and living conditions, plaintiff's living space in the ashram was cramped, dirty, and infested with rats. His typical work day began at 5:00 a.m. and ended at 10:00 p.m. Plaintiff did not eat dinner until 11:00 p.m. Defendants forced plaintiff to work as a priest and perform janitorial work, they monitored his movements and privacy, and they confiscated his passport. As a result, plaintiff was awarded $1,000,000 in compensatory damages.[1] *Id.* at *34.

In *Fernandez v. Hayes*, the plaintiff was awarded $500 a day in compensatory damages after defendants induced her to come to the United States from Kuwait based on a number of false promises. No. W-11-CA-137 (W.D. Tex. Apr. 27, 2012). After her arrival, plaintiff was

[1] The plaintiff was subject to three-and-one-half years of compelled labor. The compensatory damages award amounts to approximately $780 a day.

forced to work more than forty hours a week as a live in maid. In *Gurung v. Malhotra*, a seventeen-year-old girl was brought to the United States and forced to work sixteen hours per day, seven days per week. 2012 U.S. Dist. LEXIS 40970, at *5. Part of her obligations included giving the defendant a daily massage—a chore which made her extremely uncomfortable. Plaintiff was awarded approximately $500,000 in emotional distress damages for the approximately forty months she worked for the defendants.[2] *Id.* at *25.

At trial, Mrs. Doe testified that she was induced to travel to from Yemen to Japan with the Howards as a house cleaner. Like the examples detailed *supra*, Mrs. Doe's move was based on a number of false promises. The Howards told her that her salary would increase from $200 to $300 a month, and that she would have a day off each week, health insurance, the ability to travel home on vacation, and a safe place to live and work. Apart from the sexual abuse, the Howards forced Mrs. Doe into servitude by using isolation and threats of deportation.[3] After moving Mrs. Doe thousands of miles from her family, to a country whose language she did not know, the Defendants knew that Mrs. Doe depended on them entirely for her support. The Howards controlled all aspects of Mrs. Doe's life in Tokyo, including limiting her contacts with the outside world, monitoring her telephone calls,[4] and generally forbidding her from leaving the house without being accompanied by one of them. Mrs. Doe was a virtual prisoner in the Tokyo apartment, and she was berated if she took too long to run short errands. She was never given

---

[2] This amounts to approximately $410 a day.

[3] Mr. Howard threatened to deport Mrs. Doe the night before she escaped the Howard residence. Mrs. Doe asked Linda Howard to intervene, but Mrs. Howard indicated that she supported Mr. Howard's decision. That evening, the Howards told Mrs. Doe that she would be deported the following morning. As a result, Mrs. Doe fled the Howard residence in Japan at approximately 2:30 a.m.

[4] Mrs. Doe testified at trial that she made an attempt to report the Howards' conduct to the Ethiopian Embassy. During this phone call, Russell Howard picked up the second phone downstairs, interrupted Mrs. Doe's call, and told the Embassy officer that Mrs. Doe was lazy and that the issue would be resolved the following day. Mrs. Doe fled the Howard residence following Russell Howard's interference with her attempt at a cry for help.

time off from work; in fact, she worked every day, totaling approximately 80 to 90 hours per week. She was also denied medical care when she experienced kidney problems and severe colds. Mrs. Doe worked for the Howards in Japan from December 15, 2008 until she escaped around March 15, 2009. As a result of this experience, Mrs. Doe represented that she continues to experience debilitating emotional and psychological pain. Mrs. Doe is constantly frightened of others. She believes it will be nearly impossible to trust anyone again.

Based on these comparisons, the Court finds that an award for compensatory emotional distress damages relating to the forced labor in the amount of $500 is appropriate. Mrs. Doe worked for the defendants for approximately three months.[5] She is entitled to $44,500 in compensatory damages for forced labor and trafficking.

**b. Punitive Damages**

Punitive damages are available under the TVPA because the Act's "civil remedy provision creates a cause of action that sounds in tort." *Ditullio*, 662 F.3d at 1096. "[P]unitive damages are warranted when the defendant is found liable for conduct involving some element of outrage similar to that usually found in crime." *Id.* at 1097 (internal quotations omitted). Punitive damages awards should be based on "the degree of reprehensibility of the defendant's conduct . . . and should reflect the enormity of [the defendant's] offense." *BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996) (internal quotations omitted). Other factors courts should consider in awarding punitive damages include whether: "the harm was physical rather than economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the conduct involved repeated actions or was an isolated incident; and [whether]

[5] Mrs. Doe worked approximately 89 days, from December 15, 2008 until March 14, 2009. She escaped in the early morning on March 15, 2009.

the harm resulted from intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 437 (2003) (citing *Gore*, 517 U.S. at 576-77).

Here, the crime, involving sexual assaults, forced labor, and trafficking is particularly depraved. The harm was physical, it involved the intentional disregard for the health and safety of Mrs. Doe, it was repeated—involving approximately fourteen instances of forced sexual acts, and the harm was planned with forethought and intentionally inflicted upon Mrs. Doe.

In addition to the horrible circumstances relating to the sexual assaults, forced labor, and trafficking, Mr. Howard also traveled more than 8,000 miles from Virginia to Ethiopia in an attempt to locate Mrs. Doe, even knowing that the State Department's investigation into the trafficking matter was ongoing. Russell Howard telephoned Mr. Doe and asked him to meet with Mr. Howard at a hotel to discuss Mrs. Doe and her whereabouts. After Mr. Doe declined, Russell Howard called him back repeatedly. A couple of days later, Mr. Doe learned that Russell Howard had contacted the Ethiopian police to request help in locating Mrs. Doe. Howard also attempted to file bogus criminal charges against Mrs. Doe. These attempts at contact exacerbated Mrs. Doe's trauma and her ongoing fear.

None of the civil judgments discussing punitive damages amounts under the TVPA are analogous to Mrs. Doe's case in that none have involved forcible rapes or sexual assaults. Thus, the Court considers not only punitive damages awards in TVPA cases, but also punitive damages awarded in sexual abuse cases. In *Canal v. Dann*, a case that did not involve sexual abuse, the district court awarded a punitive damages award equal to the compensatory damages award—$309,406.41—after finding that the defendant "acted with a conscious disregard for [plaintiff's] right to be free from involuntary servitude and [the defendant] intentionally misrepresented facts for the purpose of depriving her of this right." No. 09-03366, 2010 U.S. Dist. LEXIS 97856, *11

(N.D. Cal. Sept. 2, 2010). In *Waxman v. Bough*, the plaintiff, at age six, was repeatedly sexually assaulted by his sixteen-year-old babysitter. No. 1:07-CV-01180 (E.D. Va. June 11, 2008). The jury awarded $2,250,000 in punitive damages. In *Buhalo v. City of Philadelphia*, the jury awarded $3,500,000 in punitive damages for a single incident of rape. No. 03-4727 (E.D. Pa. Nov. 9, 2006). Mrs. Doe's case involves four incidents of rape and multiple incidents of forced oral sex.

In light of the Howards' intentional egregious and outrageous conduct, and the fact that Mrs. Doe continues to live in a constant state of terror, the Court finds that an award in the amount of $2,000,000 is appropriate.

**c. Wage Restitution and Unjust Enrichment Damages**

The TVPA also mandates restitution for violations of the Act, in an amount to account for the full value of the victim's losses. 18 U.S.C. § 1593(b)(1). The full amount of the victim's losses includes costs incurred by the victim for

(A) medical services relating to physical, psychiatric, or psychological care;

(B) physical and occupational therapy or rehabilitation;

(C) necessary transportation, temporary housing, and child care expenses;

(D) lost income;

(E) attorneys' fees, as well as other costs incurred;

(F) any other losses suffered by the victim as a proximate result of the offense; and

(G) the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act.

18 U.S.C. § 1593(b)(3) (referencing § 2259(b)(3)). Though the Fair Labor Standards Act ("FLSA") does not have extraterritorial reach, it does provide a standard methodology under which to calculate damages for forced labor, and it is the methodology Congress has chosen to use under the TVPA framework. Notably, Congress did not provide an exception to using FLSA standards when it expanded the TVPA's reach to extraterritorial government employees and their dependents serving abroad. *See* 18 U.S.C. § 3271.

FLSA restitution is calculated based on the minimum hourly wage in effect at the time of employment, less any payments made to the Plaintiff by Defendants. Mrs. Doe worked more than 80 hours a week for the Defendants, for approximately three months, between December 2008 and March 2009. The minimum hourly wage at the time of Plaintiff's employment was $6.55 an hour. 29 USCA § 206(a)(1)(B). At this rate, Mrs. Doe is owed $8,384. Mrs. Doe was paid a total of $900 for her services, plus $1,500 in severance. These amounts should be subtracted from the amount owed Mrs. Doe, meaning that she is owed a net value of $5,984 in minimum wage restitution.

The FLSA also entitles the victim to recover a mandatory liquidated damages award in an equal amount. 29 U.S.C. § 216(b); *see also United States v. Sabhnani*, 599 F.3d 215, 259 (2d Cir. 2010) (applying the FLSA's additional liquidated damages award as part of the TVPA damages calculation). Thus, Mrs. Doe's total back wages and liquidated damages under the FLSA, as part of her award as a trafficking victim, amounts to $11,968.[6]

---

[6] Mrs. Doe acknowledges that a wage restitution award under § 1593 and an award on the basis of unjust enrichment would allow Mrs. Doe to recover twice for the same alleged harm. Because the Court awarded damages under § 1593, the Court declines to award additional damages on the basis of unjust enrichment.

### III. Conclusion

Based on the reasoning provided herein, the Court awards judgment in Plaintiff's favor in the amount of $3,306,468 against Defendants Linda and Russell Howard.

At the damages trial, Plaintiff's counsel indicated that a post-trial memorandum on attorneys' fees would be submitted to the Court. Accordingly, the Court reserves judgment on attorneys' fees until the Court has had an opportunity to review Plaintiff's submission.

September 4, 2012
Alexandria, Virginia

/s/ LOG
Liam O'Grady
United States District Judge

# Exhibit B

**User Name:** Kelly Guagenty

**Date and Time:** Wednesday, December 10, 2025 9:53 AM EST

**Job Number:** 270312716

## Document (1)

1. *Doe v. Moravian Coll.*

   **Client/Matter:** -None-

   **Search Terms:**

   **Search Type:** Natural Language

   **Narrowed by:**

| **Content Type** | **Narrowed by** |
|---|---|
| | -None- |

Positive
As of: December 10, 2025 2:53 PM Z

# Doe v. Moravian Coll.

United States District Court for the Eastern District of Pennsylvania

January 10, 2023, Decided; January 10, 2023, Filed

Civil No. 5:20-cv-00377-JMG

**Reporter**
2023 U.S. Dist. LEXIS 4027 *; 2023 WL 144436

JANE DOE, Plaintiff, v. MORAVIAN COLLEGE, et al., Defendants.

**Prior History:** Doe v. Moravian College, 2020 U.S. Dist. LEXIS 205905, 2020 WL 6485099 (E.D. Pa., Nov. 4, 2020)

## Core Terms

campus, summary judgment, damages, harassment, dormitory, emotional distress, emotional distress damages, cheerleading, funding, alleged assault, encounter, nominal damages, sexual assault, recipient, second amended complaint, deliberate indifference, physical harm, disciplinary, interviewed, emailed, remedies, severe, videos, walked, intentional infliction of emotional distress, take place, retroactivity, offensive, landlord, sexual

**Counsel:** **[*1]** For JANE DOE, Plaintiff: ADAM DAVID MESHKOV, LEAD ATTORNEY, MESHKOV & BRESLIN, EASTON, PA; ELEANOR MARY BRESLIN, LEAD ATTORNEY, MESHKOV & BRESLIN, LLC, EASTON, PA; JOHN R. VIVIAN, JR., LEAD ATTORNEY, LAW OFFICE OF JOHN R. VIVIAN, JR., EASTON, PA.

For MORAVIAN COLLEGE, Defendant: PAUL G. LEES, LEAD ATTORNEY, Dickie, McCamey & Chilcote, P.C., Bethlehem, PA.

For JOHN DOE, 1, Defendant: MARALEEN DANAI SHIELDS, LEAD ATTORNEY, FITZPATRICK LENTZ & BUBBA, PC, ALLENTOWN, PA; TYREE A. BLAIR, SR., LAW OFFICES OF SPITALE VARGO MADSEN & BLAIR, EASTON, PA.

For JOHN DOE, 2, Defendant: MARALEEN DANAI SHIELDS, FITZPATRICK LENTZ & BUBBA, PC, ALLENTOWN, PA; TYREE A. BLAIR, SR., LAW OFFICES OF SPITALE VARGO MADSEN & BLAIR, EASTON, PA.

JOHN DOE, 3, Defendant, Pro se, BETHLEHEM, PA.

For CITY OF BETHLEHEM POLICE DEPARTMENT, Respondent: DAVID J. MACMAIN, LEAD ATTORNEY, MacMain Leinhauser PC, West Chester, PA.

For Northampton County District Attorney's Office, Movant: BRIAN JEFFREY TAYLOR, NORTHAMPTON COUNTY SOLICITOR'S OFFICE, EASTON, PA.

For David M. Petzold Digital Forensics Laboratory, Movant: LISA R. CIPOLETTI, LEAD ATTORNEY, LEHIGH COUNTY DISTRICT ATTORNEY'S OFFICE, ALLENTOWN, PA.

**Judges:** JOHN M. GALLAGHER, United States **[*2]** District Judge.

**Opinion by:** JOHN M. GALLAGHER

## Opinion

**MEMORANDUM OPINION**

**GALLAGHER, J.**

**I. OVERVIEW**

Plaintiff Jane Doe alleges that she was sexually assaulted by defendants John Doe 1, John Doe 2 and John Doe 3 (collectively referred to as "the John Doe defendants") while she was a student at Moravian College on August 25, 2017. Plaintiff's Second Amended Complaint accuses defendant Moravian College ("Moravian") of *Title IX* violations, intentional infliction of emotional distress, and negligence. Plaintiff has also asserted claims against the John Doe defendants.[1] Before the Court is Moravian's Motion for Summary Judgment. For the reasons that follow, the motion is granted.

**II. RELEVANT BACKGROUND AND ALLEGATIONS**

In August 2017, Plaintiff was an incoming freshman student at Moravian College. Def. Moravian's Statement of Facts ¶ 3, ECF No. 101-2 [hereinafter "MCSOF"]; Pl.'s Resp. to Moravian's Statement of Facts ¶ 3, ECF No. 107-2 [hereinafter "PRSOF"]. Plaintiff, then 19 years old, was a member of the cheerleading team at Moravian College. MCSOF ¶¶ 3-4; PRSOF ¶¶ 3-4. Plaintiff moved into her campus dormitory approximately one week prior to the alleged incident so that she could participate in cheerleading tryouts and **[*3]** preseason practice. MCSOF ¶ 5; PRSOF ¶ 5. Plaintiff's dormitory was located at Wilhelm Hall, and she was assigned a roommate, M.B. MCSOF ¶ 6; PRSOF ¶ 6.

On Thursday, August 24, 2017, Plaintiff attended a dinner at a local restaurant following a cheerleading practice. MCSOF ¶ 7; PRSOF ¶ 7. Plaintiff returned to Wilhelm Hall at 6:08PM following the dinner. MCSOF ¶ 8; PRSOF ¶ 8. After she returned to her dormitory she went to the campus apartment of her teammate M.C., which was known as the "Cheerleading House." MCSOF ¶ 9; PRSOF ¶ 9. Plaintiff arrived at the Cheerleading House at approximately 7:14PM and stayed there for approximately two hours. MCSOF ¶ 10; PRSOF ¶ 10. Plaintiff consumed several alcoholic beverages while she was at the Cheerleading House. MCSOF ¶ 12; PRSOF ¶ 12. Plaintiff then walked her roommate M.B. back to their room at Wilhelm Hall. MCSOF ¶ 13; PRSOF ¶ 13. She entered the building at 9:17PM. *Id.* Plaintiff then returned to the Cheerleading House. MCSOF ¶ 14; PRSOF ¶ 14. After she arrived, Plaintiff and several other cheerleaders left the Cheerleading House and went to a house located at 127 W. Laurel Street, which was known as the "Football House." MCSOF ¶ 15; PRSOF **[*4]** ¶ 15.

