**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| JESSICA FULLER, individually and on behalf of all similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>HYDE SCHOOL; LAURA GAULD; MALCOM GAULD; GEORGIA GAULD MACMILLAN; DONALD MACMILLAN; LAURIE GAULD HURD,<br><br>Defendants. | Civil Action No. 2:25-cv-00354-SDN<br><br>Hon. Stacey D. Neumann |

# ATTORNEY KELLY A. GUAGENTY'S RESPONSE TO THE ORDER TO SHOW CAUSE

Attorney Kelly A. Guagenty ("Lead Counsel") submits this Response to the Order to Show Cause ("Response") entered by the Court on April 14, 2026. Although unintentional, the citation errors that occurred in Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Individual and Class Action Complaint ("Opposition") (ECF No. 25) and the Notice of Errata Regarding Plaintiff's Opposition to Defendants' Motion to Dismiss ("Notice of Errata") (ECF No. 29) were serious and should not have occurred. The briefing inaccuracies ultimately reflect a failure of diligence at a critical stage of review. The errors were the result of inattention - not bad faith, an intent to mislead, or a pattern of improper conduct. Lead Counsel would like to again express her sincere apology to the Court and Defendants for these inadvertent mistakes. For the reasons set forth herein and in the attached Declaration of Attorney Kelly A. Guagenty in Support of Response to the Order to Show Cause (Exh. 1, "Guagenty Declaration"), Lead Counsel respectfully suggests that if the Court deems sanctions are appropriate that a measured and

proportionate response would be reasonable under the facts of this case.

## I. LEAD COUNSEL'S EXPLANATION OF HOW THE PRIOR BRIEFING ERRORS OCCURRED

### A. Inadvertent Mistakes Made by Lead Counsel and the Use of Artificial Intelligence

For any court filing made under her name, Lead Counsel's practice has always been to personally conduct a final, line-by-line verification of every citation in a brief to confirm not only that each case, statute or other source exists but that the citation is correct and the source supports the proposition for which it was cited. This final verification is the policy for all attorneys at her firm. Regrettably, that safeguard was not adhered to here. Instead, Lead Counsel conducted a limited electronic check through Lexis to confirm that cited authorities existed and appeared to be generally relevant, rather than completing the standard, more rigorous, line-by-line verification process. This omission is what allowed the errors to remain in the version of the Opposition that was filed with the Court. Lead Counsel recognizes that this deviation from her standard practice was a significant lapse.

Artificial Intelligence ("AI") is not a tool that Lead Counsel's firm commonly uses in the drafting of pleadings. However, as AI has become generally more commonplace in the world, Lead Counsel recognizes, in hindsight, that either ChatGPT or Claude was used in the drafting process by one or more members of her team. Given the number of contributors and revisions, and the fact that Lead Counsel's case management system in which the Opposition was primarily drafted does not track specifically which user revised a document, but only that the document was amended, Lead Counsel cannot identify precisely when AI was first used. However, Lead Counsel can state that AI was used in drafting the Opposition. Regardless of which team member used AI and exactly when during the drafting process, Lead Counsel accepts full responsibility for the final

filing and the failure to ensure that all citations were properly verified. Although AI may be used in the drafting the pleadings or other court filings, it does not diminish an attorney's responsibility to ensure the accuracy of a filing. *See Park v. Kim*, 91 F.4th 610, 616 (2d Cir. 2024) ("If a lawyer chooses to employ technology in representing a client, the lawyer continues to be bound by the requirements of Federal Rule of Civil Procedure 11 …").

**B. Timeline of Relevant Events**

Beginning in mid-September 2025, Lead Counsel's elderly mother, who was living alone approximately 40 minutes away from Lead Counsel, began experiencing a rapid decline in her physical and mental health. Lead Counsel is the primary caretaker for her mother. Throughout the next two months, it became apparent that her mother could no longer live independently and needed to secure placement in an assisted living facility on an expedited basis. That process required contact with Lead Counsel's mother's healthcare providers; researching, interviewing, and visiting potential assisted living facilities; and constant in-person visits with her mother to explain and prepare her both physically and mentally to quickly move out of her home of twenty years and into an assisted living facility.

