# Exhibit A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:26-cv-01885-MWC-SP Date: June 4, 2026

Title: Serena Woodhouse v. Riverview Christian Academy *et al.*

Present: The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings: (IN CHAMBERS) ORDER DENYING DEFENDANTS' MOTION TO DISMISS (DKT. [18])**

Before the Court is Defendants Riverview Christian Academy and Teen Rescue, Inc.'s (collectively, "Defendants") motion to dismiss Plaintiff Serena Woodhouse's ("Plaintiff") complaint. *See* Dkt. # 18 ("*MTD*"). Plaintiff opposed. *See* Dkt. # 24 ("*Opp'n*"). The Court finds this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. After considering the papers, the Court **DENIES** Defendants' motion.

I. Background

Plaintiff's complaint, *see* Dkt. # 8 ("*Compl.*"), alleges as follows:

Riverview Christian Academy ("RCA") operates a residential boarding facility in Whitmore, California, with Teen Rescue, Inc. as its parent corporation.[1] *Id.* ¶¶ 4, 7. Defendants marketed RCA as a therapeutic center for troubled teens. *Id.* ¶ 2.

In her early years, Plaintiff experienced instability and trauma, including abandonment by her mother when Plaintiff was three years old. *Id.* ¶ 15. Plaintiff's father and stepmother raised her in a hostile and abusive environment. *Id.* ¶ 16. Plaintiff

---

[1] Plaintiff's complaint also lists Does 1–10 as defendants, describing those defendants as "individuals who owned, operated, managed, supervised, or were otherwise responsible for conditions at [RCA] during the relevant time period, as well as entities that exercised control" over RCA and Teen Rescue. *Id.* ¶ 8.

struggled with depression, anxiety, ADHD, suicidal ideation, and self-harming behaviors; still, Plaintiff was generally a good student. *Id.* ¶¶ 17–18.

On April 28, 2014, when Plaintiff was fourteen years old, her father and stepmother entered her room at 5:00 a.m. and instructed her to get in the car. *Id.* ¶ 21. They took Plaintiff to RCA, which was located at the top of a mountain, far away from any neighboring towns. *Id.* ¶ 22. Plaintiff remained at RCA from April 28, 2014, to September 18, 2015, and from December 23, 2015, to February 16, 2016. *Id.* ¶ 24.

Before sending Plaintiff to RCA, her father and stepmother told Defendants that they considered Plaintiff to be a "problem child." *Id.* ¶ 25. Defendants assured Plaintiff's father and stepmother that she would receive help and support at RCA, and that RCA would make Plaintiff "happy and healthy." *Id.* ¶ 26. RCA represented itself as a school that would reform teens with behavioral issues, describing the school as a "bridge to a new way of thinking and maturity as a teenager." *See id.* ¶¶ 29–30. But Defendants knew that struggling teens would be susceptible to coercion and abuse, and RCA staff attempted to psychologically and emotionally "break down" Plaintiff. *See id.* ¶¶ 34, 36. Defendants utilized tools of abuse, neglect, humiliation, isolation, surveillance, and forced labor, *see id.* ¶ 37, and Defendants never described these practices to parents of prospective students, *see id.* ¶ 38.

One component of life at RCA was frequent discipline, including for "minor mistakes" or violations of "unspoken rules." *Id.* ¶ 41. Defendants disciplined Plaintiff nearly every day, usually requiring her to "spend hours writing repetitive lines about perceived mistakes, with the length and severity" of those punishments being at the discretion of RCA staff. *See id.* ¶¶ 42–43. Defendants also subjected Plaintiff to "restricted communication," forbidding her from speaking with anyone and forbidding others from acknowledging her. *See id.* ¶ 44. Defendants encouraged children, including Plaintiff, to monitor one another and report perceived infractions. *Id.* ¶ 48.