When Plaintiff entered the Football House, she observed approximately 20 men in the living room listening to music and drinking. MCSOF ¶ 17; PRSOF ¶ 17. Plaintiff stayed at the Football House for approximately two hours. MCSOF ¶ 19; PRSOF ¶ 19. While she was there, she did not consume any alcohol, and instead drank bottled water, which was refilled several times by her cheerleading teammate K.O. *Id.* While at the party Plaintiff began dancing, but then started to feel hot and dizzy. MCSOF ¶ 20; PRSOF ¶ 20. She then sat down on a couch in the living room. *Id.* A short time later, Plaintiff was approached by John Doe 3 and began having a conversation with him. MCSOF ¶ 21; PRSOF ¶ 21. At the time John Doe 3 was a student at Bloomsburg University and was visiting Moravian College that evening. *Id.*

Members of the cheerleading team then began to leave the Football House, but Plaintiff opted to stay behind with defendants John Doe 2 and John Doe 3. Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. 333: 3-17. John Doe 2 was a sophomore at Moravian College at the time. Joint Appendix, ECF No. 102, Ex. H., John Doe 2

---

[1] On December 16, 2022, summary judgment was granted to defendants John Doe 1 and John Doe 2 with respect to Plaintiff's claim of intentional infliction of emotional distress, and denied with respect to Plaintiff's claim of assault and battery.

Dep. Tr. 9: 19-21. Plaintiff then left the house with John Doe **[*5]** 2 and John Doe 3. MCSOF ¶ 29; PRSOF ¶ 29. At this time Plaintiff believed that the two men were going to walk her back her dormitory. *Id.*

Plaintiff has claimed that as they continued walking Plaintiff informed John Doe 2 and John Doe 3 that she was feeling sick, and that John Doe 3 then offered to let her use the bathroom in John Doe 1's dormitory. MCSOF ¶ 34; PRSOF ¶ 34. A short time later the group arrived at John Doe 1's residence, which was located at the August Spangenberg Campus Townhouses ("Spang"). MCSOF ¶ 35; PRSOF ¶ 35. They then waited approximately 10 minutes for John Doe 1 to arrive and let them into the residence. MCSOF ¶ 39; PRSOF ¶ 39.

John Doe 1 then arrived and let Plaintiff, John Doe 2 and John Doe 3 into the building at 12:55AM on August 25, 2017.[2] MCSOF ¶ 43; PRSOF ¶ 43; Joint Appendix, ECF No. 102, Ex. E., Jane Doe Dep. Vol. 1 Tr. 145: 4-8. Once Plaintiff and the John Doe Defendants entered the residence they went upstairs and she was shown where the bathroom was located. MCSOF ¶ 44; PRSOF ¶ 44. After using the restroom, Plaintiff exited and walked into the upstairs hallway where she observed all three John Doe defendants inside a bedroom. MCSOF ¶ 45-46; PRSOF ¶ **[*6]** 45-46. A sexual encounter between Plaintiff and the John Doe defendants then took place inside the bedroom.[3] MCSOF ¶ 47-48; PRSOF ¶ 47-48. A portion of the encounter was video recorded on a cellphone. MCSOF ¶ 50; PRSOF ¶ 50. John Doe 1 testified that he and John Doe 3 recorded videos on his phone, which he later shared with other individuals in a group message. Joint Appendix, ECF No. 102, Ex. G., John Doe 1 Dep. Tr. 50-53. Following the encounter, Plaintiff left the residence and was walked back to her dormitory by John Doe 3.[4] MCSOF ¶ 51; PRSOF ¶ 51. Plaintiff entered her dormitory at 1:59 a.m. on August 25, 2017. MCSOF ¶ 55; PRSOF ¶ 55.

Later that morning Plaintiff spoke with her roommate M.B. and provided as much detail as she could recall regarding the events that had taken place earlier. MCSOF ¶ 68; PRSOF ¶ 68. During this conversation Plaintiff was unsure if she consented to the sexual encounter. MCSOF ¶ 69; PRSOF ¶ 69. This conversation was reported to a Moravian RA. Later that morning, Plaintiff told her friend Brandon "something bad happened to be last night. I think people took advantage of me last night." MCSOF ¶ 71; PRSOF ¶ 71. They then spoke to a Moravian RA who **[*7]** contacted the campus police. *Id.*

**a. Law Enforcement Investigation**

---

[2] The parties have presented conflicting evidence regarding Plaintiff's first encounter with John Doe 1. In their Motion for Summary Judgment, Moravian alleged that Plaintiff kissed John Doe 1 twice when he arrived. Additionally, in his interview with Detective Miller, John Doe 1 stated that Plaintiff kissed him twice after he arrived to let them into the building. Joint Appendix, ECF No. 102, Ex. M at JA01454. In her deposition, Plaintiff denied kissing any of the John Doe defendants before going into John Doe 1's residence. Joint Appendix, ECF No. 102, Ex. E, Jane Doe Dep. Vol. 1 Tr. 146: 13-21.

[3] As previously addressed by the Court, the specific facts regarding the sexual encounter are in dispute. *See* ECF No. 121. Therefore, the Court declines to include these details in this memorandum.

[4] Another area of dispute is with respect to text messages that were allegedly sent by the parties on August 25, 2017. In his deposition John Doe 3 stated that he received a text message from Plaintiff's cellphone at 2:23AM on August 25, 2017, which stated the following: "Make sure none of your friends talk. I don't want this shit to deal with my freshman year. So keep it to themselves. I don't feel well either, so I think I may pass out soon but make sure they don't shit to anyone." Joint Appendix, ECF No. 102, Ex. K., John Doe 3 Dep. Tr. 85: 7-18. Plaintiff has denied sending the message and claims that the message cannot be authenticated at trial in part because the contents of the message do not appear in Plaintiff's cellphone nor were they recoverable when her phone was extracted. PRSOF ¶ 57.

Plaintiff has alleged that defendants John Doe 1 and John Doe 2 exchanged messages in a group chat, which included the following: "We took her virginity"; "Y'all really violated that girl"; "She was calling us Daddy"; "She was fingering herself, I never saw a girl do that"; "She was crying in the bathroom"; "So, we may have a case"; and "Yea, cuz [John Doe 1] punched her." Joint Appendix, ECF No. 102, Ex. AA at JA2206-16. Several of these messages appear to have been sent by defendant John Doe 2. *See id.* In an interview with Moravian College Title IX investigators, John Doe 1 challenged the veracity of the messages and stated that John Doe 2 was just "gassing" when he sent them. Joint Appendix, ECF No. 102, Ex. S at JA 01710.

Following the report of the alleged sexual assault, Plaintiff met with Detective Moses Miller of the Bethlehem Police Department. MCSOF ¶ 72; PRSOF ¶ 72. Plaintiff provided a handwritten statement containing details of the encounter. Joint Appendix, ECF No. 102, Ex. M at JA01467. On August 26, 2017, Detective Miller interviewed John Doe 1 about the incident. *Id.* at JA01454-55. John Doe 1 also provided a written statement and the video of the sexual encounter to Detective Miller. *Id.* at JA01455. John Doe 2 was also interviewed by Detective Miller on August 26, 2017, and then provided a written statement on August 28, 2017. *Id.* On August 28, 2017, the cellphones belonging to Plaintiff, John Doe 1 and John Doe 2 were collected by the Bethlehem Police Department and sent to the Petzold Crime Lab for forensic testing. *Id.* at JA01439.

In the course of his investigation, Detective Miller reviewed cellphone videos taken of the sexual encounter, written statements and text messages related to the encounter. MCSOF ¶ 74; PRSOF ¶ 74; Joint Appendix, ECF No. 102, Ex. M at JA01464. On August 29, 2017, Detective Miller met with Assistant **[*8]** District Attorney Tatum Wilson of the Northampton County District Attorney's Office to review video evidence, written statements and text messages regarding the sexual assault allegations. Joint Appendix, ECF No. 102, Ex. M at JA01464. Upon review of this evidence, no criminal charges were filed against defendants John Doe 1, John Doe 2 or John Doe 3. *Id.*

**b. Title IX Investigation**

Following Plaintiff's report of the alleged sexual assault to police, Moravian initiated a Title IX investigation into the matter. MCSOF ¶ 77; PRSOF ¶ 77. Pursuant to this investigation, Moravian Title IX Coordinator Leah Naso (*nee* Breisch) issued "No Contact" orders to Plaintiff, John Doe 1 and John Doe 2 on August 26, 2017. *Id.* Two Title IX investigators were then appointed to gather evidence and question witnesses - Linda Hoy ("Hoy") and Donald Sabo ("Sabo"). MCSOF ¶ 78; PRSOF ¶ 78. Both of these investigators had prior law enforcement experience and were employed by Moravian as Civil Rights Investigators assigned to conduct Title IX investigations. MCSOF ¶ 79; PRSOF ¶ 79. During the course of their investigation, Hoy and Sabo conducted several interviews of the Plaintiff and John Doe Defendants, along with **[*9]** 16 interviews of other witnesses. MCSOF ¶ 80; PRSOF ¶ 80. During this investigation, Plaintiff was interviewed on August 31, 2017, September 5, 2017 and September 25, 2017. MCSOF ¶ 81; PRSOF ¶ 81. John Doe 1 was interviewed on September 11, 2017, and September 25, 2017, and John Doe 2 was interviewed on September 15, 2017, and October 5, 2017. Joint Appendix, ECF No. 102, Ex. S at JA01701. Following the interviews with the witnesses, Hoy and Sabo prepared a written investigation report. MCSOF ¶ 80; PRSOF ¶ 80. Moravian College issued the investigation report on October 23, 2017. *See* Joint Appendix, ECF No. 102, Ex. S at JA01693-01741. Prior to issuing the final report, Plaintiff was given the opportunity to review her statement and make any revisions. MCSOF ¶ 82; PRSOF ¶ 82. Plaintiff made four revisions to her statement regarding the events that took place at the Football House and defendant John Doe 1's residence. Joint Appendix, ECF No. 102, Ex. Q at JA01686-89.

A hearing in this matter before the Discipline and Review Committee at Moravian was scheduled for November 20, 2017. Joint Appendix, ECF No. 102, Ex. R at JA01690-95. Plaintiff was informed of the scheduled hearing and provided **[*10]** with a copy of the investigation report on November 6, 2017. MCSOF ¶ 84; PRSOF ¶ 84. Following her review of the report, Plaintiff met with Naso and discussed the hearing. MCSOF ¶ 85; PRSOF ¶ 85. During this meeting, Plaintiff was informed by Naso that John Doe 1 and John Doe 2 might not be expelled following the hearing. *Id.* Plaintiff then informed Naso that she no longer wished to proceed with the hearing and formal adjudication process.[5] *Id.* On November 10, 2017, Plaintiff was provided with written notice confirming her decision to no longer move forward with the disciplinary process. MCSOF ¶ 86; PRSOF ¶ 86. She was also informed that she retained the right to request that Moravian re-open the case and proceed with the hearing. *Id.* The No Contact Orders issued on August 26, 2017 continued to remain in effect. *Id.*

---

[5] Plaintiff has testified that Naso informed her during this meeting that the hearing would be held in-person, and that Naso believed John Doe 1 and John Doe 2 would not be expelled. Joint Appendix, ECF No. 102, Ex. E., Jane Doe Dep. Vol. 1 Tr. 227: 9-24.

**c. Concerns Regarding No Contact Order**

On several occasions, Plaintiff raised concerns with Naso regarding the No Contact Order and encounters with defendants John Doe 1 and John Doe 2 on campus. MCSOF ¶ 88; PRSOF ¶ 88. On September 19, 2017, Plaintiff emailed Naso and stated that she had seen defendants John Doe 1 and John Doe 2 in a campus dining hall, at which time Plaintiff **[*11]** observed them staring at her and whispering to the person they were with. Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. 255-57. In her email Plaintiff acknowledged that she would was going to see John Doe 1 and John Doe 2 from time to time on campus. *Id.* Naso responded to Plaintiff that same day and stated that while their conduct was likely not a violation of the No Contact Order, she would speak to John Doe 1 and John Doe 2 about the "need to be more mindful about how they may be impacting you during the course of this investigation." *Id.* at 258-59. Naso then emailed John Doe 1 and John Doe 2 on September 20, 2017 and informed them of Plaintiff's concerns. MCSOF ¶ 90; PRSOF ¶ 90. While she acknowledged that their conduct was likely not a violation of the No Contact Order, Naso instructed John Doe 1 and John Doe 2 to be more mindful and look the other way if or when they encountered Plaintiff. *Id.* She also asked that they encourage their friends to do the same. *Id.*

On October 13, 2017, Naso emailed John Doe 2 regarding a complaint that John Doe 2 had made which involved Plaintiff allegedly telling other students on campus that John Doe 2 was a rapist. Joint Appendix, **[*12]** ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. at JA 00865. Naso acknowledged that Plaintiff's alleged conduct was not likely a violation of the No Contact Order, but that she would follow up with Plaintiff, remind her about the No Contact Order and ask that she be more mindful moving forward. *Id.* MCSOF ¶ 92; PRSOF ¶ 92. In her subsequent email to Plaintiff, Naso did not suggest that Plaintiff's alleged conduct violated the No Contact Order, but cautioned Plaintiff to be mindful of her actions as the disciplinary process progressed. Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. at JA00865.

On October 17, 2017, Plaintiff emailed Hoy and stated that she saw defendant John Doe 1 walk towards her from a distance of approximately 50 feet as she was walking back to her dormitory one evening. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00867. Plaintiff stated that she changed her direction when she saw him approaching and thought that it was strange that she had to change her route but he did not. *See id.* Hoy then forwarded the email to Naso. *Id.* at JA00868. Naso emailed Plaintiff on October 19, 2017 and stated that she had contacted John Doe 1 to remind **[*13]** him of the terms of the No Contact Order and to ask him to be more mindful. *Id.* at JA00869.

On February 8, 2018, an incident between Plaintiff, Plaintiff's father and John Doe 1 took place at a Moravian basketball game. Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. 286-89. Plaintiff's parents attended the game to watch her cheer. *Id.* at 286: 8-25. Following the game, Plaintiff's father and John Doe 1 got into an altercation. *Id.* at 288. During this altercation, Plaintiff intervened and told John Doe 1 to leave.[6] *Id.* at 288: 6-19. Following the incident, Chief Conduct Officer Greg Meyer conducted an investigation into the matter, speaking with several witness to the incident. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00886. Plaintiff was advised on February 22, 2018 that she was found to have violated the No Contact Order. MCSOF ¶ 94; PRSOF ¶ 94. Plaintiff was provided a letter detailing the findings, which included a deadline of March 1, 2018 to appeal the decision. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00881. Plaintiff never appealed the decision. Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. 298: 24. **[*14]** John Doe 1 was found to be not responsible for violation of the No Contact Order. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00886.