Defendants' Motion to Dismiss First Amended Individual and Class Action Complaint and Incorporated Memorandum of Law (ECF No. 20) was filed on October 7, 2025. The research and drafting of the Opposition occurred from approximately mid-October through November 2025. A collaborative drafting process was employed involving several contributors, including an associate attorney, a contract attorney, a paralegal, and Lead Counsel. The team members worked remotely and independently, as opposed to being in the same office, and they communicated through telephone and Teams. As is usually the case with pleadings handled by multiple authors, the Opposition evolved through numerous drafts and revisions. As supervising counsel, Lead Counsel

bore ultimate responsibility for ensuring that the final version was truthful and accurate in all respects. Under ordinary circumstances, Lead Counsel would have closely supervised each phase of the research and drafting process and maintained tighter control over the final product. Owing to time constraints and her familial situation, Lead Counsel did not follow that practice here.

Plaintiff's deadline for filing the Opposition was Friday, November 28, 2025 (the day after Thanksgiving). Lead Counsel spent nearly the entire weekend of November 22-23, 2025 (the weekend immediately preceding the Thanksgiving holiday), packing up all her mother's belongings and moving her into her own home on a temporary basis as her mother waited for a room at the assisted living facility to become available.

On Monday, November 24, 2025, Lead Counsel first began reviewing the final draft of the Opposition. As noted previously, Lead Counsel's review of the final draft included a limited citation check, but she did not complete a full verification that all authorities supported the proposition for which they were being cited in the Opposition. On the evening of Monday, November 24, 2025, Lead Counsel had to travel from Natick, Massachusetts to Boston Logan Airport to pick up her youngest daughter, who was returning home from college in North Carolina. After returning home, Lead Counsel continued reviewing the draft of the Opposition late into the night, until approximately 2:00 a.m., without the level of focus the task required. In the early morning of November 25, 2025, at approximately 7:00 a.m., Lead Counsel's oldest daughter arrived home from a redeye flight from college in Arizona.

Although the actual deadline was a few days later, Lead Counsel had an internal firm deadline for filing the Opposition on Tuesday, November 25, 2025, because there was no paralegal support available on Wednesday, Thursday or Friday of that week due to the Thanksgiving holiday. As a result, early in the afternoon of November 25, 2025, without having completed the

standard comprehensive full citation verification, Lead Counsel authorized the filing of the Opposition, which was filed with the Court at 4:32 p.m. shortly before staff left for the Thanksgiving holiday.

In the days after the Opposition was filed, Lead Counsel continued caring for her mother, who was still living in Lead Counsel's home, while also planning for the sale of her mother's condominium, and finalizing the plans for moving her mother into the assisted living facility. On December 6, 2025, Lead Counsel moved her mother from Lead Counsel's home into the assisted living facility in Stoneham, Massachusetts. The time and emotional toll of these events on Lead Counsel was significant and exhausting.[1] These circumstances are offered as context, not excuse, and do not diminish Lead Counsel's obligation to ensure the accuracy of filings submitted to the Court.

On December 9, 2025, Defendants filed their Reply in Support of Motion to Dismiss the First Amended Individual and Class Action Complaint ("Reply") (ECF No. 26) raising the various citation issues. On that same day, Lead Counsel's prior local counsel moved to withdraw from the case.

On December 10, 2025, Lead Counsel hurriedly filed the Notice of Errata to address the citation errors on the record. While that filing was made in good faith, it contained its own mistakes and compounded the problems rather than correcting them.

[1] In prior filings, Lead Counsel has refrained from providing the full context about what was happening personally and professionally during the time the Opposition was being drafted and filed because those events do not excuse the errors that occurred. Lead Counsel includes these details here to thoroughly answer the Court's question in the Order to Show Cause (ECF No. 38) regarding how the briefing citation errors occurred. From the moment the briefing issues were first identified, it has been Lead Counsel's position that, as the supervising attorney, she bore ultimate responsibility for the accuracy of the filings and that this responsibility does not shift based on workload, timing, or personal circumstances. The context described above is offered to answer the Court's question directly and candidly, and to assist the Court in understanding how an otherwise well-established process broke down in this instance and to hopefully demonstrate that this was an isolated incident that has not occurred before and should not happen again.