Plaintiff was unable to contact anyone outside RCA on her own volition. There was only one landline telephone available on campus, and the campus lacked cell service and internet access. *Id.* ¶¶ 51–52. For the first eight or nine months at RCA, Defendants prohibited Plaintiff from calling her family. *Id.* ¶ 54. After receiving the opportunity to call her family, Defendants limited the calls to once per month for fifteen minutes at a time. *Id.* ¶ 56. RCA staff dialed and monitored Plaintiff's calls. *Id.* ¶ 57. Later, Defendants allowed Plaintiff to write a weekly letter to her family, though RCA staff read the letters

before sending them. *See id.* ¶¶ 57–58. If staff identified anything in Plaintiff's letters as being "negative" toward the facility, staff would force Plaintiff to redact—and sometimes entirely re-write—her letter. *Id.* ¶ 60. RCA prohibited visitors to Plaintiff, *see id.* ¶ 61, and the facility's limited contact exacerbated Plaintiff's psychological and emotional challenges, *see id.* ¶ 63.

Defendants required Plaintiff to participate in cleaning and meal preparation for several hours each day. *See id.* ¶¶ 66–67. Defendants also forced Plaintiff and other students to deep clean the dorms and dining hall. *See id.* ¶ 68. One component of Plaintiff's time at RCA was unpaid work for "Wolf Creek Newfoundlands," a business Defendants operated. *See id.* ¶¶ 69–70. Located on the RCA campus, Wolf Creek Newfoundlands sold Newfoundland dogs and Bengal cats. *See id.* ¶¶ 71–72. Defendants forced students—including Plaintiff—to care for and raise several litters of these animals, including assisting mothers during birth, bottle-feeding and weighing newborn animals, and providing constant care without oversight. *See id.* ¶ 72. RCA staff required students to watch and care for litters in rotating shifts, often forcing students to switch shifts in the middle of the night. *See id.* ¶ 73. The shifts would last anywhere between four and six hours, and Plaintiff would regularly work two shifts each day. *Id.* ¶ 74. Teen Rescue received approximately $5,000 per dog or cat under Plaintiff's care, without compensating Plaintiff. *See id.* ¶¶ 80, 148. The shifts sometimes created physical risks to Plaintiff—for example, at one point an unvaccinated cat under Plaintiff's care bit her. *Id.* ¶ 77. Rather than taking Plaintiff to a doctor, Defendants instructed her to "rub salt in her wound." *Id.* And despite these shifts, Defendants still required Plaintiff to participate in cooking, cleaning, schoolwork, and other mandated activities. *Id.* ¶ 75. Defendants did not allow Plaintiff to refuse participation, subjecting Plaintiff to punishment—like writing "lines" or being subject to restricted communication—when she attempted to resist working. *See id.* ¶¶ 81–85.

Defendants subjected Plaintiff to "psychological manipulation," including by telling Plaintiff that she was the cause of her family's problems and the source of family instability. *See id.* ¶¶ 88, 90. But Defendants did not provide medical attention or mental health support, *see id.* ¶ 94, instead refusing to continue Plaintiff's prescriptions for anxiety and depression, *see id.* ¶¶ 95–96. "Teachers" at RCA did not have the qualifications or training necessary to provide legitimate instruction, especially for students with severe mental health challenges. *See id.* ¶ 114. Still, Teen Rescue reaped significant revenue,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:26-cv-01885-MWC-SP Date: June 4, 2026

Title: Serena Woodhouse v. Riverview Christian Academy *et al.*

including $1,227,176 in tuition revenue in 2014, $1,333,891 in tuition revenue in 2015, and $1,727,597 in 2016. *See id.* ¶¶ 122, 124, 126.

As a result of Defendants' conduct, Plaintiff continues to suffer psychological harms, including: suicidal ideation; night terrors; panic attacks; self-harm; insomnia; flashbacks; triggers; hyperarousal; excessive and chronic worry; and hopelessness. *See id.* ¶ 134. Plaintiff also suffers from chronic pain from physical conditions, including gastroesophageal reflux disease, which her post-traumatic stress exacerbates. *See id.* ¶ 135.