During the spring semester, Plaintiff applied to several other schools before deciding to transfer. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. 300. In submitting her applications, Plaintiff had to provide an

---

[6] Plaintiff claims that on February 8, 2018, her parents felt like they were being harassed by John Doe 1 and that John Doe 1 had acted aggressively towards her father. PRSOF ¶ 94. Plaintiff also claimed that she only intervened to stop a physical altercation from ensuing between her father and John Doe 1. *Id.*

explanation of the violation to at least one prospective school. *Id.* at JA00884. Plaintiff attempted to have this violation removed from her disciplinary record, but was informed by Meyer she was no longer eligible to appeal the decision. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00898. Meyer further informed Plaintiff that an expungement process would be implemented the following year, and that she would be eligible to apply to have her record expunged beginning in February 2019. *Id.*

Plaintiff remained a student at Moravian until the end of her freshman year. MCSOF ¶ 96; PRSOF ¶ 96. She continued as a member of the cheerleading team and participated in activities and events during the year. *Id.* During her two semesters at Moravian, Plaintiff posted a cumulative GPA of 3.76. MCSOF ¶ **[*15]** 97; PRSOF ¶ 97. At the conclusion of her freshman year, Plaintiff transferred to another school to complete her undergraduate education. MCSOF ¶ 100; PRSOF ¶ 100.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(a)*. Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*). A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson, 477 U.S. at 248*). "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify [] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (internal quotation marks omitted). In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for **[*16]** trial." *Id. at 324*. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 192 (3d Cir. 2015)* (quoting *Anderson, 477 U.S. at 252*).

## IV. DISCUSSION

Defendant Moravian moves for summary judgment with respect to Plaintiff's claims of (1) Moravian's alleged violation of Plaintiff's rights under Title IX; (2) intentional infliction of emotional distress; and (3) negligence. With respect to Plaintiff's Title IX claim, Moravian contends that they are entitled to summary judgment because Plaintiff has failed to produce sufficient evidence to support her claim of Hostile Collegiate Environment, and, that the Supreme Court's recent decision in *Cummings v. Premier Rehab Keller, P.L.L.C.* precludes the damages that Plaintiff seeks. Additionally, Moravian argues that Plaintiff has failed to produce sufficient evidence to support her claims of intentional infliction of emotional distress and negligence. The Court addresses these arguments in turn.

### a. Plaintiff's Title IX Claims

In her Second Amended Complaint, Plaintiff brought two Title IX claims against defendant Moravian: a "before" claim for the conduct that took **[*17]** place prior to and during the alleged assault, and an "after" claim with respect to defendant Moravian's actions following the alleged assault. In her response to Moravian's Motion for Summary Judgment, Plaintiff conceded she does not have a viable "before" claim against Moravian due to lack of evidence. Therefore, summary judgment is granted to Moravian with respect to Plaintiff's "before" claim. Plaintiff's Title IX claim now rests upon Moravian's actions following the alleged assault.

Count I of the Second Amended Complaint alleges a Hostile Collegiate Environment claim against Moravian under Title IX, wherein Plaintiff accuses Moravian of exhibiting deliberate indifference in their response to the alleged sexual assault. Second Amended Complaint ¶¶ 56-65, ECF No. 49 ("Amended Complaint"). Plaintiff's accusations include, *inter alia*, that she was subjected to the continued presence of John Doe 1 and John Doe 2 on campus while the No Contact Order was in effect; the No Contact Order was not enforced against John Doe 1 and John Doe 2; Plaintiff was offered no remedies with respect to the dissemination of the videos of the alleged assault; and that Leah Naso, as a Moravian employee, **[*18]** did not act promptly in disciplining the alleged transgressions. *Id.* at ¶¶ 58-63.

In an action alleging a hostile collegiate environment based on student-on-student harassment under Title IX, a Plaintiff must show that:

> (1) the defendant received federal funds; (2) sexual harassment occurred; (3) the harassment occurred under circumstances wherein the funding recipient exercised substantial control over both the harasser and the context in which the harassment occurred; (4) the funding recipient had actual knowledge of the harassment; (5) the funding recipient was deliberately indifferent to the harassment; and (6) the harassment was so severe, pervasive, and objectively offensive that it [could] be said to have deprived the victim of access to the educational opportunities provided by the school.

*Davis, 526 U.S. at 645-52*. In their Motion for Summary Judgment, Moravian contested items (5) and (6).

**i. Deliberate Indifference**

A showing of deliberate indifference requires a school response to student-on-student harassment that is "clearly unreasonable in light of the known circumstances." *Davis, 526 U.S. at 648*. To prove deliberate indifference, a plaintiff must establish that the school made an official decision not to remedy the alleged **[*19]** violation. *Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1989)*. At a minimum, a plaintiff must show that the school's decisions "cause students to undergo harassment or make [them] liable or vulnerable to it." *Davis, 526 U.S. at 645*; *see* *Doe v. Univ. of Scranton, No. 19-CV-01486, 2020 U.S. Dist. LEXIS 187526, 2020 WL 5993766, at *6 (M.D. Pa. Oct. 9, 2020)*. In considering a case alleging student-on-student harassment, school administrators are to receive substantial deference with respect to their disciplinary process. *Davis, 526 U.S. at 648* ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."); *see* *New Jersey v. T.L.O., 469 U.S. 325, 342-43, n.9, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985)*); *A.J. v. Mastery Charter High Sch., No. CV 19-1458, 2022 U.S. Dist. LEXIS 167342, 2022 WL 4292330, at *4 (E.D. Pa. Sept. 15, 2022)* ("It is not our place to second-guess Defendants' disciplinary decisions following their investigation."). These standards for deliberate indifference impose a significant burden on a Plaintiff and as such these claims "rarely proceed beyond a motion to dismiss." *Saravanan v. Drexel Univ., 17-CV-3409, 2017 U.S. Dist. LEXIS 193925, 2017 WL 5659821, at *7 (E.D. Pa. Nov. 24, 2017)*; *see* *T.B. v. New Kensington-Arnold Sch. Dist., 15-CV-0606, 2016 U.S. Dist. LEXIS 161425, 2016 WL 6879569, at *7 (W.D. Pa. Nov. 22, 2016)* ("the deliberate indifference standard sets a high bar for a plaintiff seeking to recover under Title IX").[7]

**ii. Severe, Pervasive, and Objectively Offensive**

To establish this element, a plaintiff must show that the alleged harassment was so "severe, pervasive, and objectively offensive that it [could] be said to have deprived the victim of access to the educational opportunities provided by the school." *Davis, 526 U.S. at 650*. In determining whether harassment is severe, pervasive, and objectively **[*20]** offensive, the following factors should be considered: "the frequency of the offensive conduct; the nature of the unwelcome sexual acts or words, for example, whether the harassment was physical, verbal or both; whether the harassment was merely an offensive utterance; and the relationship between the parties." *Chancellor*

---

[7] It should be noted that Plaintiff's Title IX claim survived a Motion to Dismiss in this case. *See* ECF No. 46.

v. Pottsgrove Sch. Dist., 529 F. Supp. 2d 571, 575 (E.D. Pa. 2008). The Supreme Court has explained that "[w]hether gender-oriented conduct rises to the level of actionable 'harassment' thus depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved[.]" Davis, 526 U.S. at 651.

In this case Plaintiff has brought a Title IX claim alleging a hostile collegiate environment. In their Motion for Summary Judgment, Moravian argued that their response to Plaintiff's sexual assault allegations did not constitute deliberate indifference, and that Plaintiff has failed to produce sufficient evidence to show that she was subjected to harassment that was so "severe, pervasive, and objective offensive that it [could] be said to have deprived the victim of access to the educational opportunities provided by the school." Davis, 526 U.S. at 650. In her response, Plaintiff **[*21]** has argued that she is entitled to relief under Title IX, in part due to Moravian's failure to take appropriate disciplinary action against John Doe 1 and John Doe 2 for the alleged sexual assault and dissemination of the videos taken of the alleged assault, Naso's alleged statements regarding the outcome of the disciplinary hearing, and Plaintiff's violation of the No Contact Order. We need not address the question of whether a reasonable jury could return a verdict in Plaintiff's favor based on the evidence presented thus far, *see* Physicians Healthsource, Inc., 954 F.3d at 618; Daniels, 776 F.3d at 192, because the damages that Plaintiff seeks with respect to her Title IX claim are barred following the recent Supreme Court decision Cummings v. Premier Rehab Keller, P.L.L.C. 142 S. Ct. 1562, 212 L. Ed. 2d 552, reh'g denied, *142 S. Ct. 2853, 213 L. Ed. 2d 1081 (2022)*.

**iii. Emotional Distress Damages**

In their Motion for Summary Judgment, Moravian argues that the Supreme Court's recent decision in Cummings bars the recovery of non-economic damages in a private action brought under Title IX, including damages for emotional distress alleged by Plaintiff in this case. In Cummings, a patient who was deaf and legally blind brought an action against her physical therapy provider under the Rehabilitation Act ("RA") and the *Patient Protection and Affordable Care Act ("ACA")*, wherein she alleged that her provider discriminated **[*22]** on the basis of her disability by failing to provide a sign language interpreter. Id. at 1568-69. Plaintiff sought damages for "humiliation, frustration, and emotional distress." Id. at 1569.

In Cummings the Supreme Court discussed private remedies available under Spending Clause antidiscrimination legislation and acknowledged that while private individuals have the right to sue to enforce that that legislation, "it is less clear what remedies are available in such a suit." Id. at 1569-70 (quoting Barnes v. Gorman, 536 U.S. 181, 185, 122 S. Ct. 2097, 153 L. Ed. 2d 230 (2002). The Supreme Court has repeatedly interpreted Spending Clause antidiscrimination legislation through a contract-law lens - "in return for federal funds, the [recipients] agree to comply with federally imposed conditions." Cummings, 142 S. Ct. at 1570 (quoting Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L. Ed. 2d 694 (1981)). Applying this analogy, the Barnes Court held that in addition to the remedies explicitly enumerated in Spending Clause legislation, remedies "traditionally available in suits for breach of contract" would also be available. 536 U.S. at 187 (punitive damages not available because they are "generally not available for breach of contract").

In Cummings, the Court followed that same analogy and stated that in order to constitute "appropriate relief" in a private Spending Clause action, the funding recipient must be on notice that, "by accepting federal funding, it exposes itself to liability of that **[*23]** nature." 142 S. Ct. at 1570 (quoting Barnes, 536 U.S. at 187). In addressing the availability of emotional distress damages, the Court asked the simple question: "Would a prospective funding recipient, at the time it 'engaged in the process of deciding whether [to] accept' federal dollars, have been aware that it would face such liability?" Id. at 1570-71 (quoting Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296, 126 S. Ct. 2455, 165 L. Ed. 2d 526 (2006)). If answered in the affirmative, then emotional distress damages are available; if no, they are not. Id. at 1571. Accordingly, the Court stated that "we may presume that a funding recipient is aware that, for breaching its Spending Clause 'contract' with the Federal Government, it will be subject to the usual contract remedies in private suits." *Id.* (citing Barnes, 536 U.S. at 187-88). Following this logic and the Court's holding in Barnes, the Court held that federal funding recipients cannot be treated to have consented to be subject to damages for emotional distress as they are generally not available in an action for

breach of contract, and therefore these damages are not recoverable under the Spending Clause statutes. Id. at 1572.

In the wake of the Supreme Court's decision in Cummings, district courts have split on this issue, particularly on the availability of other damages remedies in a Title IX action where plaintiffs have sought emotional distress damages. **[*24]** In *Montgomery v. D.C.*, plaintiff Montgomery was detained for over five years awaiting criminal trial before he was acquitted. No. 18-CV-1928, 2022 U.S. Dist. LEXIS 92281, 2022 WL 1618741, at *1 (D.D.C. May 23, 2022). Montgomery had a history of mental health issues and alleged that he was experiencing "severe psychosis" at the time of the interrogation that led to his arrest. Id. 2022 U.S. Dist. LEXIS 92281, [WL] at *2. His civil complaint alleged that defendant District of Columbia violated his rights under the Americans with Disability Act ("ADA") and the RA. The Court denied defendant's Motion for Summary Judgment, concluding that while Plaintiff was not entitled to any emotional distress or reputation damages following the Supreme Court's decision in Cummings, he was entitled to seek a small amount of damages to compensate him for lost opportunity due to being "denied the ability to meaningfully access and participate in his interrogations." Id. 2022 U.S. Dist. LEXIS 92281, [WL] at *25. In *Chaitram v. Penn Med.-Princeton Med. Ctr.*, the Court found the plaintiff was eligible for compensatory damages under a loss of opportunity theory in an action alleging violations of the ACA and the RA. No. 21-CV-17583, 2022 U.S. Dist. LEXIS 203676, 2022 WL 16821692, at *2 (D.N.J. Nov. 8, 2022). Plaintiff in that case sought damages for the "shame, anxiety, frustration, emotional distress, fear and discrimination" that defendant's actions caused her. *Id.* In addition **[*25]** to the emotional distress damages, Plaintiff had also requested injunctive and declaratory relief, compensatory damages, and any and all relief that may be appropriate. *Id.* Citing the reasoning of the *Montgomery* court, the Court found that the plaintiff had an expectation interest to engage and participate in her own medical care through effective communication, which she alleged that the defendant denied her, and was therefore eligible for compensatory damages.

In *Doe next friend of Doe v. City of Pawtucket*, the Court granted summary judgment to Defendants with respect to Plaintiffs' alleged damages for emotional distress and pain and suffering, nominal damages, and statutory damages. 2017-CV-00365, 2022 U.S. Dist. LEXIS 179574, 2022 WL 4551953, at *3-5 (D.R.I. Sept. 29, 2022). Following the Cummings decision, the District Court asked the same question addressed by the Supreme Court: "Would a prospective funding recipient ... have been aware that it would face such liability? If yes, then emotional distress damages are available; if no, they are not." Id. 2022 U.S. Dist. LEXIS 179574, [WL] at *3 (quoting Cummings, 142 S. Ct. at 1570-71). The Court answered this question in the negative, given the similarities between the statutes at issue in Cummings, the ACA and RA, and Title IX. *Id.* The Court found that pursuant to the Supreme Court's decision in Cummings, damages for **[*26]** emotional distress are unavailable in a private suit alleging violations of Title IX. *Id.*

The Court also discussed the availability of other remedies following the Cummings decision, including nominal damages. Citing the RESTATEMENT (SECOND) OF CONTRACTS, the Court explained that nominal damages are available in a breach of contract action where damages that actually resulted from the breach cannot be proven or where no damages resulted from the breach. Id. 2022 U.S. Dist. LEXIS 179574, [WL] at *4; see *RESTATEMENT (SECOND) OF CONTRACTS§ 346(2)* (Am. L. Inst. May 2022 Update); 24 WILLISTON ON CONTRACTS § 64.9 (4th ed. May 2022 Update). Plaintiffs in that case claimed that they were entitled to pursue nominal damages even though they had not requested them in their complaint. 2017-CV-00365, 2022 U.S. Dist. LEXIS 179574, 2022 WL 4551953, at *4. The Court did not address the timeliness of the request but found that plaintiffs had no claim for nominal damages. *Id.* Relying on the RESTATEMENT, the Court stated that nominal damages cannot be "a substitute for damages that might be proven but are otherwise unavailable." *Id.* As such, the Court ruled that plaintiffs could not substitute their emotional distress damages with nominal damages. *Id.* ("[To] the extent that Plaintiffs seek nominal damages for harm that is properly characterized as emotional **[*27]** distress, the Court rejects such a facial rebranding"); see Hejmej v. Peconic Bay Med. Ctr., No. 17-CV-782 (JMA)(SIL), 2022 U.S. Dist. LEXIS 119114, 2022 WL 5429675, 2022 U.S. Dist. LEXIS 119114, at *25 (E.D.N.Y. July 5, 2022) (citations omitted) (internal quotation marks omitted) ("Plaintiffs cannot salvage their ... claim merely by recasting their request for relief [seeking emotional distress damages] as seeking nominal damages.").