On March 4, 2026, Lead Counsel filed Plaintiff's Response to Defendants' Reply to Plaintiff's Notice of Errata (ECF No. 36) which sought to identify, respond to, and acknowledge responsibility for each specific briefing error that occurred in the Opposition and Notice of Errata.

## II. LEAD COUNSEL ACCEPTS RESPONSIBILITY FOR THE BRIEFING ERRORS.

In the Notice of Errata filed on December 10, 2025 (ECF No. 29) and Plaintiff's Response to Defendants' Reply to Plaintiff's Notice of Errata filed on March 4, 2026 (ECF No. 36), Lead Counsel acknowledged that the prior filings at issue contained citation errors and inaccuracies and attempted to explain to the Court and Defendants the nature of the inaccuracies. These errors included: (1) citing to real caselaw for propositions the cases did not stand for, including a mischaracterization of *Bates v. Sequel Youth & Family Services* as distinguishing *Toviave* when it did not; (2) inapposite citation to *Doe v. Moravian College* in the content of a forced labor and *Toviave* discussion; (3) a statutory rephrase presented as an actual quotation from 5 M.R.S.A. sec. 4701 (language used was not verbatim from the statute); (4) attribution of a pleading standard to Fed. R. Civ. P. 8(a)(2) directly rather than to *Conley v. Gibson* and *Bell Atlantic Corp. v. Twombly* (from which the quote derived); and (5) reliance on a factual allegation not contained in the First Amended Complaint. Further, Lead Counsel acknowledges that her Notice of Errata, while made in good faith to try to provide a prompt explanation, contained its own inaccuracies, including the specific proposition for which *Doe v. Howard* was originally cited. Lead Counsel accepts full responsibility for these errors.

## III. LEAD COUNSEL'S PERSONAL HISTORY AND CHARACTER DEMONSTRATE THAT THIS WAS AN ISOLATED LAPSE IN JUDGMENT AND NOT A PATTERN OF MISCONDUCT.

Lead Counsel has been a lawyer since 2003. In the more than twenty-two years she has been practicing law, Lead Counsel has never been sanctioned by a Court, the subject of a bar

complaint, referred to a disciplinary authority, or found to have engaged in professional misconduct. This is also the first time in her legal career she has had to respond to an order to show cause of this nature. The errors that occurred in the Opposition and Notice of Errata were the result of a lack of time and attention during an unusually demanding and stressful time in Lead Counsel's personal and professional life. Like all people, attorneys are human, and despite employing systems meant to prevent it, human errors occur especially when review and verification are not given adequate time and necessary focus.

Lead Counsel is sincerely remorseful for the briefing errors. Lead Counsel would like to again express her apology to the Court and Defendants for these inadvertent mistakes. She is also especially apologetic to her client, Jessica Fuller, whose serious claims arising from her experiences at Hyde School have been overshadowed by these procedural issues.[2]

## IV. CORRECTIVE ACTIONS TAKEN BY LEAD COUNSEL TO ENSURE THAT FURTHER BRIEFING ERRORS DO NOT OCCUR.

Since the briefing issues were first identified in early December 2025, Lead Counsel has taken several steps to prevent them from happening again. First, Lead Counsel's firm has assigned two additional partners to this case who have been admitted *pro hac vice* in this action. These two experienced partners will also personally review all filings being made in the case moving forward. Second, Plaintiff has retained new local counsel, Kevin Fitzgerald, who has entered his appearance and is actively involved in the case moving forward. Third, Lead Counsel conferred with the firm's associate attorneys and staff to ensure that all are aware of and comply with the firm's protocol that every citation be reviewed for accuracy before any filing is made. Fourth, Lead Counsel's firm has instituted a new policy that any contract attorneys that are employed must disclose the use of

[2] Lead Counsel has been fully transparent with Plaintiff about the briefing errors that occurred, including advising her on multiple occasions about what happened and the steps that Lead Counsel has taken to try to remedy these issues to ensure they do not occur again.