The complaint lists twelve causes of action: (I) involuntary servitude based on direct liability under 18 U.S.C. §§ 1584 and 1595; (II) involuntary servitude based on beneficiary liability under 18 U.S.C. §§ 1584 and 1595; (III) involuntary servitude based on vicarious liability under 18 U.S.C. §§ 1584 and 1595; (IV) forced labor based on direct liability under 18 U.S.C. §§ 1589 and 1595; (V) forced labor based on beneficiary liability under 18 U.S.C. §§ 1589 and 1595; (VI) forced labor based on vicarious liability under 18 U.S.C. §§ 1589 and 1595; (VII) trafficking with respect to forced labor under 18 U.S.C. §§ 1590 and 1595; (VIII) trafficking with respect to forced labor based on beneficiary liability under 18 U.S.C. §§ 1590 and 1595; (IX) trafficking with respect to forced labor based on vicarious liability under 18 U.S.C. §§ 1590 and 1595; (X) attempted violations and conspiracy to commit violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") under 18 U.S.C. §§ 1584, 1589, 1590, 1594, and 1595; (XI) violations of the Child Abuse Victims' Rights Act under 18 U.S.C. § 2255; and (XII) forced labor under California Civil Code § 52.5.

After Plaintiff initially filed suit in Riverside County Superior Court, Defendants removed to this Court on April 16, 2026. *See* Dkt. # 1. Defendants filed their motion to dismiss on May 4, 2026. *See MTD*.

## II. Legal Standard

Rule 8 requires a complaint to clearly establish the claims and parties such that a defendant would have "no difficulty in responding to the claims with an answer and/or with a Rule 12(b)(6) motion to dismiss." *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131–32 (9th Cir. 2008). Pleadings that are "verbose, confusing and conclusory" are subject to dismissal. *Nevijel v. N. Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981). A plaintiff fails to comply with Rule 8 if "all defendants are lumped together in a

single, broad allegation." *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff. *See Turner v. City & Cnty. of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The court then determines whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, a cause of action's elements that are "supported by mere conclusory statements[] do not suffice." *Id*. Accordingly, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

## III. Discussion

### A. *In Loco Parentis*

Defendants argue that the Court should dismiss Plaintiff's suit because they were acting *in loco parentis*, justifying their treatment of Plaintiff. To be sure, "[w]hen parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995). But this doctrine does not excuse Defendants' actions here.

Defendants rely on *United States v. Toviave*, 761 F.3d 623, 628 (6th Cir. 2014). *See MTD* at 4–6. *Toviave*, however, is both non-binding and unpersuasive. There, the defendant brought four young relatives from Togo to live with him in Michigan. *See* 761 F.3d at 624. The defendant required the children to cook, clean, and do the laundry, and he occasionally made the children babysit for his girlfriend and relatives. *See id.* "Toviave would beat the children if they misbehaved or failed to follow one of Toviave's many rules." *See id.* Still, the Sixth Circuit reasoned that the defendant did not subject the children to forced labor, because "[t]he mere fact that Toviave made the children complete

chores [did] not convert Toviave's conduct—what essentially amounts to child abuse—into a federal crime." *See id.* Central to that court's analysis was that "forcing children to do household chores cannot be forced labor without reading the statute as making most responsible American parents and guardians into federal criminals." *See id.* at 625. Moreover, "requiring a child to perform those same chores by means of child abuse does not change the nature of the work," because "if it did, the forced labor statute would federalize the traditionally state-regulated area of child abuse." *Id.*

Defendants apply *Toviave* by arguing that "the main differences between Plaintiff and the children in *Toviave* are that she was not physically beat, she was tasked with the care of animals rather than other children, and that her parents presumably wanted help disciplining her . . . ." *See MTD* at 5. But Defendants ignore several other facts—most importantly, that Defendants profited off Plaintiff's labor. They did so by selling Newfoundland dogs and Bengal cats for $5,000 each after forcing Plaintiff and other students to work between eight and twelve hours per day raising those animals for free. *See Compl.* ¶¶ 74, 80, 148. They also ran a boarding school based on those same students' labor, reaping over one million dollars each year that Plaintiff attended. *See id.* ¶¶ 122, 124, 126. Defendants ask the Court to conclude that a parent taking the same actions would be permissible, but the Court cannot do so.

B. Involuntary Servitude Claims (Counts I–III)

18 U.S.C. § 1595 provides a private right of action to victims of violations of Chapter 77 of Title 18, which includes Sections 1584 and 1590. *See Hernandez v. Attisha*, No. 09-CV-2257-IEG (WMC), 2010 WL 816160, at *2 (S.D. Cal. Mar. 5, 2010). Section 1595 states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys['] fees.