We agree with the Court's reasoning in *City of Pawtucket* and conclude that Plaintiff's emotional distress damages under her Title IX claim are barred in this case. Title IX is one of the four *Spending Clause* statutes passed by Congress that prohibit discrimination based on protected characteristics. *Cummings, 142 S. Ct. at 1569*. While the case in *Cummings* involved claims under the RA and ACA, the Court held that these damages are not recoverable under the *Spending Clause* statutes prohibiting discrimination, which includes Title IX. *Id. at 1572*; *see Davis, 526 U.S. at 629, 640* ("we have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the *Spending Clause*....") (citations omitted). In her Second Amended Complaint, Plaintiff's Title IX claim sought damages only for emotional distress. She did not seek any compensatory damages nor any injunctive relief.

In her response to Moravian's Motion for Summary Judgment, Plaintiff acknowledged that the Supreme Court's decision in *Cummings* bars recovery of emotional **[*28]** damages under Title IX. Plaintiff argued, however, that we should not follow that decision based on the retroactivity test set forth in *Chevron Oil Co. v. Huson. 404 U.S. 97, 92 S. Ct. 349, 30 L. Ed. 2d 296 (1971)*. In response, Moravian contends that the modern rule for retroactivity is that a newly announced legal applies to all actions pending in the federal district courts or that are on appeal. *See Atl. Coast Demolition & Recycling v. Bd. of Chosen Freeholders, 112 F.3d 652, 672 (3d Cir.1997)* (citing *Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 751-53, 115 S. Ct. 1745, 131 L. Ed. 2d 820 (1995)*). We agree with Moravian.

In *Harper v. Virginia Dept. of Taxation*, the Supreme Court rejected the *Chevron* test for retroactivity. *509 U.S. 86, 97-98, 113 S. Ct. 2510, 125 L. Ed. 2d 74 (1993)*. In that case the Court held that

> "[W]hen this Court does not 'reserve the question whether its holding should be applied to the parties before it,' however, an opinion announcing a rule of federal law 'is properly understood to have followed the normal rule of retroactive application' and must be 'read to hold ... that its rule should apply retroactively to the litigants then before the Court.'"

*Id.* (quoting *James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 539, 111 S. Ct. 2439, 115 L. Ed. 2d 481 (1991)* (opinion of SOUTER, J.)). Since then the Third Circuit has embraced the modern rule for retroactivity cited by Moravian, wherein a newly announced federal legal rule applies to all open and non-final cases pending in the district courts or on appeal. *See Atl. Coast Demolition & Recycling, 112 F.3d at 672*; *M.S. v. Marple Newtown Sch. Dist., 635 F. App'x 69, 73 (3d Cir. 2015)*. We find, that the Supreme Court's decision in *Cummings* applies in this case, **[*29]** which in turn bars Plaintiff's damages for emotional distress. Therefore, summary judgment is granted to Moravian with respect to Plaintiff's Title IX claim.

**b. Intentional Infliction of Emotional Distress**

To state a claim for intentional infliction of emotional distress ("IIED") under Pennsylvania law, the plaintiff must allege facts that establish that (1) the defendant's conduct was "extreme and outrageous," (2) it was "intentional or reckless," (3) it caused emotional distress, and (4) the emotional distress was severe. *Chuy v. Phila. Eagles Football Club, 595 F.2d 1265, 1273 (3d Cir. 1979)* (en banc); *see also Taylor v. Albert Einstein Med. Ctr., 562 Pa. 176, 754 A.2d 650, 652 (Pa. 2000)* ("One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." (quoting *Restatement (Second) of Torts § 46(1)*). Conduct rises to the "extreme and outrageous" level if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone, 554 Pa. 134, 720 A.2d 745, 754 (Pa. 1998)* (quoting *Buczek v. First Nat'l Bank of Mifflintown, 366 Pa. Super. 551, 531 A.2d 1122, 1125 (Pa. 1987)*); *see also Kazatsky v. King David Mem'l Park, Inc., 515 Pa. 183, 527 A.2d 988, 991 (Pa. 1987)* (quoting *Restatement (Second) of Torts § 46 cmt. d*); *Field v. Philadelphia Elec. Co., 388 Pa. Super. 400, 428, 565 A.2d 1170 (1989)*. Finally, in order to prevail on a claim of IIED in Pennsylvania, the plaintiff must prove that she "[suffered] some **[*30]** type of resulting physical harm due to the defendant's outrageous conduct." *Reedy v. Evanson, 615 F.3d 197, 231 (3d Cir. 2010)* (quoting *Swisher v. Pitz, 2005 PA Super 56, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)*). Moreover, any claim of emotional distress must be supported by competent medical evidence. *Kazatsky, 515 Pa. at 197*.

Plaintiff has alleged that Moravian's deliberate indifference following the alleged assault caused her emotional distress. Second Amended Complaint ¶¶ 94-98, ECF No. 49. These actions include Moravian's handling of the Title IX investigation and its failure to discipline John Doe 1 and John Doe 2, permitting John Doe 1 and John Doe 2 to remain on campus while the Title IX investigation was being conducted, the treatment she received from Ms. Naso and Mr. Meyer, and the finding that she violated the No Contact Order following the incident that took place at the Moravian basketball game on February 8, 2018. *Id.* at ¶¶ 92-94; Pl. Resp. Mot. for Summ. J., ECF No. 107-1 at 14. In their Motion for Summary Judgment, Moravian argues that the conduct alleged in this case cannot be considered "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Reedy, 615 F. 3d at 231-32* (quoting *Field, 565 A.2d at 1184*).

We need not decide whether a **[*31]** jury could reasonably find that Moravian's conduct was "extreme and outrageous" because Plaintiff has failed to produce sufficient evidence to show that she suffered physical harm as a result of the alleged outrageous conduct. Under Pennsylvania law, a Plaintiff must be able to show that she suffered some type of physical harm as a result of the defendant's outrageous conduct in an IIED case. *See Reedy, 615 F.3d at 231*; *Hart v. O'Malley, 436 Pa. Super. 151, 175, 647 A.2d 542 (1994)*, *aff'd*, *544 Pa. 315, 676 A.2d 222 (1996)*. In *Reedy*, the Third Circuit affirmed summary judgment in favor of the defendants, two police officers and a township public safety director, where the plaintiff was unable to point to any physical harm she suffered as a result of the defendants' conduct. In its opinion the Court stated

> While one may argue whether [Defendant's] conduct was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious," *Field, 565 A.2d at 1184*, we need not decide the issue, because, to succeed on an intentional infliction of emotional distress claim, [Plaintiff] must show that she suffered "some type of resulting physical harm due to the defendant's outrageous conduct." *Swisher, 868 A.2d at 1230*.

*Reedy, 615 F.3d at 231*. Furthermore, a plaintiff alleging IIED is required to present competent medical evidence regarding the physical **[*32]** harm suffered. *Kazatsky, 515 Pa. at 197* ("We therefore conclude that if *section 46 of the Restatement* is to be accepted in this Commonwealth, at the very least, existence of the alleged emotional distress must be supported by competent medical evidence.").

The Court takes very seriously the trauma and emotional distress claimed by Plaintiff, however, the evidence in the record does not satisfy the physical harm requirement of an IIED claim under Pennsylvania law. Moreover, Plaintiff has not presented any competent medical evidence as is necessary to establish injuries that can be attributed to the alleged actions of Moravian. Therefore, as a matter of law, because Plaintiff cannot establish that she experienced physical harm as a result of Moravian's alleged actions, and has produced no competent medical evidence, Moravian is entitled to summary judgment with respect to Plaintiff's IIED claim.

**c. Negligence**

In Count IV of her second amended complaint, Plaintiff has asserted a claim of negligence under Pennsylvania common law against Moravian alleging that the college failed to provide adequate security. Second Amended Complaint ¶¶ 101-111, ECF No. 49. To establish a claim of negligence under Pennsylvania law, a plaintiff must show that **[*33]** "(1) the defendant owed the plaintiff a duty of care, (2) that duty was breached, (3) the breach resulted in the plaintiff's injuries, and (4) the plaintiff suffered an actual loss or damages." *Collins v. Phila. Suburban Development Corp., 2018 PA Super 17, 179 A.3d 69, 73 (Pa. Super. 2018)* (quoting *Merlini ex rel. Merlini v. Gallitzin Water Authority, 602 Pa. 346, 980 A.2d 502, 506 (Pa. 2009)*). A landlord generally owes no duty to protect its tenants from the criminal conduct of other parties. *Feld v. Merriam, 506 Pa. 383, 485 A.2d 742, 747 (Pa. 1984)*. However, an exception to this rule is recognized where the landlord establishes a program of security, the tenants reasonably rely upon it, and the landlord negligently carries out the program. *Id.* Importantly, though, "a tenant may not expect more than is offered." *Id.*

Here, Plaintiff has offered scant evidence regarding the security program or protocol implemented by Moravian in the dormitories at the school. To date, evidence has been produced that shows the defendant Moravian required school identification cards to enter the dormitories, they used residential advisors in their dormitories, and that security workers were employed by the school. Taken as a whole, there is evidence that Moravian had in fact implemented security protocols in the campus dormitories at the time of the alleged assault, and their students, in this case the Plaintiff, reasonably relied on these protocols. **[*34]** As such, Moravian owed a duty to the Plaintiff as a landlord.

Moravian contends that no such duty is owed because courts have moved away from imposing a duty of *in loco parentis* upon colleges and universities. *See* *Bradshaw v. Rawlings, 612 F.2d 135, 138 (3d Cir. 1979)*; *Alumni Ass'n v. Sullivan, 524 Pa. 356, 364, 572 A.2d 1209 (1990)*; *Millard v. Osborne, 416 Pa. Super. 475, 487, 611 A.2d 715 (1992)*. While the authoritarian role of colleges and universities has been diluted over time, *see* *Bradshaw, 612 F.2d at 138*, the alleged assault in this case occurred in a campus dormitory. There is evidence that this dormitory, like other dormitories on campus, had a security program in place that was designed to protect students. There is also evidence that Plaintiff reasonably relied on that program of security. Additionally, none of the cases cited above involved tortious acts alleged to have taken place in campus dormitories. *See* *Bradshaw, 612 F.2d at 138* (student passenger injured in off campus automobile accident); *Sullivan, 524 Pa. at 358* (owner of off-campus fraternity house sued students after fire damaged house); *Millard, 416 Pa. Super. at 477* (student motorcyclist killed in off-campus motorcycle accident).

Now that we have concluded that Moravian owed the Plaintiff a duty as a landlord, we must now address the second element of Plaintiff's negligence claim: whether Moravian breached that duty. To determine whether a defendant has breached their duty in a landlord tenant **[*35]** context, a Plaintiff must go beyond a "showing that what was provided could have been better administered or undertaken in a more effective manner." *James v. Duquesne Univ., 936 F. Supp.2d 618, 643 (W.D. Pa. 2013)*. A plaintiff must allege that the operation of the security program was negligent.

In *James*, a student at Duquesne University was shot after leaving a dance that was held on campus by a campus organization. *Id. at 623-24*. The student then commenced a personal injury action against the university, alleging, *inter alia*, that the university was negligent in providing security for its students. *Id. at 628*. Plaintiff's expert in that case identified several areas where the security protocol had failed at the time of the incident, including, failing to provide off-duty officers at the entrance, delegating students the responsibility of providing security, failing to instruct off-duty officers about their duties and responsibilities at the dance, and failing to assign a uniformed security officer at the entrance to the dance. *Id. at 643*. In granting summary judgment to the defendant, the Court stated that the expert's findings did not establish breach of a cognizable duty because it was not "based on an expectation of the reasonable benefits of what was offered." *Id. at 644*. Referencing **[*36]** the Pennsylvania Supreme Court's decision in *Feld*, the Court held that Plaintiff's theory that the security measures were inadequate and could have been better administered did not establish a breach of duty under Pennsylvania law. *Id.* ("*Feld* and its progeny consistently hold that such a showing does not breach a duty...").

Here, Plaintiff has failed to establish that Moravian breached its duty to provide an adequate program of security to its students. First, outside the use of campus scan cards, the presence of campus security officers and the use of residential advisors, Plaintiff has failed to establish what the security program at Moravian specifically entailed during the time period of the alleged assault. Moreover, Plaintiff has failed to produce any evidence to establish what the standard campus security practices were at that time, particularly with respect to campus dormitories. Plaintiff's evidence includes the use records of scan cards to enter campus buildings, testimony regarding the presence of campus security officers and the use of residential advisors, and an affidavit from a residential advisor. This evidence is insufficient to support Plaintiff's claim of negligence.

In her **[*37]** motion response, Plaintiff appears to claim that there is a material dispute of fact because a large majority of campus sexual assaults take place during the first weeks of semesters, according to publicly available statistics. This claim goes to foreseeability, insofar as Moravian was on notice regarding the prevalence of campus sexual assaults during that time period, and as such should have had better security in place. However, even if we

were to find an issue of fact with respect to the foreseeability of the alleged assault, Plaintiff still has not produced sufficient evidence to suggest that Moravian's security program, particularly with respect to campus dormitories, was operated negligently on the night of the assault. Therefore, we grant summary judgment to Moravian with respect to Plaintiff's negligence claim.

**V. CONCLUSION**

For the reasons set out in this memorandum, summary judgment is granted to Moravian. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*

JOHN M. GALLAGHER

United States District Court Judge

**ORDER**

**AND NOW**, this 10th day of January, 2023, upon consideration of Defendant Moravian College's Motion for Summary Judgment (ECF No. 101), Plaintiff's Opposition **[*38]** to Defendant Moravian College's Motion for Summary Judgment (ECF No. 107), Defendant Moravian College's Reply Brief (ECF No. 108), and any exhibits attached thereto, and for the reasons provided in the accompanying Memorandum Opinion,

**IT IS HEREBY ORDERED** that Defendant Moravian College's Motion for Summary Judgment (ECF No. 101) is **GRANTED**.

**IT IS FURTHER ORDERED** that JUDGMENT is ENTERED in favor of Defendant Moravian College and against Plaintiff.

BY THE COURT:

*/s/ John M. Gallagher*

JOHN M. GALLAGHER

United States District Court Judge

---

# Exhibit C

2024 WL 3316989
Only the Westlaw citation is currently available.
United States District Court, N.D.
Alabama, Southern Division.

Anna Claire BATES and Jane Doe, Plaintiffs,
v.
SEQUEL YOUTH AND FAMILY
SERVICES, LLC, et al., Defendants.

Case No.: 2:23-CV-01063-RDP
|
Signed July 3, 2024
|
Filed July 5, 2024

**Attorneys and Law Firms**

Denise P. Wiginton, Zarzaur, Mujumdar & Debrosse, Birmingham, AL, Gregory M. Zarzaur, Kelsie Marie Overton, The Zarzaur Law Firm, Birmingham, AL, Thomas Earl James, Law Offices of Tommy James, Birmingham, AL, for Plaintiffs.

Cole Robinson Gresham, H. Thomas Wells III, Starnes Davis Florie LLP, Birmingham, AL, for Defendants.

**MEMORANDUM OPINION**

R. DAVID PROCTOR, CHIEF UNITED STATES DISTRICT JUDGE

***1** This matter is before the court on Defendants' Partial Motion to Dismiss the First Amended Complaint. (Doc. # 18). The Motion (Doc. # 18) has been fully briefed and is ripe for review. (Docs. # 18, 21, 22). For the reasons discussed below, the Motion (Doc. # 18) is due to be denied.

## I. Factual Background [1]

Plaintiffs Anna Claire Bates and Jane Doe bring this suit on behalf of themselves and other similarly situated individuals based on claims of forced labor and abuse of teenagers who have emotional and behavioral issues and were housed at Sequel Youth and Family Services, LLC's facilities across the United States. The relevant factual allegations are set out below.