AI in legal research and writing at any stage of brief writing. Fifth, Lead Counsel has independently taken steps to better educate herself on the appropriate and ethical use of emerging technologies in the legal practice. Specifically, Lead Counsel has registered to attend a full-day continuing legal education program entitled "AI and Emerging Technology Conference 2026" on April 29, 2026. Lead Counsel will attend this program and will share the information and guidance obtained with the other attorneys and staff at her firm to ensure firm-wide adherence to best practices.

Moreover, since the filing of the Opposition in November 2025, Lead Counsel has also developed a significantly greater awareness of the risks associated with the use of AI in legal drafting and research. In the months following the filing, Lead Counsel has better familiarized herself with emerging caselaw addressing AI-related citation issues and has become more adept at identifying when AI may have been used in the drafting process. This increased awareness further ensures that similar issues will not occur in the future.

## V. STANDARD OF REVIEW

Under Rule 11, the standard for imposing sanctions is objective: whether a reasonable attorney, after conducting a reasonable pre-filing inquiry, would have concluded that the filing was warranted by existing law or a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law. *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024) (citing Fed. R. Civ. P. 11(b)(2)). Moreover, imposition of sanctions is discretionary with the Court, not mandatory. *Thomas v. Treasury Management Ass'n*, 158 F.R.D. 364, 369 (D. Md. 1994) (citing *Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir. 1994), in explaining that the 1993 amendment to Rule 11 "makes it clear that the imposition of sanctions is discretionary with the Court, not mandatory"). "[T]he primary, or 'first' purpose of Rule 11 is to deter future litigation abuse. *In re Kunstler*, 914 F.2d 505, 522-23 (4th Cir. 1990).

## VI. IF THE COURT WERE TO FIND SANCTIONS ARE APPROPRIATE, LEAD COUNSEL RESPECTFULLY SUGGESTS THAT A MEASURED RESPONSE IS REASONABLE UNDER THE CIRCUMSTANCES.

Courts evaluating briefing issues frequently distinguish between cases involving wholly fabricated authorities (*see e.g., Benjamin v. Costo Wholesale Corp.,* 779 F. Supp. 3d 341, 342-345 (E.D.N.Y. 2025)) and cases involving mischaracterization or misuse of existing sources (*see, e.g., In re Philips Recalled CPap, Bi-Level Pap, and Mechanical Ventilator Prods. Liab. Litig.*, 2026 U.S. Dist. LEXIS 74999, *3-4 (W.D. Pa. 2026)). The instant case involves the latter and not the fabrication of non-existent cases. The reported decisions further demonstrate that this distinction matters, both in evaluating culpability and in determining an appropriate response.

In cases where sanctions are deemed to be appropriate, courts employ a range of different measures to deter future improper submissions and punish the prior briefing errors depending on the nature of the conduct in the individual case. Sanctions can include but are not limited to: (1) a warning (*see e.g., In re Philips, supra*, at *3-4), (2) an order to take a continuing legal education course (*see e.g., Dastou vs. Holmes,* No. 2381-CV02212, 2025 WL 1907624, *3 (Middlesex Sup. Ct. June 25, 2025), (3) a monetary fine paid to the court (*see e.g., Benjamin v. Costo Wholesale Corp.,* 779 F. Supp. 3d 341, 351 (E.D.N.Y. 2025)), (4) written disclosure to the client with certification of compliance to the court (*see e.g.*, *Gauthier v. Goodyear Tire & Rubber Co.*, 2024 U.S. Dist. LEXIS 214029, *7-8 (E.D. Tex. Nov. 25, 2024)) and other measures including case dismissal[3] which is typically reserved for the most egregious errors and unapologetic conduct (*see e.g., Grant v. City of Long Beach*, 96 F.4th 1255 (9th Cir., March 7, 2024)).