18 U.S.C. § 1595. Section 1584 punishes anyone who "knowingly and willfully holds to involuntary servitude . . . any person for any term . . . ." 18 U.S.C. § 1584. Some courts have defined involuntary servitude as "a condition of enforced compulsory service of one to another," *Corrigan v. Buckley*, 271 U.S. 323, 330 (1926), and "action by a master causing a servant to have, or believe he or she has, no way to avoid continuing to work for the master," *Del Elmer v. Metzger*, 967 F. Supp. 398, 402 (S.D. Cal. 1997) (citing *United States v. Shackney*, 333 F.2d 475 (2d Cir. 1964)).

Defendants argue that the Court should dismiss Count I (involuntary servitude based on direct liability) because Defendants did not force Plaintiff to do anything more than "a parent would ask a child to do, while being well within said parent's rights." *See MTD* at 6. Without providing any additional authority, Defendants rest on their *in loco parentis* argument. *See id.* ("The Court should not interpret the TVPRA to mean that children cannot be made to perform household chores by adults acting *in loco parentis*."). But the Court has already rejected this assertion, identifying that Defendants' requirements of Plaintiff far exceeded the bounds of household chores—instead, Plaintiff describes a lucrative entity relying on the unpaid labor of RCA students. And Plaintiff's allegations—including that Defendants made this unpaid labor compulsory—fall within the meaning of involuntary servitude. *See Corrigan*, 271 at 330; *Del Elmer*, 967 F. Supp. at 402; *see generally Compl.* Accordingly, the Court cannot dismiss Plaintiff's Count I.

Defendants' arguments as to Count II (beneficiary liability) and III (vicarious liability) are derivative of their argument on Count I. *See MTD* at 6 ("For the reasons explained above, Plaintiff fails to state a claim for involuntary servitude. Accordingly, the remaining claims for different liability based on said servitude should also be dismissed for failure to state a claim."). Because Defendants did not prevail on their Count I argument, their contentions on Counts II and III likewise fail. Plaintiff's complaint alleges that Defendants benefitted from Plaintiff's involuntary servitude by reaping $5,000 per dog and cat sold and collecting more than one million dollars in revenue each year from RCA. And the complaint states that RCA employees—for whom Defendants would be vicariously liable—forced Plaintiff to work as she did. Thus, Counts II and III survive.

C. Forced Labor Claims (Counts IV–IX)

Plaintiff's claim for forced labor derives from 18 U.S.C. § 1589, which prohibits obtaining the labor or services of any person by any of the following means: (1) threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of

serious harm to that person or another person; (3) abuse or threatened abuse of law or legal process; or (4) by means of any scheme intended to cause a person to believe that if she did not perform this labor, that she or another person would suffer serious harm or physical restraint. *See* 18 U.S.C. § 1589(a). The statute defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person . . . to perform or continue performing labor or services . . . ." *See* 18 U.S.C. § 1589(c)(2).

Defendants maintain that Plaintiff cannot plead a forced labor claim for two reasons. First, they again refer to their arguments that "the alleged labor were household chores and care of animals," which "do[es] not exceed anything a parent would ask a child to do . . . ." *See MTD* at 7. But the Court has already determined that parents cannot run businesses by forcing their children to work through the night, doing tasks that far exceed normal household chores. *See supra* Sections III.A, III.B. Second, Defendants aver, "the purported psychological harm Plaintiff describes does not amount to anything more than life and light discipline at a boarding school." *See MTD* at 7.

But the complaint describes conditions much more severe than those of a boarding school. Plaintiff could not contact her family for at least her first eight months on campus, despite her history of depression, anxiety, ADHD, and suicidal ideation. *See Compl.* ¶¶ 17, 54, 62. The RCA campus lacked cell service and internet, and RCA staff monitored Plaintiff's phone calls and required her to omit any negative reference to the facility. *See id.* ¶¶ 56–60. Defendants' punishments exceeded the bounds of normal school environments—Plaintiff's complaint describes complete isolation, including staff forbidding any student from acknowledging her. *See id.* ¶ 44. And staff fostered an environment where students would monitor one another for any perceived infraction. *See id.* ¶ 48. Defendants precluded Plaintiff from receiving medical care despite the potential for serious injury stemming from an unvaccinated cat biting her. *See id.* ¶ 77. Students also regularly worked eight to twelve hours each day caring for the pets to be sold—including throughout the night—causing sleep deprivation. *See id.* ¶ 74. These allegations are at least plausible to qualify as serious harm under the statutory scheme.