### A. The Sequel Defendants

In 1999, Adam Shapiro and John Ripley founded Sequel Youth and Family Services, LLC ("Sequel"), an operation of boarding school facilities for teenagers with behavioral problems. (Doc. # 15 ¶¶ 1-3, 22-23, 114). Sequel operated over forty facilities in twenty-one different states until 2020. (*Id.* at ¶¶ 3, 22, 114). It had fifty companies within its corporate structure, and over 2,500 employees. (*Id.* at ¶ 22).

One of Sequel's companies was Sequel TSI Holdings, LLC ("TSI Holdings"), an Iowa limited liability company with its principal place of business in Huntsville, Alabama. (*Id.* at ¶¶ 29-30). TSI Holdings was the managing member of two other Sequel entities: Sequel TSI of Alabama, LLC ("TSI of Alabama") and Sequel TSI of Auldern, LLC ("TSI of Auldern"). (*Id.* at ¶ 31).

TSI of Alabama -- now doing business as Brighter Path Alabama, LLC -- was an Alabama limited liability company with its principal place of business in Montgomery, Alabama. (*Id.* at ¶ 32). At all times relevant, TSI of Alabama owned and operated residential facilities in the state of Alabama for at-risk youth, including Sequel Montgomery. (*Id.* at ¶ 33).

TSI of Auldern was a North Carolina limited liability company with its principal place of business in Huntsville, Alabama. (*Id.* at ¶ 34). At all times relevant, TSI of Auldern owned and operated Auldern Academy, a residential facility for teens with behavioral issues, in North Carolina. (*Id.* at ¶ 35).

### B. Plaintiff Anna Claire Bates

Plaintiff Anna Claire Bates attended Auldern Academy, a "private therapeutic boarding school offering 8th through 12th-grade college preparatory education" for young girls, from April 2016 to June 2017. (Doc. # 15 ¶¶ 15, 42).

During Plaintiff Bates's enrollment at Auldern Academy, all students were required to participate in on-campus "community service." (*Id.* at ¶ 45). Specifically, the school's website stated "[o]n-campus service might find our students planting flowers or cleaning the school vans, helping with the deep cleaning of various campus buildings or windows, and other chores." (*Id.*). However, Plaintiff Bates alleges that Auldern Academy required much more than just a few hours of "community service" and instead used the students in its care as free janitors and groundskeepers to cut operating costs. (*Id.*). Plaintiff Bates alleges that she and other students at

Auldern Academy were forced to clean and maintain the entire campus. (*Id.* at ¶ 46). Indoor tasks included sweeping, mopping, and taking out the trash in buildings across campus. (*Id.* at ¶ 47). Typical outdoor tasks consisted of "weeding, laying out pine straw, moving rocks, and building hiking trails." (*Id.* at ¶ 48). But, some students reported being forced to participate in more strenuous outdoor chores, such as repairing properties, building cabins while ill, and lining paths with boulders for up to twelve hours at a time. (*Id.*).

***2** Plaintiff Bates alleges that Auldern Academy ensured the students performed the labor by employing a variety of abusive measures if they refused to do the work. (*Id.* at ¶ 49). She witnessed staff members tackle, sit on, pull, and physically beat other students. (*Id.* at ¶ 50). One student was forced to carry boulders for up to twelve hours a day, forbidden from speaking to anyone, and required to sleep on the floor of the dorm lobby with the lights on. (*Id.* at ¶ 57). Other students had school credits removed from their transcripts, resulting in them having to remain at the Academy longer to make up a course or re-take a course at a different location. (*Id.* at ¶¶ 70-71).

Other methods of punishment were more egregious and lasted indefinitely. A student could be mandated to a period of "Refocus," which included "runn[ing] up a hill carrying rocks, sleep[ing] on the floor of the activities room with no blanket or pillow, eat[ing] only plain oatmeal and rice and beans which they had to cook over a fire, and walk[ing] six miles." (*Id.* at ¶ 54). Plaintiff Bates was placed on Refocus during her time at Auldern Academy, where she was forced to limit her food intake and participate in strenuous physical activity, resulting in her nearly passing out. (*Id.* at ¶¶ 55-56). Another student was punished by having to participate in Refocus for twenty-five days, and was forced to perform manual labor, including walking up and down a hill with a backpack full of heavy rocks, and raking the forest. (*Id.* at ¶ 59). Months later, the same student was placed on Refocus again as a scare tactic "because the staff thought she would only continue behaving according to their instructions and expectations if she was afraid of Refocus." (*Id.*).

Students were also punished by being placed on "Non-com", during which they were forbidden from communicating or making eye contact with anyone other than therapists during weekly one-on-one therapy sessions. (*Id.* at ¶ 61). The time spent on Non-com varied from student to student, with some girls experiencing isolation for twenty-five days to over a month. (*Id.* at ¶¶ 64-65). Alternatively, a student could be placed on "5 Foot" or "2 Foot," during which she was under twenty-four-seven supervision and required to be within those distances from a staff member at all times, including when sleeping. (*Id.* at ¶ 67). As a result, the student was forced to move her mattress to the dorm's common room floor and sleep next to the staff person's desk each night. (*Id.*). This often resulted in a child going to sleep later than and waking up earlier than all other students. (*Id.*).

Out of fear of these punishments, Plaintiff Bates and other students at Auldern Academy participated in manual labor for no pay. (*Id.* at ¶¶ 43, 72-73).

### C. Plaintiff Jane Doe

Plaintiff Jane Doe resided at Sequel Montgomery, a "Staff-Secure Residential facility that offered an intensive therapeutic long-term program," from December 2014 to the fall of 2015. (Doc. # 15 ¶¶ 17, 83). Plaintiff Doe alleges that, during her enrollment at Sequel Montgomery, she and other children were forced to clean the campus without pay. (*Id.* at ¶¶ 84-90).

Similar to Plaintiff Bates, Plaintiff Doe alleges that Sequel Montgomery forced students to perform unpaid labor by threats and infliction of force, harm, disciplinary procedures, and physical restraints. (*Id.* at ¶¶ 93-95). One method of discipline included extending the length of a child's required placement at Sequel Montgomery if they failed to comply with staff orders, resulting in the child losing access to privileges, such as communicating with family. (*Id.* at ¶¶ 96-99). Another practice of punishment consisted of placing students on "GI", during which a student was forbidden from interacting with peers and had to remain at least ten feet away from other residents at all times. (*Id.* at ¶ 100). Similarly, students could be locked in a seclusion room the size of a small child's closet called "the Box" for extended periods of time and only checked on every few hours. (*Id.* at ¶ 102). Students in the Box had limited access to basic necessities, such as a restroom; as a result, Plaintiff Doe and other students placed in the Box were forced to urinate or defecate on themselves. (*Id.* at ¶¶ 102-104).

***3** In addition to being forced to perform unpaid labor, Plaintiff Doe also alleges that she was repeatedly sexually abused by an adult male employee during her enrollment at Sequel Montgomery. (*Id.* at ¶¶ 195-197). Although she reported the sexual abuse to her therapist, the therapist did not report to the abuse to the police or any other appropriate notification channel. (*Id.* at ¶ 198). Later, Plaintiff Doe

reported the sexual abuse to a female social worker employed at Sequel Montgomery; the same female social worker befriended and groomed Plaintiff Doe, before sexually abusing her as well. (*Id.* at ¶ 199-200).

**D. Other Sequel Locations**

In addition to Auldern Academy and Sequel Montgomery, Sequel owned over forty other rehabilitation facilities in twenty-one states. (Doc. # 15 ¶¶ 114, 118). Plaintiffs allege that part of Sequel's business model was to maintain low operating expenditures by intentionally understaffing all of its facilities. (*Id.* at ¶ 181). For instance, John Ripley -- the co-founder of Sequel -- informed business students that "[y]ou can keep [sic] make money in this business if you control staffing[.]" (*Id.* at ¶ 182).

Plaintiffs allege that all of Sequel's facilities were understaffed, and, as a result, Sequel had standardized policies and procedures in place at all of its facilities to make the resident children perform manual labor without pay. (*Id.* at ¶¶ 129-130, 183). As evidence of this, they point to four other locations with allegations of forced labor. (*Id.* at ¶ 130).

Further, they allege that "Sequel facilities nationwide employed force, threats of force, physical restraint, and threats of physical restraint to force the children to acquiesce to their demands, expectations, and instructions, including those involving the children's labor." (*Id.* at ¶ 136). They point to numerous reports of physical, psychological, and emotional abuse from children housed at various Sequel facilities across the United States. (*Id.* at ¶¶ 137-166).

**E. The Filing of this Action**

Plaintiffs Bates and Plaintiff Doe (collectively "Plaintiffs") filed the First Amended Complaint in this action on November 20, 2023. (Doc. # 15). The First Amended Complaint asserts both individual and class claims against Sequel, TSI Holdings, TSI of Alabama, and TSI of Auldern (collectively "Defendants"). Plaintiffs bring this action on behalf of themselves and the following "Class":

> All minors who were housed at one of the facilities owned, operated, or managed by Defendant Sequel Youth and Family Services, LLC, Defendant TSI Holdings, LLC, Defendant Sequel TSI of Alabama, LLC, or Defendant Sequel TSI of Auldern, LLC and who provided labor or services without pay. The class includes only those who had not yet reached the age of twenty-eight prior to September 16, 2022.

(*Id.* at ¶ 218).

In addition, Plaintiff Bates and Plaintiff Doe each assert claims on behalf of subclass members at their individual facilities. Plaintiff Bates bring claims on behalf of herself and the following "Auldern Subclass":

> All minors who were held at Auldern Academy at 990 Glovers Grove Church Rd, Siler City, NC 27344 and who provided labor or services without pay. The Auldern Subclass only includes those who had not yet reached the age of twenty-eight prior to September 16, 2022.

(*Id.* at ¶ 219). Plaintiff Doe asserts claims on behalf of herself and the following "Sequel Montgomery Subclass":

> All minors who were held at Sequel Montgomery, Alabama, and who provided labor or services without pay. The Sequel Montgomery Subclass only includes those who had not yet reached the age of twenty-eight prior to September 16, 2022.

***4** (*Id.* at ¶ 220).

The First Amended Complaint asserts six federal causes of action: (1) Count I – Civil Action Under 18 U.S.C. § 1595(a) for Forced Labor Violation of 18 U.S.C. § 1589(a) against TSI of Auldern and TSI of Alabama on behalf of Plaintiffs, the Auldern Subclass, and the Sequel Montgomery Subclass; (2) Count II – Civil Action Under 18 U.S.C. § 1595(a) for Benefitting from the Forced Labor Violation of U.S.C. § 1589(a) against all Defendants on behalf of Plaintiffs and the

Class; (3) Count III – Civil Action Under 18 U.S.C. § 1595(a) for Human Trafficking Violation of 18 U.S.C. § 1590(a) against TSI of Auldern and TSI of Alabama on behalf of Plaintiffs, the Auldern Subclass, and the Sequel Montgomery Subclass; (4) Count IV – Civil Action Under 18 U.S.C. § 1595(a) for Benefitting from the Human Trafficking Violation of 18 U.S.C. § 1590(a) against all Defendants on behalf of the Plaintiffs and the Class; (5) Count V – Civil Action Under 18 U.S.C. § 1595(a) for Attempted Forced Labor in Violation of 18 U.S.C. § 1594(a) against TSI of Auldern and TSI of Alabama on behalf of Plaintiffs, the Auldern Subclass, and the Sequel Montgomery Subclass; (6) Count VI – Civil Action Under 18 U.S.C. § 1595 for Conspiracy to Force Labor in Violation of 18 U.S.C. § 1594(b) against all Defendants on behalf of Plaintiffs and the Class. (*Id.* at ¶¶ 239-296).

In addition, Plaintiff Doe asserts the following state law causes of action individually against TSI of Alabama: (1) Count VII – Negligence and/or Wantonness; and (2) Count VIII – Negligence and/or Wantonness: Premises Liability. (*Id.* at ¶¶ 297-314).

Defendants filed a Partial Motion to Dismiss on December 8, 2023. (Doc. # 18). The Motion to Dismiss seeks dismissal of Counts I-V in part and Count VI in its entirety. (*Id.*).

**II. Legal Standard**

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Id.* at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,' " the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

***5** In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.' " *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense ... to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

Complaints that tender " 'naked assertion[s]' devoid of 'further factual enhancement' " will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Stated differently, the complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

**III. Discussion**

Plaintiffs allege that Defendants violated various sections of the Trafficking Victims Protection Reauthorization Act ("TVPRA"). 18 U.S.C. §§ 1581-1597 (2022). Under Section 1589(a) of the TVPRA, it is illegal for an individual or corporation to provide or obtain the labor or services of a person:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by

> means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a)(1-4). Similarly, Section 1590(a) states:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. ...

18 U.S.C. § 1590(a).

Although Sections 1589 and 1590 are criminal statutes, a victim is authorized to bring a civil action to enforce either statute under Section 1595. It states:

> [a]n individual who is a victim of a violation may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a). "The purpose of [S]ection 1595 is to provide a civil remedy for violation of the federal peonage, slavery, and trafficking in persons statutes." *Baird v. Tech Providers, Inc.*, 2017 WL 1057637, at *3 (N.D. Ala. 2017) (citing *Dlamini v. Babb*, 2014 WL 5761118, at *4 (N.D. Ga. 2014)). In essence, Section 1595(a) creates two separate causes of action: one against those who directly engaged in the violation of the TVPRA (a "direct-liability claim") and another against those who knowingly benefitted from participating in a venture that they knew or should have known violated the TVPRA (a "beneficiary-liability claim").

Plaintiffs bring both direct-liability and beneficiary-liability claims in this matter. Counts I, III, and V assert direct-liability claims against TSI of Auldern and TSI of Alabama for forced labor, human trafficking, and attempted forced labor. (Doc. # 15 at 52, 60, 67). And, Counts II and IV assert beneficiary-liability claims against all Defendants. (*Id.* at 55, 62). Finally, Count VI asserts a conspiracy claim against all Defendants. (*Id.* at 68).

***6** Defendants seek dismissal of Counts I through V of the First Amended Complaint in part and Count VI in entirety for five reasons. (*See* Doc. # 18 at 2-3). First, Defendants claim that Plaintiffs have failed to plausibly allege that a violation of the TVPRA took place at any other facility. (*Id.* at 2). Second, Defendants argue that Counts II and IV are due to be dismissed against Sequel and TSI Holdings because the First Amended Complaint does not plausibly allege that either entity knew or should have known about the TVPRA violations. (*Id.* at 3). Third, Defendants contend that Counts II and IV should be dismissed against TSI of Auldern and TSI of Alabama to the extent they make claims as to facilities outside of Auldern Academy and Sequel Montgomery. (*Id.*). Fourth, Defendants argue that all of Plaintiffs' claims relating to conduct at Sequel Montgomery either prior to Plaintiff Doe's arrival or after her departure are due to be dismissed. (*Id.*). And, finally, Defendants contend that Count VI is due to be dismissed in entirety because Plaintiffs have not plausibly alleged that Defendants entered into a conspiracy. (*Id.*). The court examines each argument, in turn.

### A. The First Amended Complaint plausibly alleges that violations of the TVPRA occurred at other facilities owned by Sequel and TSI Holdings.

First, Defendants argue that any allegations against facilities other than Auldern Academy and Sequel Montgomery are due to be dismissed because Plaintiffs have failed to allege that a forced labor violation of the TVPRA occurred at any other facility. "[T]o state a claim [for forced labor] under § 1589(a), a plaintiff must adequately plead that the defendant (1) provided or obtained the labor or services of plaintiff (2) 'by means of' one of the enumerated means, and (3) did so 'knowingly.' *Hubbard v. Crow*, 2023 WL 10366527, at *11 (W.D. Tex. 2023) (citing *United States v. Toure*, 965 F.3d 393, 400 (5th Cir. 2020)).