In this case, viewing the totality of the circumstances, it would be reasonable for the Court to decline imposing sanctions or, alternatively, limit any sanction to a modest and non-punitive

[3] It is worth noting that Defendants have not sought dismissal of the action as a sanction for the briefing inaccuracies. *See* Defendants' Reply to Plaintiff's Responsive Filing (ECF No. 37 at 1) filed on March 12, 2026.

measure, such as a warning. Lead Counsel promptly conceded the citation issues once they were raised. There is also no evidence of bad faith or intent to mislead the Court. To the contrary, the record reflects that the errors arose from a lapse in diligence during an unusually demanding period involving significant personal and professional obligations of Lead Counsel. Additionally, Lead Counsel has already taken meaningful remedial steps, including (1) immediately filing the Notice of Errata, (2) acknowledging the briefing errors and accepting responsibility for them, (3) being forthcoming about the use of AI in the drafting process, (4) taking corrective actions to ensure these types of mistakes do not happen again including adding additional layers of attorney review for the firm's court filings, reinforcing the firm's citation verification protocols with other attorneys and staff, and implementing policies governing the use of AI in legal drafting, (5) registering for a continuing legal education program on the use of AI and other emerging technologies, and (6) advising Plaintiff about the briefing errors that occurred so she is fully informed about the situation. Nonetheless, Lead Counsel fully recognizes the Court's inherent power to order sanctions as it deems appropriate under the facts of this case.

## VII. LEAD COUNSEL'S SUGGESTION FOR MOVING FORWARD

Lead Counsel respectfully proposes a potential two-step approach for the Court's consideration to remedy the prior briefing issues and ensure the integrity of future proceedings in this matter. First, an immediate priority should be to ensure that the Court has an accurate, carefully verified Opposition so that the Court can issue a decision on the Motion to Dismiss. Lead Counsel is prepared to submit a corrected brief in short order in whatever manner the Court directs.

Second, if the Court determines that a more significant sanction than a warning is appropriate, Lead Counsel respectfully submits that a modest monetary fine and providing a copy of the Court's ruling to Plaintiff and certification to the Court of compliance would be sufficient

to serve the purposes of Fed. R. Civ. P. 11.

**CONCLUSION**

Accordingly, Lead Counsel respectfully requests that the Court permit the filing of a corrected Opposition and, if any sanction is imposed, that it be measured and proportionate under the circumstances.

Dated: April 28, 2026

Respectfully Submitted,

*/s/ Kelly A. Guagenty*

Kelly A. Guagenty (MA BBO 658872)
*(Admitted pro hac vice)*
JUSTICE LAW COLLABORATIVE, LLC
210 Washington Street
North Easton, MA 02356
Phone: (508) 230-2700
Email: kelly@justicelc.com

*Attorney for Plaintiff Jessica Fuller*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Kelly A. Guagenty*
Kelly A. Guagenty

# Attachment

#59

**COMMONWEALTH OF MASSACHUSETTS**

**MIDDLESEX, ss.**

**SUPERIOR COURT**
**CIVIL ACTION**
**NO. 2381CV02212**

**ROBERT DASTOU**

**vs.**

**KATHRYN HOLMES**

**FINDINGS, RULINGS, AND ORDER IMPOSING SANCTIONS**

The Court held a hearing to address the suspected misuse of generative artificial intelligence by an attorney in court filings. In reviewing motions in limine and proposed jury instructions filed by Defendant's counsel, I identified citations to cases that do not exist, a quotation attributed to a real case that was not contained in the opinion, and misstatements as to the holding of real cases. One proposed jury instruction introduced what sounded like a legitimate legal concept, but that concept was fictitious.

The underlying case involved breach of contract and conversion claims against the defendant who, while moving out of the apartment that she had shared with the plaintiff after a difficult break-up, took possession of their dog and denied the plaintiff access to the dog. A jury trial was held, and the jury found for the plaintiff on his claims and for the defendant on one counterclaim. Ultimately, the dog was awarded to the defendant.

Generative AI presents significant risks in legal writing. Of concern is the potential for AI to generate fabricated legal authorities, including non-existent cases and statutes. These fictitious legal authorities are called "hallucinations," because the language model produces content that is fictitious but presented as it if it were true.[1] This occurs because generative AI models are trained to predict the most likely next word in a sequence based on patterns in massive text datasets. Even when referencing real case law, generative AI lacks the ability to perform nuanced legal reasoning which may result in misinterpreting case law.