Defendants analogize Plaintiff's case to *Headley v. Church of Scientology International*, 687 F.3d 1173 (9th Cir. 2012), *see MTD* at 7–8, though the analogy is inapt. In *Headley*, two adults brought forced labor claims under the Trafficking Victims Protection Act by stating that the Church of Scientology prohibited them from leaving the ministry through threat of psychological harm. *See Headley*, 687 F.3d at 1178. The

plaintiffs there described the psychological harm as "lost contact with family, friends, or each other," which the Ninth Circuit found insufficiently serious under the statute. *See id.* at 1180. And the panel identified that the potential harm the *Headley* plaintiffs faced was only speculative, noting that "the warning of such a consequence is not a 'threat.'" *See id.* By contrast, Plaintiff's harm here was not speculative at all—Defendants routinely subjected Plaintiff to complete isolation and sleep deprivation. Moreover, Plaintiff was at RCA involuntarily, unlike the plaintiffs in *Headley*, who joined on their own volition and could leave at any time. *See id.* The *Headley* plaintiffs were adults, while Plaintiff here was a minor, for which the Court must account when evaluating what constitutes "serious harm." Lastly, the Ninth Circuit was evaluating *Headley* at the summary judgment stage—here, Plaintiff need only provide plausible allegations of serious harm. Having done so, her forced labor claim must proceed.

Defendants argue that the Court should dismiss Plaintiff's Counts V through IX, since those claims derive from Plaintiff's claim under Count IV. Because the Court declined to adopt Defendants' reasoning as to Count IV—and Defendants offer no additional arguments as to Plaintiff's other forced labor claims—it must do the same with respect to Counts V through IX. Accordingly, all forced labor claims survive.

D. Attempt and Conspiracy (Count X)

Plaintiff's complaint adequately pleads attempt. "Attempt convictions require . . . evidence that the defendant both intended to violate the statute and took a substantial step toward completing the violation." *United States v. Lindsey*, 742 Fed. Appx. 280, 281 (9th Cir. 2018) (internal quotation marks and citation omitted). To show conspiracy, a plaintiff must plead an agreement and an overt act in furtherance of the conspiracy. *See, e.g.*, *Hernandez v. Balakian*, 480 F. Supp. 2d 1198, 1214 (E.D. Cal. 2007).

Defendants assert that the Court must dismiss Plaintiff's claims for attempt and conspiracy because her claims are "conclusory." *See MTD* at 10. To be sure, Defendants highlight allegations in Plaintiff's complaint that are conclusions, but these allegations are not the only basis for Plaintiff's attempt claim. The complaint refers to substantial steps through the acts that Defendants required of Plaintiff, including raising expensive dogs and cats and working through the night. *See Compl.* ¶¶ 74, 80, 148. And because Plaintiff pleads Count X as attempt and conspiracy, establishing attempt allows the claim to

survive.[2] *See Am. Int'l Indus. v. Brenntag Specialties, Inc.*, No. 2:21-cv-03888-RGK-KK, 2021 WL 5264239, at *3 (C.D. Cal. Aug. 30, 2021) ("Although a defendant can move a court under Rule 12(b)(6) to dismiss part of a complaint, a defendant cannot use Rule 12(b)(6) to dismiss part of a claim." (emphasis omitted) (citations omitted)).