Defendants do not dispute that the First Amended Complaint clearly states a claim under Sections 1589(a) and 1590(a) for forced labor at both Auldern Academy and Sequel Montgomery. Indeed, Plaintiffs have alleged numerous examples of labor that students were required to perform around both facilities and describes a myriad of different punishments that both schools employed when students refused to participate in the labor. (*See* Doc. # 15 ¶¶ 42-111). But, Defendants argue that the First Amended Complaint does not plausibly allege that violations of the TVPRA occurred at any other facility owned by Sequel. The court disagrees.

Plaintiffs have pled enough information to support a reasonable inference that violations of the TVPRA occurred at other facilities as well. *Iqbal*, 556 U.S. at 678. The First Amended Complaint states that "Sequel facilities nationwide employed force, threats of force, physical restraint, and threats of physical restraint to force the children to acquiesce to their demands, expectations, and instructions, including those involving the children's labor." (Doc. # 15 ¶ 136). In support of this, Plaintiffs contend that Sequel had standardized policies and procedures in place across all of its facilities, including disciplinary policies and procedures. (*Id.* at ¶ 131). Further, Plaintiffs cite to at least four students who allege they were forced to work without pay at other schools owned by Sequel (*id.* at ¶ 130), as well as over 20 documented instances of abuse at facilities across the nation. (*Id.* at ¶¶ 133-161).

Defendants direct the court to *Flores v. Starwood Hotels & Resorts Worldwide, Inc.* in support of their argument that Plaintiffs have failed to state a TVPRA claim for conduct at Sequel's other facilities. 2015 WL 12912337 (C.D. Cal. 2015). There, a plaintiff filed suit alleging minimum wage violations against his employer on behalf of himself and any other employees who had worked at either his facility or another of the employer's facilities within the state of California. *Id.* at *2. The defendants sought dismissal of the class claims on the basis that the plaintiff had failed to point to violations at any location other than the one where he was employed. *Id.* at *3. The *Flores* court agreed. In doing so, the *Flores* court found it particularly relevant that the plaintiff's complaint did not demonstrate any knowledge or reasonable beliefs of the employment practices or policies at the plaintiff's own work site, let alone at one of the defendant's other work sites across the state. *Id.* at *4.

***7** The *Flores* court relied on *Mendez v. H.J. Heinz Co.*, another employment case from that court. 2012 WL 12888526 (C.D. Cal. 2012). Like in *Flores*, the *Mendez* plaintiff brought claims against his employer on behalf of himself, as well as both a statewide and nationwide class. *Id.* at *1. The *Mendez* court concluded that dismissal of the class claims was appropriate because the plaintiff "allege[d] no facts to demonstrate or suggest that any member of the putative class, in California or nationwide, had similar work experiences ..." to him. *Id.* at *4. Further, the court noted the fact that the plaintiff's allegations, at most, showed that the employer's policies were implemented on only a factory-wide basis and they had not plausibly suggested that the policies were implemented at every factory in the country, or even the state. *Id.*

But, the pleadings here go well beyond those in *Flores* and *Mendez*. Unlike the plaintiffs in *Flores* and *Mendez* (who did not plausibly suggest that their employers implemented the same policies and procedure across all locations), Plaintiffs allege that Sequel had standard policies in place at all of its facilities nationwide, including disciplinary policies and practices for the use of physical restraints when students did not follow commands. (Doc. # 15 ¶¶ 131-32, 161). Further, in contrast to the plaintiff in *Mendez* who did not point to any putative class members with similar experiences as him, the First Amended Complaint identifies numerous students at different locations who contend they were forced to perform labor and subject to abusive practices. (*Id.* at ¶¶ 130, 137-160).[2]

Whether Plaintiffs can actually prove that violations of the TVPRA occurred at each of these facilities remains to be seen. But, that is a question for another day. At this stage of the litigation, a plaintiff must only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556. Plaintiffs' allegations that Sequel had uniform policies and procedures in place at all facilities to force children to engage in unpaid labor have done just that. Therefore, Defendants' argument that the First Amended Complaint fails to plausibly allege a violation of the TVPRA at any other facility is due to be denied.

**B. Counts II and IV are not due to be dismissed.**

Counts II and IV assert beneficiary-liability claims against all Defendants, alleging that they knowingly benefitted from a venture that they knew or should have known violated

Sections 1589 and 1590(a). Defendants contend that the beneficiary-liability claims in Counts II and IV should be dismissed against Sequel and TSI Holdings because Plaintiffs have not plausibly alleged that either Defendant knew or should have known of the alleged TVPRA allegations at the individual facilities. In addition, Defendants also argue that Counts II and IV should be dismissed against TSI of Auldern and TSI of Alabama because neither facility knew or should have known that forced labor violations were occurring at any of Sequel's other facilities. The court analyzes each argument, in turn.

**1. Counts II and IV are not due to be dismissed against Sequel and TSI Holdings.**

***8** To state a beneficiary-liability claim under Section 1595, a plaintiff must allege that a defendant: (1) knowingly benefitted; (2) from participating in a venture; (3) that venture violated the TVPRA; and (4) the defendant knew or should have known that the venture violated the TVPRA. *Red Roof Inns, Inc.*, 21 F.4th at 723. Defendants argue that the beneficiary-liability claims in Counts II and IV should be dismissed against Sequel and TSI Holdings because the First Amended Complaint does not plausibly allege the fourth element – that either Sequel or TSI Holdings knew or should have known that the other Defendants violated the TVPRA.

The Eleventh Circuit has made clear that a defendant may be held liable under the TVPRA if it has either actual or constructive knowledge that the venture in which it participated and from which it benefitted violated the TVPRA. *Id.* at 725. "Actual knowledge requires '[a]n awareness or understanding of a fact or circumstance.' " *Id.* (quoting *Knowledge*, Black's Law Dictionary (11th ed. 2019)). On the other hand, constructive knowledge is "that knowledge which 'one using reasonable care or diligence should have.' " *Id.* (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)). Thus, to state a claim under the TVPRA, Plaintiffs must plausibly allege that Sequel and TSI Holdings had (at least) constructive knowledge that the venture in which they participated and from which they benefited violated the TVPRA as to Plaintiffs. *See J.C. v. I Shiri Khodiyar, LLC*, 624 F. Supp. 3d 1307, 1319 (N.D. Ga. 2022).

Dismissal of a Section 1595 claim is appropriate when a plaintiff offers "no instances that would have prompted a reasonable person or company to be aware of or even suspect" the possibility of a TVPRA violation. *See Cassone v. Austin Chronicle Corp.*, 2024 WL 2031713, at *9 (W.D. Tex. May 7, 2024) (finding that a complaint failed to meet the requisite constructive knowledge requirement because the complaint did not directly plead that the defendant should have known of the venture). But, courts within this circuit have found that constructive knowledge was properly pled even if a complaint cited only to "red flags" that supported open signs of a TVPRA violation. *See A.D. v. Choice Hotels Int., Inc.*, 2023 WL 5510090, at *5 (M.D. Fla. 2023) (finding that "red flags" at a hotel including payments in cash, requests for sheet changes, and the victim's physical appearance should have made employees and staff aware of a TVPRA trafficking violation); *A.D. v. Best Western Int., Inc.*, 2023 WL 5510064, at *5 (M.D. Fla. 2023) (same). Thus, "an overt or direct act" that would put the defendant on notice of a TVPRA violation is not required to meet the knowledge requirement. *Best Western Int., Inc.*, 2023 WL 5510064, at *5.

After careful review, the court finds that Plaintiffs have stated enough facts to plausibly allege that Sequel and TSI Holdings had at least constructive knowledge that its facilities were violating the TVPRA. The First Amended Complaint alleges that "Defendant Sequel intentionally maintained 'low operating expenditures' by consistently understaffing all of its facilities." (Doc. # 15 ¶ 181). In support of this, Plaintiffs point to the quote from John Ripley, the co-founder of Sequel, informing business students that "[y]ou can ... make money in this business if you control staffing." (*Id.* at ¶ 182). To be sure, as Defendants' note in their brief (Doc. # 18 at 9), a company-wide plan to limit the number of staff to conserve revenue is not tantamount to an admission of forced labor. But, Plaintiffs' pleading emphasis on controlling staffing, combined with the allegations made in the First Amended Complaint about the tasks students were required to perform, raises a plausible inference that Sequel and TSI Holdings had to be aware that necessary maintenance at each camp was being improperly provided by students, not maintenance staff.

***9** Further, the First Amended Complaint alleges that Sequel and TSI Holdings had the same corporate leadership who exercised "rigorous oversight and control" of the individual facilities. (Doc. # 15 ¶¶ 176, 186, 189, 192). These corporate leaders "continuously evaluate[d] [the] programs" and were involved at the facility level in employee termination, policy and process changes, and staff-wide training (*Id.* at ¶¶ 176, 189-192). Plaintiffs also point to numerous instances where these corporate leaders were notified of "red flags" at various

facilities, such as severe understaffing and abusive practices. (*Id.* at ¶¶ 183-185, 188).

"Knowledge and other conditions of a person's mind may be alleged generally." *S.Y. v. Marriott Int., Inc.*, 2021 WL 2003103, at *5 (M.D. Fla. 2021) (citing Fed. R. Civ. P. 9(b) and *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018)). Here, the First Amended Complaint sufficiently alleges facts that, when assumed true, should have made Sequel and TSI Holdings generally aware of violations of the TVPRA. As discussed earlier, this is not to say that Plaintiffs will ultimately prevail on their claims against these two Defendants. But, because the First Amended Complaint "succeeds in 'identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible,' " it survives the motion to dismiss. *Watts*, 495 F.3d at 1296 (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted). The court finds that the allegations of the First Amended Complaint are sufficient to raise a plausible inference that Sequel and TSI Holdings should have been aware of students impermissibly being forced to perform labor at their facilities.

#### 2. Counts II and IV are not due to be dismissed against TSI of Auldern and TSI of Alabama.

Defendants also argue that Counts II and IV should be dismissed against TSI of Auldern and TSI of Alabama because the pleadings do not adequately allege that those at either facility knew or should have known that forced labor violations were occurring at any of Sequel's other facilities. But, this argument is flawed: it incorrectly hinges the "knowledge" requirement on the wrong prong of the beneficiary-claim analysis. As the Eleventh Circuit has made clear, to assert that a defendant *knowingly* benefitted from a venture a plaintiff only must allege that "the defendant knew it was receiving some value from participating in an alleged venture" – not that it knew others were *also* participating in the venture. *Id.* And, a complaint alleges that a defendant participated in a venture if it alleges that it "took part in a common undertaking or enterprise involving risk and potential profit." *Id.* at 725.

Here, the First Amended Complaint alleges the following: (1) all Defendants were in a venture to provide shelter, education services, and other care to minors with behavioral, emotional, and physical issues (Doc. # 15 ¶ 112); (2) Sequel and TSI Holdings had a venture-wide scheme to control costs by limiting the number of staff members employed (*id.* at ¶ 264); and (3) TSI of Auldern and TSI of Alabama participated in this scheme and increased profits by not paying for adequate staff but instead improperly obtaining the labor services of children at their facilities via force or threats (*id.* at ¶¶ 262, 264). These allegations, when assumed to be true (as they must be at this stage), plausibly allege that TSI of Auldern and TSI of Alabama took part in a common undertaking or enterprise of forcing students to perform free labor instead of hiring staff and were aware that they were receiving value from it in the form of increased profits. It is not necessary that they knew other Sequel locations were doing the same. Thus, the requisite knowledge component for pleading beneficiary-liability claims under Sections 1589 and 1590(a) is met here.

### C. The First Amended Complaint plausibly alleges TVPRA violations occurred at Sequel Montgomery prior to Plaintiff Doe's arrival and after her departure.

***10** Defendants also seek dismissal of any claims about their alleged conduct that occurred at Sequel Montgomery either prior to Plaintiff Doe's arrival or after her departure. Defendants contend that Plaintiff Doe "asserts claims for Defendants' alleged violations of the TVPRA for the 17-year span dating from approximately 2007 to the present" but "does not sufficiently allege that the allegedly illegal conduct began prior to [her] arrival or extended beyond her departure from the Montgomery facility." (Doc. # 18 at 10).

As noted previously, Plaintiff Doe asserts claims on behalf of the following Sequel Montgomery Subclass:

> All minors who were held at Sequel Montgomery, Alabama, and who provided labor or services without pay. The Sequel Montgomery Subclass only includes those who had not yet reached the age of twenty-eight prior to September 16, 2022.

(Doc. # 15 ¶ 220). As an initial matter, any limitation of the subclass is premature at this stage of the litigation. "Outside of inherently subjective and indeterminate class definitions, striking a class claim before a motion for certification (and before the benefit of pre-certification discovery) is rare." *Moore v. Walter Coke, Inc.*, 294 F.R.D. 620, 627 (N.D. Ala.

2013). Instead, a class or subclass definition in a complaint is a working definition that may be altered or limited as the pre-certification process -- which is affected by a number of matters, including discovery -- reveals more information that "sheds light on the contours of the potential class." *Id.* (citing 7AA Charles Alan Wright et al., Federal Practice and Procedure § 1785.4 n.1 (3d ed) ("In making a determination of whether an action may proceed as a class action, the court necessarily must pass on the appropriateness of the class proposed by plaintiff ... [the class] definition may be relevant to future discovery and to trial preparation, but it remains subject to change before the decision on the merits and does not establish the class will be bound by the judgment.")).

In any event, the court finds that the First Amended Complaint *does* sufficiently allege that TVPRA violations occurred both prior to Plaintiff Doe's arrival at Montgomery Sequel and after her departure from the facility. Although the existence of class claims in this case affects the standard a court applies in evaluating a motion to dismiss, it does not fundamentally change the nature of the inquiry. Instead, "[a]s long as the class allegations make it plausible that discovery will lead to facts that would justify certifying a class action, the court will not dismiss the class claims." *Wallace v. VF Jeanswear Ltd. P'ship*, 2020 WL 999341, at *5 (N.D. Ala. 2020) (citing *Faught v. Am. Home Shield Corp.*, 2007 WL 9657811, at *1 (N.D. Ala. 2007)). Here, the allegations do just that.

Plaintiff Doe alleges that the cleaning requirements at Sequel Montgomery were not newly implemented when she arrived, but instead had already been in place before she was placed there. (Doc. # 15 ¶ 92). Further, she contends that the punishment methods used to force students to perform labor were used throughout her enrollment, and those same methods were also highlighted as still being used in a report that was released about the school five years after she had left. (*Id.* at ¶ 105). These allegations, when assumed to be true, raise at least an inference that discovery will reveal other students were forced to perform labor before, during, and after Plaintiff Doe's time at Sequel Montgomery.

Therefore, Defendants' argument that any claims relating to conduct that occurred at Sequel Montgomery either prior to Plaintiff Doe's arrival or after her departure are due to be dismissed fails, and the Motion to Dismiss is due to be denied as to this claim.

**D. Plaintiffs have plausibly alleged that Defendants entered into a conspiracy.**

***11** In Count VI, Plaintiffs bring a civil action under 18 U.S.C. § 1595 for Conspiracy to Force Labor in Violation of 18 U.S.C. § 1594(b). (Doc. # 15 at 68). Under Section 1594(b), "[w]hoever conspires with another to violate section 1581, 1583, 1589, 1590, or 1592 shall be punished in the same manner as a completed violation of such section." 18 U.S.C. § 1594(b). For there to be a conspiracy under this statute, there must be an agreement to violate the prohibition on forced labor. *Paguirigan v. Prompt Nursing Emp't Agency LLC*, 286 F. Supp. 3d 430, 440 (E.D. N.Y. 2017) (citing *United States v. Svoboda*, 347 F.3d 471, 476-77 (2d Cir. 2003)).