Lawyers have a duty to provide competent representation of their clients and demonstrate candor towards the tribunal. Mass. R. Prof. Conduct 1.1 & 3.3. This extends to submitting filings

---

[1] Fictitious quotes are another example of a hallucination.

that accurately state the law and present arguments that supports their clients' interests. By submitting motions and briefs that contain hallucinations and misstatements of the law, the lawyer violates their professional obligations. If a lawyer uses generative technology, they may not blame errors in their work product on the technology. Any document filed with the court must be thoroughly reviewed to ensure accuracy and the protection of client interests.

I credit that this was the first time that the attorney had used generative AI and that she was, and still is, confused by the technology. She was not aware that generative AI can produce hallucinations. She explained that she has a bank of motions in limine that she uses in trial matters, both civil and criminal, and that she had used ChatGPT to check spelling, grammar, and to format her motions.[2, 3] She explained that she was not aware that ChatGPT had altered her motions beyond spelling, grammar, and formatting.

As to the confounding jury instruction, the attorney claimed that it was a model instruction that she found on Westlaw and promised to produce it for the court. The proposed instruction looked like a model instruction in its structure and its use of footnotes for citing case law, and due to its seeming legitimacy, I wasted time mid-trial looking for the origin of this instruction to no avail. Counsel did not produce the model instruction and instead explained in an affidavit that she had taken the superior court's model jury instructions and "put them into ChatGPT for formatting." The result was an instruction that referenced a fictitious legal concept and included a footnote with both a fictious case and a real case that did not support the concept. Counsel attempted to explain that the real case indirectly supported the premise of her proposed jury instruction, which it did not.

The hallucinations contained in the pleadings (fictitious citations and quotations) are obvious results of generative AI. As to the misstatements of holdings in real cases, it is difficult for me to discern whether the inadequacies are the result of poor case analysis or the misuse of generative AI. Misuse of generative AI is sanctionable; poor drafting is not.

I appreciate Counsel's contrition regarding her use of generative AI and her sincere apology to the Court. I appreciate that she admitted to using the tool, although it was clearly used for more than spelling, grammar, and formatting. I credit that she has learned from her error and

---

[2] Counsel did not create an account with ChatGPT prior to using it, which would have maintained a history of inquiries.

[3] I noticed an assortment of citations to both criminal and civil cases in motions on this civil matter.

believe her when she said that she will not use generative AI again in her filings. Unprompted, Counsel proposed and implemented an appropriate sanction: she did not bill her client for her work on the motions in limine and jury instructions and for her time in court arguing those motions. Notwithstanding the poor quality of the motions, her client did not fare worse at trial because of the motions. The motions did not have an impact on the defendant's outcome at trial.

As an additional sanction, I am ordering Defendant's counsel to complete a CLE course offered by MCLE titled: How to Draft Civil Jury Instructions When a Model One Does Not Exist: The 60-Minute Lawyer.[4] The program is an on-demand webcast and Counsel has six months to submit a sworn statement to the court verifying completion of the program.

Overreliance on AI risks deskilling legal practitioners, especially attorneys who need to develop critical thinking and legal writing skills. Given these dangers, any use of generative AI in legal work must be approached with caution and careful supervision. Lawyers who assume the risk of using generative AI must establish a thorough review process to ensure accuracy, ethical compliance, and protection of client interests.

**ORDER**

For the reasons stated, it is hereby **ORDERED** that Defendant's Counsel:

1. Is enjoined from billing Defendant for time spent preparing motions in limine and jury instructions for this matter and for time in court litigating these motions; and
2. Shall complete MCLE's online program, "How to Draft Civil Jury Instructions When a Model One Does Not Exist: The 60-Minute Lawyer," and submit a sworn statement to the Clerk of Court affirming its completion no later than six months from the date that this order issues.

Keren Goldenberg
Justice of the Superior Court

[4] https://www.mcle.org/product/catalog/code/2200324WBA