Still, Defendants argue that "an ordinary commercial relationship does not constitute participation in a trafficking venture." *See MTD* at 11 (citing *A.G. v. Northbrook Indus., Inc.*, 171 F.4th 1257 (11th Cir. 2026)). They contend that "Plaintiff relies on mere labels and the amounts on Defendants' tax filing," and that she "fails to present well-substantiated allegations linking Defendants to the alleged trafficking activities, or anything more than a passive business relationship." *See id.* But Plaintiff's complaint alleges that Defendants operated Wolf Creek Newfoundlands by requiring minors to work excessive hours through the night. *See Compl.* ¶¶ 69–74, 80, 148. They also ran RCA itself by forcing students to clean and prepare meals. *See id.* ¶¶ 66–67. Though these latter activities in moderation would not necessarily create an inference of trafficking, Plaintiff's allegation that Defendants relied almost entirely on student labor is sufficient at this stage to plausibly allege a statutory violation. Moreover, the incentive driving the businesses' labor was not payment, but psychological punishment.

Defendants refer to the elements of 18 U.S.C. § 1595(a) to dispute beneficiary liability, which include knowing benefit, participation in the venture, violation of the TVPRA, and knowledge of the violation. *See MTD* at 11 (citing *Jane Doe #1 et al. v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021)); *see also* 18 U.S.C. § 1595(a). Plaintiff has alleged that Defendants participated in the operation of RCA and Wolf Creek Newfoundlands while knowing that they derived $5,000 per pet and over one million dollars in tuition revenue each year. As discussed previously, Plaintiff's complaint plausibly alleges violations of the TVPRA. *See supra* Sections III.A, III.B. Lastly, it is reasonable to infer that Defendants would be aware that they could not extract the unpaid labor of minors to propagate their businesses, establishing a knowing violation. *See Halliwell v. A-T Sols.*, 983 F. Supp. 2d 1179, 1182 (S.D. Cal. 2013) ("In deciding a motion to dismiss, the court draws all reasonable inferences in favor of the nonmoving party." (citation omitted)).

[2] Because it need not do so, the Court does not reach whether Plaintiff has established conspiracy.

Accordingly, the Court cannot dismiss Count X.

E. Claim Under 18 U.S.C. § 2255 (Count XI)

18 U.S.C. § 2255 offers a civil remedy for minors who suffer personal injuries stemming from forced labor under 18 U.S.C. §§ 1589 and 1590. *See* 18 U.S.C. § 2255; *Hall v. Wells Fargo & Co.*, No. EDCV 17-02465 JGB (KKx), 2018 WL 6016143, at *2 (C.D. Cal. Feb. 22, 2018). Defendants rely on only their previous arguments, stating that Plaintiff has not plausibly pled forced labor as a predicate offense. Because the Court has already rejected this argument, *see supra* Section III.C, it must do so again. Thus, because Plaintiff's complaint plausibly pleads forced labor violations, Count XI under 18 U.S.C. § 2255 survives.

F. California Trafficking Claim (Count XII)

California Civil Code § 52.5 allows a plaintiff to bring a civil claim if a defendant subjected her to human trafficking under California Penal Code § 236.1. *See* Cal. Civ. Code § 52.5. Section 236.1 prohibits depriving or violating another person's personal liberty "with the intent to obtain forced labor or services." *See* Cal. Civ. § 236.1(a).

Defendants refer to their previous arguments. They state that "Plaintiff's allegations regarding the labor or work . . . required do not amount to more than household chores and boarding school life," noting that RCA could act *in loco parentis*. *See MTD* at 13. The Court has already determined that Defendants' alleged actions far exceeded household chores and boarding school life. *See supra* Sections III.A, III.B, III.C. Plaintiff's complaint also explains that Defendants stripped Plaintiff of all outside contact and the ability to leave, and they closely monitored and censored Plaintiff's later eventual contact. *See Compl.* ¶¶ 51–54, 56–58, 60–63. And the complaint plausibly alleges that Defendants intended to operate their businesses off students' labor by inflicting psychological punishment against any student who failed to comply. Accordingly, the Court cannot dismiss Plaintiff's Count XII.

IV. Conclusion

For the foregoing reasons, the Court **DENIES** Defendants' motion to dismiss. The June 5, 2026, hearing is **VACATED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 5:26-cv-01885-MWC-SP Date: June 4, 2026

Title: Serena Woodhouse v. Riverview Christian Academy *et al.*

**IT IS SO ORDERED.**

:

**Initials of Preparer** TJ