To plead a conspiracy claim, it is not necessary to allege that each Defendant knew of every essential detail or participated in every stage of the conspiracy; instead, Plaintiffs must only plead that Defendants "knew of the conspiratorial goal and that [they] voluntarily participated in helping to accomplish that goal." *United States v. Brown*, 872 F.2d 385, 390 (11th Cir. 1989) (quoting *United States v. Lee*, 695 F.2d 515 (11th Cir. 1983), *cert. denied*, 464 U.S. 839, 104 S. Ct. 130, 78 L. Ed. 2d 125 (1983) (internal citations omitted)).

It is the rare case that contains direct evidence of a conspiracy. Instead, "[w]hile mere presence or association with other persons involved in a criminal enterprise is not sufficient to prove participation in a conspiracy ... the essential elements of a conspiracy can be proven by inference from the actions of the actors or by circumstantial evidence." *United States v. Gianni*, 678 F.2d 956, 959 (11th Cir. 1982) (citing *United States v. Conway*, 632 F.2d 641, 643 (5th Cir. 1980)). [3]

Defendants assert that the First Amended Complaint is void of facts suggesting the existence of a conspiracy. And, they spend a portion of their brief arguing the fact allegations here only suggest parallel conduct at various facilities. (Doc. # 18 at 14). In support of this argument, they rely on the Eleventh Circuit's ruling in *American Dental Ass'n v. Cigna Corp.* 605 F.3d 1283, 1294-95 (11th Cir. 2010). There, the plaintiffs alleged that a conspiracy could be inferred between multiple insurance companies because each engaged in the same conduct, including the collective use and development of an automated process to manipulate coding software and the use of the same claims submission procedure. *Id.* at 1294. The court of appeals disagreed, holding that under *Twombly* "allegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy." *Id.* (citing *Twombly*, 550 U.S. at 557). The court made clear that "when allegations of parallel conduct are set out ... they must be placed in a

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* (citing *Twombly*, 550 U.S. at 557).

But here, Plaintiffs have pointed to more than just mere parallel conduct at various facilities. Plaintiffs' allegations include the following: that individuals in leadership roles at Sequel and TSI Holdings had a goal of keeping staff levels low by avoiding hiring adequate janitorial and groundskeeping staff (Doc. # 15 ¶ 293); that Sequel and TSI Holdings maintained oversight and control at the individual Sequel facilities to ensure that each facility complied with its policies, practices and procedures (*id.* at ¶ 293-295); that these policies and procedures included use of physical restraints and force to coerce the residents to provide unpaid labor (*id.*); and that Auldern Academy and Sequel Montgomery voluntarily joined and engaged in this effort by operating facilities that were understaffed, requiring the students to perform unpaid labor, and imposing abusive punitive measures for students who did not comply (*id.* at ¶ 295).

***12** When viewing these allegations in the light most favorable to Plaintiffs, and assuming their veracity, the court finds them sufficient to allege that all Defendants were aware of "the conspiratorial goal" and "voluntarily participated in helping to accomplish" it. *Brown*, 872 F.2d at 390. And, because Plaintiffs contend that it was Sequel's company-wide scheme to cut costs by retaining low levels of staff, they have sufficiently alleged that the forced labor at various facilities was more than just mere random parallel conduct, but instead each facility's concentrated decision to comply with the scheme.

Finally, Defendants argue that, even if the First Amended Complaint plausibly alleges a claim of conspiracy, that claim is nonetheless barred by the intracorporate conspiracy doctrine. (Doc. # 18 at 14-15). This doctrine was aptly summarized in *McAndrew v. Lockheed Martin Corp.*:

> The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under this doctrine, a corporation can conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.

206 F.3d 1031, 1036 (11th Cir. 2000).

But, as Plaintiffs note, an important exception to this doctrine exists: "the intracorporate conspiracy doctrine cannot shield corporate employees and corporations accused of criminal conspiracies." *Id.* at 1039. This remains true even when, like here, a plaintiff asserts a civil claim that seeks recovery from a criminal conspiracy. *Id.* at 1041 ("[W]e conclude that the criminal conspiracy exception to the intracorporate conspiracy doctrine applies regardless of whether the criminal conspiracy arises under 18 U.S.C. § 371 or 42 U.S.C. § 1985. Because [the claim] ... necessarily alleges a criminal conspiracy, the intracorporate conspiracy doctrine cannot apply."). Thus, because the claim here accuses Defendants of a conspiracy under the criminal code, the intracorporate conspiracy doctrine is inapplicable, and this argument is without merit. *See* 18 U.S.C. §§ 1595, 1594(b).

Therefore, the court finds that Count VI of the First Amended Complaint plausibly alleges that Defendants engaged in a conspiracy. As a result, Defendants' motion to dismiss Count VI is due to be denied.

**IV. Conclusion**

After careful review, Defendants' Partial Motion to Dismiss the First Amended Complaint (Doc. # 18) is due to be denied. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this July 3, 2024.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 3316989

## Footnotes

1 In evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court assumes the factual allegations in the complaint are true and gives the plaintiff the benefit of all reasonable factual inferences. *Hazewood v. Found. Fin. Grp., LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008). Accordingly, the facts set out herein are taken from Plaintiffs' First Amended Complaint (Doc. # 15), and they are assumed true for purposes of ruling on Defendants' motion.

2 Defendants spend a portion of their brief correctly noting that the TVPRA does not provide a cause of action for abuse only, but instead only for "obtain[ing] ... labor or services by means of serious harm or threats of serious harm." (Doc. # 18 at 8). Thus, they argue that, although the Complaint points to numerous instances of abuse at various facilities (*see* Doc. # 15 ¶¶ 136-160), these instances fail to state a claim for a TVPRA violation at these facilities because they do not allege that the abuse was used to force labor. That argument misses the target. The Complaint clearly alleges that residents in those facilities were so fearful of the punishments and threats of punishment that they acquiesced to instructions to perform labor. (*See id.* at ¶¶ 166, 246).

3 The Eleventh Circuit recognizes that Fifth Circuit decisions rendered prior to the close of business on September 30, 1981 are binding precedent. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D

FILED
2025 Oct-14 PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ANNA CLAIRE BATES AND JANE DOE,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**SEUQEL YOUTH AND FAMILY SERVICES, LLC, SEQUEL TSI HOLDINGS, LLC, BRIGHTER PATH ALABAMA, LLC, SEQUEL TSI OF AULDERN, LLC, AND JOHN RIPLEY,**<br><br>**Defendants.** | } | **Case No.: 2:23-CV-01063-RDP** |

**MEMORANDUM OPINION**

This matter is before the court on Defendant John Ripley's Motion to Dismiss the Second Amended Complaint. (Doc. #55). The Motion has been fully briefed (Docs. # 55, 58, 60) and is ripe for decision. After careful review and for the following reasons, the Motion is due to be denied.

## I. Background[1]

Plaintiffs Anna Claire Bates and Jane Doe filed their initial complaint in this action against Defendants Sequel TSI Holdings, LLC, Sequel TSI of Alabama, LLC, Sequel TSI of Auldern, LLC, and Sequel Youth and Family Services, LLC, on August 14, 2023. (Doc. # 1). On November 11, 2023, Plaintiffs filed their First Amended Complaint (Doc. #15), and on May 16, 2025, Plaintiffs filed their Second Amended Complaint (Doc. #44). Defendant Ripley was named as a Defendant in the Second Amended Complaint ("SAC"). (*Id.* at ¶¶ 33-36).

[1] In evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court assumes the factual allegations in the complaint are true and gives the plaintiff the benefit of all reasonable factual inferences. *Hazewood v. Found. Fin. Grp., LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008). Accordingly, the well-pleaded facts set out herein are taken from Plaintiffs' Second Amended Complaint (Doc. # 44), and they are assumed true for purposes of ruling on Defendant Ripley's motion.

Plaintiffs' SAC asserts two causes of action against Defendant Ripley: Count 2, a civil action under 18 U.S.C § 1595(a) for benefiting from forced labor violations of 18 U.S.C. § 1589(a), and Count 4, a civil action under 18 U.S.C § 1595(a) for benefiting from the human trafficking violation of 18 U.S.C. § 1590(a). (*Id.* at ¶¶ 333-344, 350-361). For the purpose of analyzing this motion, the court focuses on Plaintiff's claims against Defendant Ripley.

**A. Defendant Ripley's Involvement in the Sequel Venture**

Defendant Ripley "was the co-founder of Defendant Sequel and served as its Chairman of the Board." (*Id.* at ¶ 33). Defendant Ripley became the majority owner of Defendant Sequel in 2014 and remained Chairman of its Board of Directors after it was purchased in 2017. (*Id.* at ¶¶ 34-35). In 2021, Defendant Ripley formed Vivant Behavioral Healthcare and purchased a majority of Defendant Sequel's operating facilities. (*Id.* at ¶ 36).

Defendant Ripley was a founder of the "Sequel Venture" within the "troubled teen industry," which began in 1999 with Sequel Management Services, LLC. (*Id.* at ¶¶ 112-114). The Sequel Venture was formed to provide "shelter, education services, and other care to minors with perceived behavioral, emotional, and physical challenges." (*Id.* at ¶ 112). The Sequel Venture acquired and sold various facilities and companies during the 2000s and 2010s. (*Id.* at ¶¶ 115-158). During that time period, Defendant Ripley remained in a leadership role in the Venture, including signing the biennial report for Venture LLCs and listing his home address as the principal office for the LLCs. (*Id.* at ¶ 123) ("Defendant Ripley signed the Biennial Report for Sequel Youth Services, LLC, as its manager, and the report listed his home address as the principal office of the LLC.") ("[Defendant Ripley] signed the Biennial Report for Sequel Youth Services of Clarinda, LLC, and Sequel Youth Services of Woodward, LLC as their manager.") (*Id.* at ¶ 125) (same for SequelCare of Iowa, LLC and Sequel CBS Holdings, LLC) (*Id.* at ¶ 126) (same for Sequel Youth

and Family Services, LLC, the manager of Sequel CBS Holdings, LLC/Sequel TSI Holdings, LLC).

In 2021, Defendant Ripley formed Vivant Behavioral Healthcare, LLC in Delaware "to buy back the facilities the Sequel Venture was operating." (*Id.* at ¶ 145). Defendant Sequel sold three facilities to Vivant Behavioral Healthcare "but much of Sequel's corporate management team were retained to operate the same businesses in these facilities." (*Id.* at ¶ 146).

Plaintiffs allege that Sequel Venture staff were charged with child abuse and children in Sequel Venture facilities were injured and even killed while Defendant Ripley was in leadership of the Venture. (*Id.* at ¶ 254-69). As part of its business strategy, the Sequel Venture "intentionally maintained 'low operating expenditures' by consistently understaffing all of its facilities." (*Id.* at ¶ 222) (citation omitted). Defendant Ripley explained that "you can . . . make money in this business if you control staffing." (*Id.* at ¶ 223) (citation omitted). Corporate leadership of the Sequel Venture, including Defendant Ripley, "exercised rigorous oversight and control of the individual facilities" within the Venture. (*Id.* at ¶ 246). "Defendant Sequel conducted weekly audits of all programs" and "established incident response protocol and critical incident review" procedures. (*Id.* at ¶ 228).

As a founder, owner, and shareholder, Defendant Ripley "benefited when the value of the Sequel Venture increased" and "received distributions or dividends." (*Id.* at ¶ 159). Defendant Ripley was also paid a founder's fee of $1.25 million in 2016 for his role in the creation of the Sequel Venture (*Id.*) and benefited reputationally from the Sequel Venture (*Id.* at ¶ 160). "Defendant Ripley was aware of all of these financial benefits." (*Id.* at ¶ 159).

**B. Forced Labor Allegations Against the Sequel Venture**

Plaintiffs allege that the Sequel Venture cut costs by using the children in its program as "free labor instead of paying for additional staff or services." (*Id.* at ¶ 168). "Sequel facilities nationwide employed force, threats of force, physical restraint, and threats of physical restraint to force the children to acquiesce to their demands, expectations, and instructions, including those involving the children's labor." (*Id.* at ¶ 177). "Children in the Sequel Venture's care were so fearful of . . . disciplinary measures that they acquiesced to perform labor for the Sequel Venture in an effort to avoid these disciplinary measures." (*Id.* at ¶ 207). In support, Plaintiffs point to numerous reports of physical, psychological, and emotional abuse against children in Sequel facilities across the United States. (*Id.* at 178-206).

Plaintiff Bates was enrolled at Auldern Academy, a facility within the Sequel Venture, from April 2016 to June 2017. (*Id.* at ¶¶ 7, 16). Plaintiff Bates alleges that she and the other students at Auldern Academy were forced to "clean and maintain the entire campus," including the bathrooms, dining hall, activities building, dormitories, common area, and therapy annex. (*Id.* at ¶¶ 46-47). They were also required to do landscaping work and manual labor, such as building a cabin and carrying boulders to line a path. (*Id.* at ¶ 48). If the students did not participate in the labor, they could be punished through the use of measures like "Refocus." (*Id.* at ¶¶ 49-60). When students were put on Refocus, they were forced to "run up a hill carrying rocks, sleep on the floor . . . with no blanket or pillow, eat only plain oatmeal and rice and beans, . . . and walk six miles." (*Id.* at ¶ 54). Students could also be placed on "Non-com," under which they were "not permitted to communicate with anyone other than their therapist during their weekly one-on-one session." (*Id.* at ¶ 61). Plaintiff Bates claims she was forced to work for no pay, which benefited Defendants. (*Id.* at ¶ 16).

Plaintiff Doe was placed at Sequel Montgomery by the State of Alabama from December 2014 to Fall 2015. (*Id.* at ¶¶ 6, 18). Plaintiff Doe and other students in Sequel Montgomery were required to "sweep, mop, and wipe down the day room, hallways, and lunch room," "clean the group restroom," "clean the back porch," and "empty all trash cans." (*Id.* at ¶ 87). They were also required to deep clean the entire campus weekly. (*Id.* at ¶¶ 88-91). If the students failed to comply with staff orders, they were disciplined. (*Id.* at ¶ 96). This discipline included having the length of the student's required placement extended (*Id.* at ¶¶ 98-99), not being allowed to interact with peers (*Id.* at ¶ 100), and being locked in a seclusion room for hours at a time (*Id.* at ¶ 102). Plaintiff Doe claims she was forced to work for no pay to the benefit of Defendants. (*Id.* at ¶¶ 18, 108).

## II. Legal Standards

Because Defendant Ripley's motion is filed based on the Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), the court recounts the standard of review regarding each of those rules.

### A. Rule 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), "[a] plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). After the defendant challenges jurisdiction with affidavit evidence in support of its position, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless [the defendant's] affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002). If, however, "the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Id.*

**B. Rules 8 and 12(b)(6)**

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Id*. at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ*., 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Id. A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp*., 605 F.3d 1283, 1290 (11th Cir. 2010)).

That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

## III. Analysis

Plaintiffs' SAC brings two causes of action against Defendant Ripley: Count 2, a civil action under 18 U.S.C § 1595(a) for benefiting from the forced labor violation of 18 U.S.C. § 1589(a), and Count 4, a civil action under 18 U.S.C § 1595(a) for benefiting from the human trafficking violation of 18 U.S.C. § 1590(a). (*Id.* at ¶¶ 333-344, 350-361).

### A. This court has personal jurisdiction over Defendant Ripley.

Rule 4(k)(1) states that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." Fed. R. Civ P. 4(k)(1). The Eleventh Circuit has found that "[w]hen a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction." *Kammona v. Onteco Corp.*, 587 F. App'x 575, 579 (11th Cir. 2014) (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997)). Title 18 U.S.C. § 2255 provides:

> (a) In general.--Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation, regardless of whether the injury occurred while such person was a minor, may sue in any appropriate United States District Court . . . .
> (c)(2) Service of process.--In an action brought under subsection (a), process may be served in any district in which the defendant--
>> (A) is an inhabitant; or
>> (B) may be found.

18 U.S.C. § 2255(a), (c). Section 1589 of the TVPRA makes it a crime to knowingly provide or obtain forced labor or benefit financially "from participation in a venture . . . providing or obtaining" forced labor. *Id.* § 1589. And § 1590 makes it a crime to traffic any person for "labor or services in violation of this chapter," including forced labor. *Id.* § 1590. Section 1595 provides a civil remedy for violations of §§ 1589 and 1590, and § 2255(a) "specifically authorizes victims who were minors at the time certain . . . offenses were committed to bring civil actions for such criminal violations." *Doe #1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136, 1173 (N.D. Ala. 2022).

Plaintiffs' civil claims against Defendant Ripley are based on 18 U.S.C § 1595(a). Plaintiffs assert that this court has personal jurisdiction over all Defendants based on Rule 4(k)(1)(C) and the nationwide service of process provision of 18 U.S.C. § 2255 because Plaintiffs were minors at the time of their trafficking and assert claims as victims of 18 U.S.C. §§ 1589 and 1590. (*Id.* at ¶ 37). Further, Plaintiffs assert that the "statutory nationwide service of process provision provides a basis for nationwide personal jurisdiction over the Defendants" and that "the [c]ourt can look to the entire United States to determine if minimum contacts exist." (*Id.* at ¶ 38). Thus, because Defendant Ripley is "a resident and citizen of the United States" and owned businesses within the United States, Defendant Ripley has purposefully established minimum contacts with the United States. (*Id.* at ¶ 39).

Defendant Ripley argues that because 18 U.S.C. § 2255 does not include § 1595 in its list of enumerated statutes, § 2255 does not authorize nationwide service of process for civil claims brought under § 1595(a). (Doc. # 55 at 6-7).

The Honorable L. Scott Coogler, formerly of this court, addressed nationwide service of process under § 2255 in *Doe #1 v. MG Freesites*. 676 F. Supp. 3d at 1171-75. In *MG Freesites*, one of the Plaintiffs asserted claims under the TVPRA, 18 U.S.C. §§ 1591 and 1595, and the

federal child pornography statute, 18 U.S.C. §§ 2252 and 2252A. *Id.* at 1172. The Defendants moved to dismiss Plaintiff's claims under Rule 12(b)(2) and the Supreme Court's decision in *Bristol-Myers Squibb Company v. Superior Court of California*, 582 U.S. 255 (2017), alleging that the court did not have personal jurisdiction over them. *Id.* The court found that *Bristol-Myers* did not apply because Plaintiff asserted "federal statutory claims under 18 U.S.C. §§ 1591, 2252, and 2252A, which, through the operation of 18 U.S.C. § 2255, provide for nationwide service of process." *Id.* Thus, "the personal jurisdiction analysis is governed by the Fifth Amendment's Due Process Clause and [boils down to] whether the Defendants have sufficient contacts with the United States and not specifically with Alabama." *Id.*

While the list of statutes enumerated in § 2255(a) does not include § 1595(a), Plaintiffs have brought claims under § 1595(a) for alleged violations of §§ 1589 and 1590, which are listed in § 2255. Since Plaintiffs allege that while they were minors, they were "victim[s] of a violation of section 1589 [and] 1590" in their suit under § 1595(a), § 2255(a) authorizes them to "sue in any appropriate United States District Court," including this court. 18 U.S.C. § 2255(a); *see Doe v. MG Freesites, LTD*, No. 7:21-CV-00220-LSC, 2024 WL 5339485 at *8 (N.D. Ala. Dec. 19, 2024) (explaining that § 1595(a) "creates an adjunct civil cause of action" for victims of a TVPRA violation). Any other conclusion would run contrary to the intent of the nationwide service of process provision, since § 1595 provides the civil cause of action for violations of §§ 1589 and 1590. Thus, Plaintiffs' claims, "through the operation of 18 U.S.C. § 2255, provide for nationwide service of process." *MG Freesites*, 676 F. Supp. 3d at 1172.

Defendant Ripley is correct that he does not have sufficient minimum contacts with Alabama. Defendant Ripley has been a resident of Virginia for 27 years and has never been a resident of Alabama, owned Alabama real estate, had an Alabama bank account, voted in Alabama,

or held an Alabama driver's license. (Doc. # 55-1 at 1-2). But, because § 2255 explicitly provides for nationwide service of process, the question is not whether Defendant Ripley has sufficient contacts with Alabama. Rather, the question is whether Defendant Ripley has sufficient contacts with the United States. And, as a Virginia resident for 27 years who intends to remain there indefinitely (Doc. # 55-1 at 1), the court finds that Defendant Ripley has sufficient minimum contacts with the United States for this court to exercise jurisdiction over him in this case.

Defendant Ripley also contends that, because he was not a perpetrator and rather an alleged beneficiary of the alleged crimes, 18 U.S.C. § 2255 does not apply to him. (*Id.* at 6-7). The court is not persuaded. Nothing in § 2255 limits claims under the statue to only perpetrators. *See MG Freesites*, 676 F. Supp. 3d at 1175 n.5 (noting that under § 2255, a victim may choose to recover liquidated damages for a *beneficiary liability* claim). In fact, § 1595 specifically includes those who "knowingly benefit . . . from participation in a venture" engaged in forced labor or trafficking. 18 U.S.C. § 1595.

For all the above reasons, this court has personal jurisdiction over Defendant Ripley based on the nationwide service of process provision applicable to Plaintiffs' claims.

**B. Plaintiffs have stated plausible claims against Defendant Ripley.**

To state a claim for beneficiary liability under the TVPRA, 18 U.S.C. § 1595, Plaintiffs must plausibly allege that Defendant Ripley "(1) knowingly benefited (2) from participating in a venture; (3) that venture violated the TVPRA as to the [Plaintiffs]; and (4) the franchisors knew or should have known that the venture violated the TVPRA as to the [Plaintiffs]." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021). After careful review, as explained below, the

court finds that Plaintiffs have stated sufficient facts to allege plausible TVPRA beneficiary liability claims against Defendant Ripley.

**1. Plaintiffs have plausibly alleged Defendant Ripley knowingly benefited.**

First, to allege that Defendant Ripley "knowingly benefited" from the violations, Plaintiffs must plead that Defendant Ripley "knew [he] was receiving some value from participating in the alleged venture." *Id.* at 724. Here, Plaintiffs contend that Defendant Ripley "founded the Sequel Venture with Sequel Management Services, L.L.C. in 1999" (Doc. # 44 at ¶ 114) and served in leadership roles for various entities within the Sequel Venture (*Id.* at ¶¶ 123, 125-26, 128, 130-32, 134-39). Plaintiffs also claim that in 2021, Defendant Ripley formed Vivant Behavioral Healthcare to buy back the facilities the Sequel Venture sold between 2020 and 2022. (*Id.* at ¶¶ 144-46). Further, Plaintiffs allege that from 1999, Defendant Ripley "benefited when the value of the Sequel Venture increased" as a partial owner, "received distributions or dividends" as a shareholder of entities within the Sequel Venture, "was paid a founder's fee" of $1.25 million "for his role in the creation of the Sequel Venture," and benefited reputationally from the Sequel Venture. (*Id.* at ¶¶ 159-60). Because "Defendant Ripley was aware of all of these financial benefits" (*Id.* at ¶ 159), Plaintiffs have plausibly alleged that he "knowingly benefited" from his participation in the Sequel Venture. *Red Roof Inns, Inc.*, 21 F.4th at 724-25.

**2. Plaintiffs have plausibly alleged Defendant Ripley participated in the Sequel Venture.**

Next, "participation in a venture" requires that Plaintiffs allege that Defendant Ripley "took part in a common undertaking or enterprise involving risk and potential profit." *Red Roof Inns, Inc.*, 21 F.4th at 725. "We begin with the venture [Plaintiffs] say that [Defendant Ripley] participated in." *Id.* Here, Plaintiffs allege that Defendant Ripley and others were engaged in a venture to provide "shelter, educational services, and other care to minors with perceived

behavioral, emotional, and physical challenges." (Doc. # 44 at ¶ 112). Plaintiffs claim that Defendant Ripley participated in the alleged Sequel Venture as a founder and executive. (*Id.* at ¶¶114-15, 123, 125, 126, 128, 130-32, 134-39, 142, 145-46). Plaintiffs also assert that Defendant Ripley profited from his participation in the venture, as explained above. Thus, because Plaintiffs have alleged that Defendant Ripley "took part in a common undertaking or enterprise involving risk and potential profit," *Red Roof Inns, Inc.*, 21 F.4th at 725, Plaintiffs have plausibly alleged that Defendant Ripley participated in the Sequel Venture.

**3. Plaintiffs have plausibly alleged the Sequel Venture violated the TVPRA.**

Third, a "venture that violated the TVPRA" as to the Plaintiffs requires Plaintiffs to "plead sufficient facts to plausibly allege that the venture in which [Defendant Ripley] participated committed [a TVPRA crime] against them." *Red Roof Inns, Inc.*, 21 F.4th at 725. In this case, Plaintiffs allege that the Sequel Venture violated two provisions of the TVPRA, 18 U.S.C §§ 1589 and 1590. (Doc. # 44 at ¶¶ 333-44, 350-61). Section 1589 makes it a crime to knowingly provide or obtain forced labor or benefit financially "from participation in a venture . . . providing or obtaining" forced labor. 18 U.S.C. § 1589. And § 1590 makes it a crime to traffic any person for "labor or services in violation of this chapter," including forced labor. *Id.* § 1590. Plaintiffs have plausibly alleged, and Defendant Ripley does not seem to contest, that residents within Sequel facilities were so fearful of punishment and threats of punishment that they performed forced labor when instructed to do so. (Doc. # 44 at ¶ 170-207). Thus, Plaintiffs have plausibly alleged that the Sequel Venture violated the TVPRA.

**4. Plaintiffs have plausibly alleged Defendant Ripley knew the Sequel Venture violated the TVPRA.**

Finally, Plaintiffs must allege that Defendant Ripley had "either actual or constructive knowledge that the venture in which [he] participated and from which [he] benefited violated the

TVPRA" as to Plaintiffs. *Red Roof Inns, Inc.*, 21 F.4th at 725. The Eleventh Circuit has made clear that a defendant may be held liable under the TVPRA if they have either actual or constructive knowledge that the venture in which they participated and from which they benefited violated the TVPRA. *Id.* "Actual knowledge requires '[a]n awareness or understanding of a fact or circumstance.'" *Id.* (quoting *Knowledge*, Black's Law Dictionary (11th ed. 2019)). On the other hand, constructive knowledge is "that knowledge which 'one using reasonable care or diligence should have.'" *Id.* (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)). Thus, to state a claim under the TVPRA, Plaintiffs must plausibly allege that Defendant Ripley had (at least) constructive knowledge that the venture in which he participated and from which he benefited violated the TVPRA as to Plaintiffs. *See J.C. v. I Shiri Khodiyar, LLC*, 624 F. Supp. 3d 1307, 1319 (N.D. Ga. 2022).

Dismissal of a Section 1595 claim based on lack of knowledge is appropriate when a plaintiff offers "no instances that would have prompted a reasonable person or company to be aware of or even suspect" the possibility of a TVPRA violation. *See Cassone v. Austin Chronicle Corp.*, 2024 WL 2031713, at *9 (W.D. Tex. May 7, 2024) (finding that a complaint failed to meet the requisite constructive knowledge requirement because the complaint did not directly plead that the defendant should have known of the venture). But, courts within this circuit have found that constructive knowledge was properly pled even if a complaint cited only to "red flags" that supported open signs of a TVPRA violation. *See A.D. v. Choice Hotels Int., Inc.*, 2023 WL 5510090, at *5 (M.D. Fla. 2023) (finding that "red flags" at a hotel including payments in cash, requests for sheet changes, and the victim's physical appearance should have made employees and staff aware of a TVPRA trafficking violation); *A.D. v. Best Western Int., Inc.*, 2023 WL 5510064, at *5 (M.D. Fla. 2023) (same). Thus, "an overt or direct act" that would put the defendant on notice

of a TVPRA violation is not required to meet the knowledge requirement. *Best Western Int., Inc.*, 2023 WL 5510064, at *5.

Plaintiffs allege that the Sequel Venture "intentionally maintained 'low operating expenditures' by consistently understaffing all of its facilities." (Doc. # 44 at ¶ 222) (citation omitted). This allegation is supported by a quote from Defendant Ripley, who explained that "you can . . . make money in this business if you control staffing." (*Id.* at ¶ 223) (citation omitted). Plaintiffs also allege that the corporate leadership of the Sequel Venture, including Defendant Ripley, "exercised rigorous oversight and control of the individual facilities" over the venture. (*Id.* at ¶ 246). For example, "Defendant Sequel conducted weekly audits of all programs" and "established incident response protocol and critical incident review process." (*Id.* at ¶ 228). Additionally, Plaintiffs allege that Sequel Venture staff were being charged with child abuse and children in Sequel Venture facilities were injured and even killed while Defendant Ripley was in leadership of the Venture. (*Id.* at ¶¶ 254-69).

"Knowledge and other conditions of a person's mind may be alleged generally." *S.Y. v. Marriott Int., Inc.*, 2021 WL 2003103, at *5 (M.D. Fla. 2021) (citing Fed. R. Civ. P. 9(b) and *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018)). The quote from Defendant Ripley, combined with Plaintiffs' allegations regarding controlling staffing and "rigorous oversight" from corporate leadership, including Defendant Ripley, is enough to plausibly allege that Defendant Ripley had at least constructive knowledge that minor students were being forced to perform labor at facilities within the Sequel Venture.

**C. Plaintiffs' SAC is not a shotgun pleading under Federal Rule of Civil Procedure 8.**

Defendant Ripley claims that Plaintiff's SAC is a shotgun pleading. The Eleventh Circuit has identified four types of shotgun pleadings:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

*Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015) (footnotes omitted). District courts retain the authority to dismiss complaints on shotgun pleading grounds. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). But the court must grant a plaintiff at least one chance to remedy such shotgun pleading deficiencies *sua sponte* before dismissing an action on shotgun pleading grounds. *Id.* "In these cases, even if the parties do not request it, the district court 'should strike the complaint and instruct counsel to replead the case—if counsel [can] in good faith make the representations required by Fed. R. Civ. P. 11(b)." *Id.* (quoting *Byrne v. Nezhat*, 261 F.3d 1075, 1133 n.113 (11th Cir. 2001) ).

Plaintiffs' four counts do not "adopt[] the allegations of all preceding counts." *Weiland*, 792 F.3d at 1321-23. Plaintiffs' SAC separates "into a different count each cause of action or claim for relief." *Id.* Finally, Plaintiffs' multiple claims against multiple defendants specify "which of the defendants are responsible for which acts or omissions [and] which of the defendants the claim is brought against." *Id.* For example, Plaintiffs have brought only two of its four claims against Defendant Ripley. (Doc. # 44 at ¶¶ 333-44, 350-61). Within each of those claims, Plaintiffs specify

how Defendant Ripley was involved in and benefited from the venture and what he knew or should have known about the venture. (*Id.*) Thus, Plaintiffs' SAC is not a shotgun pleading.

## IV. Conclusion

After careful review, Defendant Ripley's Motion to Dismiss is due to be denied. An order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this October 14, 2025.



**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE